# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

CHARLES CHITAT NG,
Defendant and Appellant.

S080276

Orange County Superior Court
94ZF0195

July 28, 2022

Justice Groban authored the opinion of the Court, in which Justices Corrigan, Liu, Kruger, Jenkins, Guerrero, and Pollak* concurred.

---

*  Presiding Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. NG

S080276


Opinion of the Court by Groban, J.


A jury convicted defendant, Charles Chitat Ng, of 11 counts of first degree murder against Sean Dubs, Deborah Dubs, Harvey Dubs, Clifford Peranteau, Jeffrey Gerald, Michael Carroll, Kathleen Allen, Lonnie Bond, Sr., Lonnie Bond, Jr., Robin Scott Stapley, and Brenda O'Connor. (Pen. Code, § 187.)[1] The jury found true the multiple-murder special circumstance. (§ 190.2, subd. (a)(3).) The jury returned a death verdict, and the trial court sentenced defendant to death in 1999. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

## I. FACTUAL BACKGROUND

Between July 1984 and April 1985, 12 people went missing from Northern California. In July 1984, Harvey Dubs, his wife Deborah, and their 16-month-old son Sean disappeared from their San Francisco apartment. In November 1984, Paul Cosner disappeared from San Francisco; he tried to sell his car on his way home from work and was never seen again. In January 1985, Clifford Peranteau failed to show up for work in San Francisco and was never seen again. One month later, in February, Jeffrey Gerald disappeared from San Francisco after telling his roommate he was going to do a "side job" of helping

---

[1]    All further undesignated statutory references are to the Penal Code.

1

someone move.  In April 1985, Kathleen Allen disappeared from Milpitas after getting into a car with a stranger who was supposed to take her to see her boyfriend, Michael Carroll, in Lake Tahoe.  Carroll also disappeared.  Later that month, Lonnie Bond, Sr. (Bond), his fiancée Brenda O'Connor, and their infant son Lonnie Bond, Jr. (Lonnie), disappeared from the house they rented in Wilseyville.  Their friend Scott Stapley, who often visited, also disappeared.[2]

These disappearances remained unsolved and seemingly unrelated until defendant, along with accomplice Leonard Lake, attempted to shoplift a vise from a lumber store in June 1985. While Lake spoke with police officers, defendant walked away from the scene.  After officers searched his vehicle, Lake was arrested for possession of a firearm and subsequently committed suicide while in police custody.  Officers then began searching for defendant.  This search led officers to Lake's property in Wilseyville, where they uncovered evidence that connected defendant and Lake to the missing persons.

Shortly after Lake's arrest, defendant fled to Canada.  He was arrested in a shoplifting incident a few weeks later. Defendant was ultimately extradited in 1991, at which time proceedings in the present case began.  After resolving dozens of motions filed by the defense, a venue change, and a competency hearing, trial began in September 1998.  The jury returned its verdicts on February 24, 1999.  The penalty phase began on March 8, 1999; the jury returned a sentence of death on April 30, 1999.

---

[2]     Stapley's full name is Robin Scott Stapley, but he generally went by the name Scott Stapley.

**A. Guilt Phase**

*1. Prosecution Case*

*a. Lake's Capture*

On June 2, 1985, John Kallas visited South City Lumber Company in South San Francisco. Kallas had been a reserve police officer for the South San Francisco Police Department for 28 years. While at the lumber store, he saw an Asian man, later identified as defendant, carrying a large vise that was sold at the store. Suspicious that the man was shoplifting, Kallas continued observing defendant as he walked past him, continued to walk past the checkout counter, and exited the store with the merchandise. After a salesclerk confirmed that they had not sold that vise to defendant, Kallas and one of the clerks walked outside. Approximately 50 feet away, he observed the Asian man standing by the passenger door of a gold Honda. The man then started walking toward the street and away from the store. Kallas walked over to the vehicle and saw a box of wrenches in the back seat but did not see the vise. He saw the trunk was ajar, opened it, and saw the missing vise. Kallas called the police department. While he was on the phone, a bearded man, later identified as Lake, approached Kallas and started talking to him. He asked if he could pay for the vise; Kallas told him to speak to a clerk because he did not work there.

South San Francisco Police Officer Daniel Wright responded to the store. Wright ran the license plate for the vehicle and found that it was registered to Bond. Wright looked inside the open trunk and saw the vise, as well as a backpack. He opened the backpack and found a semiautomatic gun and a silencer. He ran the serial number for the gun through the

computer system and found it was registered to R. Scott Stapley. He put the gun and silencer back in the backpack as Lake approached. Lake explained that he paid for the vise that his friend took. When Wright asked for Lake's name, Lake identified himself as R. Scott Stapley and provided Wright with a California driver's license bearing the name Robin Scott Stapley. Lake acknowledged that the vehicle belonged to Bond and said that Bond was "up north."

Wright arrested Lake for possession of a firearm that had a silencer. At the police station, Lake ingested cyanide and started convulsing. He was taken to the hospital where he died a few days later. Before convulsing, Lake wrote a note to "Lyn" that stated, in part, "I love you. I forgive you. Freedom is better than all else. Tell Fern I'm sorry . . . I'm sorry for all the trouble."

Police officers subsequently ran the vehicle identification number from the Honda and learned it was associated with a missing person, Paul Cosner. After that, the South San Francisco Police Department turned the vehicle over to Inspector Irene Brunn of the San Francisco Police Department. She worked in the missing persons unit and had been investigating Cosner's disappearance. Inside the vehicle, Inspector Brunn found a Pacific Gas and Electric Company bill addressed to Lake's ex-wife Claralyn B. The envelope listed an address in Wilseyville, a town in Calaveras County, approximately three hours west of San Francisco.

### b. Wilseyville Property

Inspector Brunn contacted Claralyn on June 3 hoping she could help the police find defendant. Inspector Brunn and Claralyn met at a local café and made arrangements to meet at

the Wilseyville property the following day. Claralyn gave Inspector Brunn a key and permission to search the premises. Inside the living room, Inspector Brunn discovered two pieces of equipment, including a VCR, that had been missing from the Dubs residence; unrelated to the Cosner case, Inspector Brunn had also been investigating the Dubs family disappearance. She called her office, provided them the serial number for the VCR, and confirmed it was from the Dubs residence.

At that point, Claralyn revoked her permission for the officers to search the property. The officers left the house, secured the premises, and obtained a search warrant.

An investigation of the Wilseyville property subsequently commenced. The investigation lasted five weeks and involved four law enforcement agencies. Investigators discovered thousands of bone and tooth fragments buried throughout the property. At least four dental specimens belonged to a child under the age of three years old. After reviewing all the found fragments, two forensic anthropologists concluded that they belonged to at least four adults, one child, and one infant. "Many hundreds" of the bone fragments showed various degrees of burning. Investigators also found a child's liver buried on the property.

In addition to the main house, there was also a bunker on the Wilseyville property. The bunker contained three rooms, two of which were behind a hidden doorway. One of the hidden rooms contained a bed, a desk, dressers, and some food. The second room was approximately seven by three feet and enclosed by a wooden door. Inside that room was a small bed with a foam pad on it, a plastic bucket, a roll of toilet paper, and a small

lamp. The door into the small room could only be opened from the outside.

### c. *Search for Defendant*

Police searched defendant's San Francisco apartment on June 7, five days after he walked away from the lumber store. They found items belonging to Bond and Peranteau, as well as a map of San Francisco on which the Dubses' street had been circled. The police also found two boxes of .22-caliber ammunition, a pamphlet about how to make a silencer for a .22-caliber gun, and photos of the bunker under construction.

Toward the end of June, a 14-year-old boy was playing in a wildlife park in Calgary, Canada with a friend. He came across a lean-to near some bushes and saw an Asian man lying down inside. The man said that he was tired and asked the boy to leave. The boy had seen a photograph of defendant in the news and thought that might have been the person he saw in the park. He told his parents about the man.

On July 6, defendant was arrested for shoplifting. Officers seized a pair of handcuffs and a key, a .22-caliber handgun that previously belonged to Lake, and ammunition.

The following day, a detective met with the young boy and his father at the wildlife park. He asked the boy to show him where the man had been camping. The detective found the lean-to and approximately 30 meters away found a cleared area with a sleeping bag. The sleeping bag lay on top of wood planks; underneath the planks was a dugout big enough to fit a person. The dugout contained a camera belonging to Stapley and a towel from Peranteau's apartment.

### d. Discovery of Bond's and Stapley's bodies

On July 8, back in Calaveras County, police officers were patrolling the area near the Wilseyville property. The officers observed some tufts of material and cloth scattered on the ground approximately one quarter mile away from the property. The material looked like it was insulation from a sleeping bag. Upon further investigation, it appeared that animals had dug up the material along with some bone. Investigators began excavating the site and discovered bodies, later identified as Bond and Stapley. The bodies were in separate sleeping bags, one on top of the other.

Bond had been shot once in his head. His wrists were handcuffed together. He had a plastic bag over his head. He had a leather strap with a ball gag wrapped around his neck.

Stapley had been shot three times: in the front of his mouth; above his right eyebrow; and in his right collarbone. He had a plastic bag over his head and shoulders, and his hands and ankles were bound with duct tape. A leather strap with a ball gag was wrapped around his neck.

### e. Evidence of the Murders

#### i. Dubs family

In July 1984, Harvey Dubs, his wife Deborah, and their 16-month-old son Sean lived in an apartment in San Francisco. Harvey worked at Petrov Graphic Types World, also in San Francisco. In addition to his day job, Harvey was trying to start a new videotaping business that he ran out of their home.

On July 25, Harvey left work around 5:00 p.m., which was earlier than usual. He told a coworker, Lauren Bradbury, that he had put an ad in the newspaper to sell video equipment, and he was meeting someone who had responded to his ad. Shortly

after, around 5:45 p.m., Deborah spoke on the phone with her friend Karen Tuck. Deborah told Tuck that she was expecting someone to come over to talk to Harvey about his video equipment. Someone either rang the bell or knocked on the door, so Deborah terminated the phone conversation to go answer the door. Tuck tried to call Deborah the following day, but Deborah did not answer.

Dorice Murphy lived across the street from the Dubs family. At approximately 5:45 p.m. on July 25, Murphy saw an Asian man walking down the Dubses' front steps struggling to carry a suitcase. He approached a waiting car. A second man walked out of the driver's side and opened the trunk. The Asian man put the suitcase in the trunk, entered the vehicle, and they drove away.

Harvey did not show up for work the following day, nor did he notify his boss in advance that he would not appear at work. It was unusual and "totally out of character" for him to not notify his boss that he would miss a day of work. Another man, identifying himself as James Bright, did call Petrov Graphic Types World and told Bradbury that Harvey was not coming into work. The caller said that Harvey had to go to Washington State for a family emergency. Bradbury found the conversation to be odd because Harvey was from New York, did not have any other relatives, and would never leave the company "stranded." Bradbury also knew that Deborah was from the Bay Area. Bradbury asked the caller for his phone number, after which he became very irritated and hung up. Deborah's father filed a missing persons report that evening, on July 26.

Barbara Speaker lived in an apartment directly below the Dubs family. On July 27, she heard footsteps around 11:30 a.m.

coming from the Dubses' apartment. She stepped outside and saw defendant closing the Dubses' front door. He left the keys in the door and then walked down the stairs carrying a "flight bag" and a duffle bag. The bags appeared full and heavy. Speaker followed defendant down the stairs and outside to the street. She said, "Excuse me" to try to get his attention, but he continued walking. When defendant reached the end of the street, a car came around the corner quickly and pulled over. Defendant entered the car, and it drove away. Speaker believed the car was the Dubses' car. While testifying, defendant confirmed that the driver of the car was Lake.

Around half an hour later, Tuck's husband George visited the Dubses' apartment to see if he could find out anything. He recognized Deborah's key ring in the front door. He went inside and saw empty space on shelving in the bedroom where Harvey usually kept his cassette tapes and VCR machines. George believed items had recently gone missing in light of the fact that there was dust on the shelf but no dust in the specific spots where items had been removed.

Later that night, as Speaker arrived home, she saw a man through the living room window of the Dubses' apartment. Once inside her apartment, she heard footsteps upstairs. She looked out her window and saw the man walking down the stairs carrying something large. The man resembled the man she had seen walking out of the Dubses' apartment that morning.

The Dubs family disappearance received extensive media coverage, including in the newspaper and television press conferences. Investigators had no leads on their disappearance until Inspector Brunn discovered the family's VCR in Wilseyville the following summer.

A few days after that discovery, officers showed Dorice Murphy a photographic line up. She identified defendant as the man she had seen walking out of the Dubses' apartment the day they disappeared. Speaker identified defendant in a photographic line up as well.

### ii. Paul Cosner

Paul Cosner lived in San Francisco with his girlfriend, Marilyn Namba. On November 2, 1984, Cosner called his sister and made plans to meet with her the next morning. Later that evening, Namba called Cosner while she was at her work, and they made plans to watch a movie on television when she got home. Cosner seemed rushed on the phone. He told Namba that he was going to deliver a car he was selling. The car was a gold Honda Prelude and matched the vehicle Lake and defendant were using when Lake was arrested at the lumber store seven months later.

Cosner did not come home for his date with Namba. He also failed to show up the following morning to meet his sister. Neither Namba nor Cosner's sister saw or heard from him again. The following day, Cosner's sister filed a missing persons report.[3]

### iii. Clifford Peranteau

Clifford Peranteau worked with defendant at Dennis Moving Company in San Francisco. They were on the same crew and worked together on a regular basis. Hector Salcedo also worked at Dennis Moving Company and was close with Peranteau. Salcedo and Peranteau often spent time at

---

[3] The jury failed to reach a verdict on the murder charge against Cosner.

Peranteau's house after work.  One night in December 1984 or January 1985, defendant arrived unexpectedly at Peranteau's home.  At some point, he took out a bag of marijuana and showed it to Salcedo and Peranteau.  He told them he had a friend with a plantation and if they wanted to help work on the plantation, they could take some marijuana home for themselves.

One Friday night in January 1985, Salcedo and Peranteau went out for drinks to celebrate the San Francisco 49ers making it into the upcoming Super Bowl.  Around midnight or 1:00 a.m. early Saturday morning, Salcedo dropped off Peranteau at his home and then went home himself.  Peranteau did not appear for work the following day.  Salcedo, concerned, tried to reach Peranteau on the telephone several times, but his friend did not answer.  After work, Salcedo went to Peranteau's home, but nobody answered the door.  Salcedo returned to Peranteau's home several times to try to reach his friend.  Around one week after Peranteau went missing, he noticed that Peranteau's motorcycle was missing.  The motorcycle had still been there when Salcedo previously checked the house.  Peranteau's ex-girlfriend also checked on the house after he was reported missing.  She noticed that "[m]ostly everything" was gone.  She had last been inside the home three to four weeks prior, and nothing was missing at that time.

After Peranteau disappeared, Dennis Goza, the owner of Dennis Moving Company, received a letter, purportedly from Peranteau, explaining his absence.  The letter read, "Dennis: Sorry to leave you on such short notice but a new job, place to live, and a honey all came together at once.  Please send my check for the last three days I worked and my W-2 to my new address below.  Thanks, Cliff."  The address provided was for a post office box in Mokelumne Hill, a town about 20 miles from

11

Wilseyville. The main body of the letter was typed, but the signature and address were handwritten. The signature did not look genuine. Subsequent analysis revealed that the letter had been typed on a typewriter found at the Wilseyville property. A police investigator testified that Lake had forged the letter.

In April 1985, about three months after Peranteau disappeared, Lake sold Peranteau's motorcycle to a man in Wilseyville. Lake told the buyer that Peranteau was a friend in San Francisco who had asked Lake to sell the motorcycle for him.

In July, while investigating defendant's hideout in Calgary, officers found a striped towel that had been taken from Peranteau's home. In defendant's San Francisco apartment, officers found a pen and pencil set that belonged to Peranteau. At the Wilseyville property, officers found additional items that had been taken from Peranteau's apartment.

### iv. Jeffrey Gerald

Jeffrey Gerald also worked on a crew with defendant at Dennis Moving Company. Gerald lived in an apartment in San Francisco with his roommate Terry Kailer. Over the course of six weeks, on 12 occasions, Kailer answered the phone to a caller who identified himself as Charlie or Charlie Ng.

On the morning of February 24, 1985, Kailer answered two calls from the same caller. Later that day, Gerald told Kailer that it had been defendant on the phone and he was going to meet him at a bus station to do "a side job" for a move. Gerald told Kailer that he would be home by dinner and would bring Chinese food. At the bus station, Gerald called his girlfriend, Sandra Krumbein, and said he was going to help a friend move for $100. They made plans for Krumbein, who lived in New

Jersey, to come to San Francisco. Neither Krumbein nor Kailer ever saw or heard from Gerald again.

Three days later, Kailer came home from work and found Gerald's bedroom door ajar. She noticed that some things had been moved, and several things were missing, including his clothes, bedding, guitar and amplifier, and pictures. Kailer filed a missing persons report.

Investigators later found Gerald's guitar at the Wilseyville property. They found Gerald's Social Security card buried on the property.

### v. *Michael Carroll and Kathleen Allen*

Michael Carroll lived with his foster brother, John Gouveia, in Milpitas in 1984. Carroll and defendant were acquainted, and sometime before Carroll disappeared, Gouveia answered a phone call from someone who identified himself as Chuck. The caller asked to speak with Carroll. Gouveia asked, "Is this Charles Ng?" The caller laughed and said, "Yeah. Just tell Mike I called."

Kathleen Allen was Carroll's girlfriend. Allen worked at a Safeway store in Milpitas. On April 14, 1985, Allen received a phone call at work. After the call, she told a coworker that "Mike" had been shot and might be dead. She said that someone was going to pick her up and take her to Lake Tahoe. That evening, Allen called her friend James Baio. She told Baio that Carroll had been gone for two days, and she had received a phone call from him saying that "he had gotten into some trouble" and was going to the Lake Tahoe Area. Carroll had told her that he wanted her to meet him, and he was going to send someone to pick her up. Telephone records indicate that at

1:01 p.m. that afternoon, someone at the Wilseyville property called the Safeway store.

Allen left work between 7:00 p.m. and 7:30 p.m. She entered a gold Honda Prelude, later identified as Cosner's car. Inside the vehicle was a Caucasian male.

Allen spoke with Baio again; he called her at a Milpitas hotel. She told him that she could not talk at that moment because somebody else was in the room with her. Allen sounded like she was in a hurry. She told him the person "was kind of a weird guy" and that he wanted to take pictures of her. Baio asked her to call him when she got to her destination, but he never heard from her again.

The next day, on April 15, Allen called her manager at Safeway and asked for four weeks off from work. She told her manager that her boyfriend had found a job, or had a good lead on a job, near Lake Tahoe and she wanted to go with him. Phone records indicate that someone at the Wilseyville residence called the Safeway store on the morning of April 15.

At some point, Lake gained possession of Carroll's car. On April 14, the same day that Allen left work to drive to Lake Tahoe, Lake called George Blank, a friend in San Jose, and asked for help with a car that had been stranded in Milpitas. Lake said that the car belonged to some friends, and he would send a man by the name of Charles to the bus depot with the car keys. Blank arranged for his daughter, Debra Blank, to receive the call from Charles.

On April 16, Debra received a call from someone who identified himself as Charles and said he was a friend of Lake. Debra went to the bus station to meet Charles, later identified as defendant, to pick up the car keys. Defendant also gave her

a letter which contained directions to the car's location. Debra gave the keys and letter to her father. Blank followed the directions and found the car in the parking lot at the Milpitas Safeway. The car, a Mercury Capri, belonged to Carroll. Blank drove the car home. On April 26, Lake went to Blank's house to inspect the car and remove some items. Lake asked Blank to fix the car and then try to sell it. On May 8 or 9, Blank received a letter and paperwork from Lake. The letter told Blank that after he sold the car and took his share for the repairs, he should deposit the remaining balance into a specific account using the enclosed deposit slip. The paperwork included a pink slip for the Capri, a release of liability, and an insurance policy all bearing Carroll's name. Lake also sent a stamped, preaddressed envelope from the Safeway Federal Credit Union and a bank deposit slip bearing Allen's name.

Investigators found a videotape titled "M Ladies, Kathi, Brenda" buried on the Wilseyville property. The first scene of the video shows Allen shackled in a chair. Lake and defendant tell her that if she cooperates with them, 30 days later they will drug her, blindfold her, and release her somewhere. If she does not, they will shoot her and bury her in the same place they buried Carroll. They told her to provide information on Carroll's bank accounts and "who we need to write to make things correct." Lake tells Allen that she will need to write letters to explain that Carroll got a job and moved away because "we want to phase Mike off, just sort of just move him over the horizon, and, uh, let people know that, yea, Mike moved off to God knows where, and we never heard from him again. That's semi-acceptable." Lake tells Allen they will keep her busy, and she must agree to cook, clean, and "fuck" for them. He continues, "That's your choice in a nutshell. It's not much of a choice unless

you've got a death wish." Lake acknowledges that he and defendant are being "selfish bastards" and tells Allen that if she cooperates, they will be "as nice as we can to you within the limits of keeping you prisoner." If she did not cooperate, they would tie her onto the bed, rape her, shoot her, and bury her. After Allen agrees to cooperate, Lake unshackles her, and the men force her to strip naked. Defendant tells Lake he wants to take a shower with Allen, and defendant says it "won't be the last time." When Allen appears nervous, Lake says they do not want to have to make an example of her and requests that she cooperate. Allen fully undresses and walks off camera with defendant.

In the next scene, a nearly naked Allen massages a naked defendant. In the last scene with Allen, she is lying face down and shackled to a bed, wearing only shorts. Lake admonishes Allen that she needs to cooperate with them while also taking pictures of her. When Allen asks how she has not cooperated, Lake tells her she tried to beat down the door. Lake tells Allen he has cyanide pills and if he ever got caught, he would take them. Lake threatens to hit and whip Allen if she tries to escape again. Lake tells Allen that he normally does not confess his "sadistic tendencies" to strangers, but that he could talk to Allen because she was "going to go away, and I'm never going to have to deal with you again, unfortunately for you." Lake makes Allen put on lingerie and then takes more photographs of her. He tells her to get dressed because they are going outside.

Investigators found a two-gallon plastic barrel buried at the Wilseyville property containing several items belonging to Carroll and Allen. Inside the Wilseyville house, investigators found books with Carroll's name printed inside.

Investigators obtained copies of Allen's canceled checks from April and May 1985. One of the checks was dated May 2, 1985, more than two weeks after Allen disappeared. The check was made out to Randy Jacobson, whose body was found at the Wilseyville property. A handwriting expert testified that Lake wrote the "face detail" of the check and probably signed Allen's name.

### vi. *Lonnie Bond, Sr., Brenda O'Connor, Lonnie Bond, Jr., and Scott Stapley*

In January 1985, Lonnie Bond, Sr., rented the house, known as the Carter house, next door to the Wilseyville property. The two houses shared a common driveway. Bond lived there with his fiancée, Brenda O'Connor, and their infant son, Lonnie Bond, Jr.

Sometime after Bond moved in, the property manager for the Carter house received a call from Lake. He complained to the property manager that someone was firing gunshots from the house and that Bond was failing to lock the gate to their common driveway.

Stapley lived in San Diego with his girlfriend, Tori Doolin. In February 1985, Stapley and Doolin visited Bond and O'Connor in Wilseyville. Doolin met Lake when he came to the Carter house to talk to Bond and Stapley.

Doolin last saw Stapley on the evening of April 19, 1985, in San Diego. Stapley had retrieved Bond and O'Connor's belongings from a storage locker and loaded the items in his truck. He was planning to drive O'Connor and the baby from San Diego back to the Carter house.

A few days later, on April 23, defendant got into a traffic accident in Kern County while driving Stapley's truck. The

17

following day, defendant and Lake appeared at Doolin's apartment in San Diego. Defendant waited in the car while Lake and Doolin spoke. Lake told Doolin that he had found Stapley, Bond, O'Connor, and the baby dead in the Carter house. He said that he had burned their bodies in a type of funeral ceremony, buried the bodies, and then cleaned the house. Lake wanted to take Stapley's belongings back to Wilseyville to make it appear like Stapley had moved out. Doolin gave Lake his bicycle, clothing, and other miscellaneous items. Doolin walked outside with Lake, where defendant was still waiting. Lake showed Doolin the damage to Stapley's truck from the accident.

Doolin never saw Stapley again. O'Connor's mother never saw or heard from O'Connor or the baby again. In May, Lake called the property manager for the Carter house and said that he thought her tenants had left town. He also told her that Bond had left his car for Lake because he owed Lake money.

O'Connor was also featured in the M Ladies video. The first scene with O'Connor shows her sitting in the same chair where Allen sat, with her hands bound. O'Connor is asking what Lake and defendant did to her family. They tell her they did not kill Bond or Lonnie, but when she asks if they are going to let her family go, they respond "probably not." Lake tells O'Connor that they hate her, and that the neighborhood hated her family after they moved into the Carter house. He says that they were going to give Lonnie to a family in Fresno that did not have kids. O'Connor repeatedly pleads for her baby. Lake tells O'Connor she must work, clean, and "fuck" for them or they will tie her to the bed, rape her, and shoot her. O'Connor agrees to cooperate.

Defendant cuts off O'Connor's T-shirt and bra with a knife and tells her that she is "totally ours." He says, "You can cry and stuff like the rest of them, but it won't do you no good. We are pretty, ha, cold-hearted, so to speak." They ask if she is ready for a shower. When Lake says she will shower with defendant, he replies, "Yep. I always do that. It's luckier." Lake says defendant has his heart set on showering with O'Connor, and he does not want to turn defendant down. O'Connor strips and repeatedly tells Lake and defendant that she is dizzy, hot, and does not feel well. They tell her to "suffer" but eventually get her some water. She tells the men she does not need to take a shower, but defendant responds that it is a "house rule" that she be clean before he and Lake "fuck" her. The scene ends with O'Connor and defendant going to take a shower, and Lake tells defendant to be careful with her.

When Lake was arrested at the lumber store, he had a gun registered to Stapley as well as credit cards and a bank card in Stapley's name. As mentioned earlier, police discovered Bond's and Stapley's bodies buried near the Wilseyville property.

### f. Maurice Laberge

Maurice Laberge met defendant in 1986 while they were both imprisoned in Canada.[4] They had neighboring cells and passed items back and forth. They exercised together in the yard every day between March and June or July 1986.

Laberge kept notes of the conversations he had with defendant on the exercise yard. Defendant shared cartoons related to what they discussed in the yard, and he gave them to

---

[4] Laberge died in a car accident before trial. His testimony from defendant's extradition hearing was read into evidence.

Laberge. Laberge sent the cartoons defendant shared, and his notes, to his lawyer.

During one of Laberge's conversations with defendant, defendant seemed "very worried" that the police would watch a videotape found on the Wilseyville property. He told Laberge that the videotape featured Kathi Allen and Brenda O'Connor, two women whom he and Lake had kept in a cell for some time. Defendant described scenes from the video to Laberge. He also shared cartoons depicting scenes from the video, some in graphic detail. They are discussed in more detail below in section II.E.1.

In addition to the cartoons, Laberge testified at the extradition hearing that defendant admitted his involvement in several of the murders. Defendant told Laberge that killing Sean Dubs, the baby, was "not easy, but it was just business, a part of the operation." Defendant told him that they took video equipment from the Dubs residence. Regarding Cosner, defendant told Laberge that he did not want to kill "that punk, but Lake wanted his fucking Honda, a cheap fucking Honda." He also described the sounds that Cosner made after defendant shot him. Regarding Peranteau, defendant told Laberge that he made a mistake in keeping Peranteau's pen set after killing him. He believed he could say that Lake gave him the pens as a defense. He described for Laberge the process of shooting Peranteau while Peranteau pleaded for his life. Defendant further said that authorities would not find Peranteau or Gerald because he burned their bodies after he and Lake killed them. Defendant told Laberge that he killed Gerald so he could move up in seniority at the moving company.

Regarding Allen, defendant told Laberge that he killed her "quicker" because she tried to break out of her cell. He said that

he put his gun inside her vagina and made her call Safeway to ask for time off.  Finally, he admitted shooting Stapley and Bond and then burying the bodies.

### g.  Defendant's Relationship with Lake

The prosecution introduced evidence of defendant's relationship with Lake.  Lake's sister, Fern Ebeling, testified that in 1984, she acted as an intermediary between defendant and Lake, receiving mail from Lake and forwarding it to defendant, and receiving mail from defendant and forwarding it to Lake.  That same year, defendant attended Thanksgiving dinner at Lake's mother's house.  He was the only nonfamily member present.  The following month, in December 1984, defendant introduced Lake to a coworker who needed work done on his house.

### 2.  Defense Case

#### a.  Leonard Lake

The defense presented evidence of Lake's involvement in several uncharged murders, including his brother, Donald, and his best friend, Charles Gunnar.  Several witnesses, including defendant, testified that Lake frequently went by the name Charles Gunnar.

The defense presented evidence of Lake's controlling and abusive relationships with women.  Witnesses also testified about Lake's interest in photographing women nude and in sexually provocative positions, including girls as young as 10 years old.  Some women testified about their personal experiences being photographed by Lake, including one who was coerced into being photographed and was subsequently raped by Lake when she was 16 years old.

Lake carried cyanide in his pocket and told several witnesses that he would take it if he were ever captured. Lake also told witnesses about wanting to build a bunker to use in a nuclear war. Lake had fantasies of keeping women hostage in the bunker.

While he was posted in Hawaii with the United States Marine Corps, defendant met a man who was posted there while serving in the Army. In the summer of 1981, the man told defendant about Lake and provided defendant with Lake's address at the time. During part of 1982, defendant lived with Lake and Claralyn in Philo, a town in Mendocino County. Lake's neighbor, Ernie Pardini, testified that Lake frequently reprimanded defendant and spoke to him in a degrading and domineering manner. Pardini believed Lake was verbally abusive toward defendant. He testified that defendant seemed very timid around Lake and behaved like he was trying to win Lake's approval.

b. *Charged Offenses*

The defense presented evidence that Lake was the dominant or sole offender in the charged offenses. A few days before Cosner disappeared, a neighbor saw him speaking with Lake in the building's garage. One of Lake's neighbors in Wilseyville testified that the day after Gerald disappeared, he saw Lake with a bloody sheet wrapped around his body. That same day, a local doctor treated Lake for a gunshot wound in his hand.

Lake told another neighbor in Wilseyville that he thought the Bond family were "pests" and that he believed it was okay to kill someone if they were bugging you.

### c. *Defendant's Testimony*

After the defense rested and the prosecution finished its closing argument, the defense moved to reopen its case to allow defendant to testify. The court granted the motion.

Defendant was born in Hong Kong and moved to the United States when he was 18 years old. He met Lake when he was 22 or 23 years old. Defendant looked up to Lake and trusted and respected him. Defendant appreciated that Lake accepted him as a friend even though he was not a United States citizen, could not drive, did not have a job, and had a criminal record. He knew that Lake was a survivalist and was preparing for the end of the world by building survival shelters and stockpiling supplies. When defendant was court-martialed, Lake sent him photos of construction on the bunker. Defendant did not know that Lake was building a place to keep sex slaves.

Sometimes Lake would stay with defendant in San Francisco. Lake kept bedding, a change of clothing, tools, ammunition, and marijuana in defendant's apartment.

Defendant denied being involved in Gerald's disappearance. He never met Gerald at a bus station nor did he ever call Gerald's number and ask to meet at a bus station. He was not in Wilseyville the day that Gerald disappeared because he was scheduled to work an eight-hour shift at Dennis Moving Company the following day. He also worked the day that Gerald's apartment was burglarized.

Defendant denied being involved in the disappearance of the Dubs family. Defendant denied being the person that neighbor Dorice Murphy saw walking out of the Dubses' apartment the day they disappeared. He admitted being the person that neighbor Barbara Speaker saw leaving the

apartment two days later, but asserted he did so after Lake asked him for help with a "job." Defendant denied making any comments to Laberge about his involvement in the Dubs murders and did not know how the map with their residence circled ended up in his apartment. He acknowledged that a VCR without a serial number was found in his apartment but said it belonged to Lake and he did not know where Lake got the VCR from.

Defendant testified that he had nothing to do with the disappearance of Cosner and did not enter into any sort of agreement with Lake to kill Cosner. Lake had told defendant that Cosner's Honda was a "hot car," and he obtained it from drug dealers. Defendant denied telling Laberge that Lake killed Cosner because he wanted the Honda. He also denied telling Laberge that Cosner was "a hard operation because he wouldn't cooperate" and that Cosner made strange noises when defendant shot him.

Defendant denied having anything to do with Peranteau's disappearance. He denied ever visiting Peranteau's apartment and testified that he did not know where Peranteau lived. He claimed he had no involvement in taking Peranteau's property to Wilseyville and did not know how it got there. He denied telling Laberge that he had shot Peranteau in the head and burned the body.

Defendant testified that the M Ladies video was Lake's idea. Allen was the first woman he helped Lake imprison. He knew that Allen was not there willingly and believed that Lake was trying to modify Allen's behavior to turn her into a willing sex slave. They did not agree nor plan to kill Allen. Defendant acknowledged his participation in the video but asserted that he

could not confront Lake or ask not to be involved. He stated that he did not have sexual intercourse or oral sex with Allen. When defendant left Wilseyville to go back to San Francisco, Allen was still alive. Defendant did not know anything about Carroll's death. He acknowledged that on the video, Lake told Allen to cooperate or else they would bury her in the same place that they buried Carroll. He claimed, however, that he was not paying attention when Lake said that and he did not actually help Lake kill or bury Carroll. Defendant denied making any statements about Allen to Laberge.

Defendant testified that the first time he saw O'Connor was when they started filming her in the M Ladies video. He knew that Lake hated O'Connor for several reasons. He assisted Lake in threatening O'Connor to comply but did not intend to physically hurt her or kill her. He helped Lake by projecting solidarity so that O'Connor knew two people were involved and she would be more likely to comply. Defendant testified that he was not present when Bond and Stapley were killed. Sometime after they recorded the video with O'Connor, Lake showed defendant two bodies under the porch: Bond and Stapley. Defendant bound Bond's body, put a gag in his mouth, and put the body in a sleeping bag. Lake did the same thing to Stapley's body. Lake wanted it to appear like they had been killed by rival drug dealers.

Defendant said he regretted his actions in the M Ladies video. He said he was "young and adventurous" and did not exercise independent judgment.

The day that Lake was arrested, defendant thought someone saw him take the vise and he panicked. He was worried the police would discover Cosner's car, the M Ladies

video, and the buried bodies. He was also worried that he would be deported back to Hong Kong. He met up with Claralyn and together they drove back to the lumber store to check on Lake. Defendant crouched down in the backseat as Claralyn drove by and saw Lake standing in the lot with police. Later that night, he bought a one-way plane ticket to Chicago and eventually made his way into Canada.

### B. Penalty Phase

#### 1. *Prosecution Case*

The prosecution presented evidence that on July 15, 1982, defendant was convicted by military court for conspiracy to commit larceny of government property valued at more than $100; larceny of government property valued at more than $100; and unlawful entry with intent to commit larceny of government property. On November 14, 1981, after arrest for the larceny offenses, defendant escaped from confinement in a military facility until he was captured on April 29, 1982. Lake and Claralyn were present in the apartment that officers searched after defendant's April arrest.

The prosecution presented evidence of defendant's arrest for shoplifting in Canada and the discovery of the lean-to in the wildlife park, described above.

Several people testified about the victims and the impact of their deaths. Sharon O'Connor, Brenda O'Connor's mother, testified that she was very close with her daughter and loved her very much. O'Connor's death was very difficult for her and tore the family apart. Her grandson, Lonnie, was "the sweetest little guy." The absence of remains was very hard for the family because they could not have a funeral. Sandra Bond testified that she was O'Connor's sister and was also married to Bond's

brother, so she was "getting it from both sides." She explained that her mother was grieving O'Connor while her mother-in-law was grieving Bond, which was hard on her and her husband. She "kind of lost [her] identity" after O'Connor died.

Robert McCourt, Clifford Peranteau's brother, testified that Peranteau "was a nice guy" who "liked anybody and everybody." They had 10 other siblings, and they all had a hard childhood, but Peranteau tried to keep all the siblings connected to each other. Their mother had been hospitalized five times "because of this mess" and refused to accept that Peranteau had died.

Jeffrey Nourse testified that Deborah Dubs was his cousin, but they were very close and she was more like a sister to him. Deborah was very artistic and "always had a zest for life and [was] just a joy to be around." Harvey Dubs was a "very quiet, very loving, very caring human being." Nourse said that he thought about Deborah, Harvey, and their son Sean every day. Their family had still not gotten used to the Dubs family's absence at family gatherings, especially holidays like Thanksgiving.

Roger Gerald, Jeffrey Gerald's father, testified that his son was fun-loving, humorous, and nonviolent. He was very close with his son. Gerald's death had been very difficult on the family and left an unexplainable void in their everyday lives. He continued to ask himself why this had happened but knew he would never get an answer. Denise Gerald, Gerald's sister, testified that her brother "was and still is probably the finest person I have ever been able to spend time with; funny, passive, life loving, comical, [and] warm. He was a very wonderful person." She testified that Gerald's death "has taken [my]

27

mother from me.  She is alive but part of her died with that one phone call.  I lost my father that I knew."

Diane Allen, Kathleen Allen's sister, testified that Kathleen "was a very strong, intelligent person" who always made her laugh and always had the answer to a problem.  Her sister's death "destroyed" her family; her mother could not handle losing her daughter.  Diane missed her sister very much, and she felt it was not fair that Kathleen missed out on so much in life.

Dwight Stapley, Scott Stapley's father, testified that Stapley played a lot of sports growing up and was very active. While Stapley was in community college, his parents lived in separate houses due to their jobs and Stapley lived with his dad. During that time, they "went from being father and son to roommates, buddies," and it was "quite a wonderful experience." His wife learned of their son's death when a news anchor phoned their home and left a message asking to talk.  The way they learned of his death was difficult for the family.  Dwight explained that he and his wife carefully followed defendant's case and went to court proceedings in Canada, Calaveras County, and Orange County.  They had spent their life savings traveling to court hearings.  Their other children were just starting to deal with the impact of losing their brother.  Lola Stapley, Stapley's mother, testified that her son was "a great big overgrown teddy bear.  Everybody loved him."  His death left her "absolutely devasted."  Stapley's sister was pregnant when Stapley was murdered and named her son after her brother. The family keeps an empty chair at the table when they get together for dinners to signify that Stapley was with them spiritually.

### 2. *Defense Case*

Several of defendant's family members testified on his behalf. Alice Shum, defendant's aunt, testified that she lived with defendant's family during part of his childhood in Hong Kong. Shum saw defendant's father beat him with a stick for getting poor grades in school or failing to complete his homework. Defendant was a quiet child and did not talk to other people very often. Shum moved to the United States in 1973; defendant moved to the United States in 1979 to attend college. Defendant visited Shum and played with her young sons. Defendant sent Shum Mother's Day cards and holiday cards while he was in prison. Shum's son, Hubert, testified that he was eight years old when he last saw defendant and was 23 years old at the time of trial. He talked to defendant occasionally when defendant called Shum. Hubert said that defendant means a lot to him, and he thought that they would have been close if not for this case.

Defendant's sisters, Alice and Betty, did not testify but their statements made to a psychologist were introduced by way of stipulation. Alice explained that they had a sheltered and protective upbringing, and she believed the three siblings tended to be naïve, easily influenced, gullible, and overly trusting of others. She described defendant as "curious and naughty" and said he liked to play pranks on other people. Alice related that their father punished defendant for his transgressions by hitting him with a feather duster cane. Betty explained that during his teenage years, defendant appeared sad most of the time, would sleep in the afternoon after coming home from school, appeared withdrawn and lonely, and did not speak to other family members very much. She opined that their protective upbringing resulted in her, Alice, and defendant

being dependent on others to make decisions for them. Betty believed defendant was kind at heart.

Defendant's father, Kenneth Ng, testified. Education was very important to Ng, and he worked hard to have his children accepted into private schools. He admitted punishing defendant for not doing his homework or for not getting good grades. He would beat defendant "very hard" with a stick. Ng acknowledged that, looking back, there might have been a better way to discipline and teach his children. Defendant's mom, Oi Ping Ng, also testified. She explained that defendant was very shy as a child and did not talk much. She knew that Ng beat defendant, but she was unable to stop him.

Several witnesses testified about defendant's time in the Marines. Ray Guzman explained that he and defendant would go to dinner or to the movies. They would sometimes stop at a martial arts school and watch students practicing. He never saw defendant involved in a fight with anyone. Hugh Daugherty explained that defendant always followed orders and did everything Daugherty asked him to do. Defendant was very quiet and "did his own thing." He had observed defendant practicing martial arts. David Burns testified that he was surprised to learn of defendant's involvement with the armory theft and said it was out of character. He occasionally observed defendant practicing martial arts but never saw him fighting with anyone. Bradley Chapline testified that defendant was quiet, well spoken, and appeared to be well educated.

The defense presented expert testimony regarding defendant's character and mental state. Psychologist Abraham Nievod conducted psychological testing on defendant in 1993, 1996, and 1998. Dr. Nievod also reviewed the reports from two

court appointed experts who had also evaluated defendant. Dr. Nievod explained that defendant scored very high on schizoid, avoidant, and dependent personality disorders. Schizoid people do not relate well with other people or know how to have long-term relationships, which Dr. Nievod explained was consistent with defendant's history as a "loner." People with avoidant personality disorder avoid groups of people and forming close relationships with people because they are afraid of being rejected or failing. If they find one person they can trust, they will model behavior after that person and will do almost anything to maintain that relationship. Dr. Nievod opined that defendant latched onto Lake as a sort of caregiver and as someone who would teach him how to operate in the world.

Psychiatrist Stuart Grassian testified that in the previous 12 to 13 years, defendant had spent 10 years in solitary confinement. After meeting with defendant, he observed "terribly, very profound, very pronounced obsessional thinking." Dr. Grassian said that defendant was preoccupied with constant hunger and smells, and "the enormous overriding preoccupation with his desperate need to have Michael Burt reassigned to his case." Dr. Grassian testified that solitary confinement can affect a person's ability to think, concentrate, remember, and to cooperate in their own defense. He described defendant as a docile, passive, and compliant person. Dr. Grassian reviewed Dr. Nievod's reports and agreed that defendant suffered from dependent personality disorder.

Psychiatrist Paul Leung specialized in Asian family structure and culture. He explained that in a traditional Hong Kong family at the time defendant grew up, the father is an authoritative figure in the family, and children are expected to do what their parents tell them to do. The father is sometimes

viewed as a person for children to fear and the disciplinarian of the family. Beating one's children was not uncommon, but defendant's father was "a bit more harsh" than fathers in the typical family. Parents generally have high expectations for their sons, especially when there is only one son in the family. Dr. Leung explained that defendant's father had very high expectations for him and disciplined him more because of those expectations.

## II. GUILT PHASE ISSUES

### A. Right to Representation

Defendant raises several contentions regarding his right to representation. First, he asserts the trial court deprived him of his constitutional rights when it appointed the Orange County Public Defender as standby counsel while he represented himself. Second, defendant contends the trial court erroneously revoked his right to represent himself without justification. Third, he asserts the trial court abused its discretion when it denied one of his motions to substitute counsel, made during jury selection. Finally, defendant contends the trial court abused its discretion when it declined to appoint his preferred attorney as counsel.

#### 1. *Factual Background*

Defendant's representation in this case involved several attorneys, 37 *Marsden* motions, and a brief period of representing himself.

Proceedings began on June 8, 1985, when the Calaveras County Justice Court issued a warrant for defendant's arrest. On July 15, 1985, the court appointed the Calaveras County Public Defender to represent defendant, who at the time was in custody in Canada. On December 10, 1985, the court appointed

Garrick Lew, who had previous experience working with defendant, to represent him. On January 14, 1987, the court appointed Michael Burt as second counsel. Burt represented defendant in San Francisco and worked for the San Francisco Public Defender (SFPD), but the court appointed him as an independent contractor. Shortly after, the United States asked Canada to extradite defendant. On September 20, 1988, while defendant was still in Canada, the court ruled that it lacked jurisdiction to appoint counsel and removed Burt and Lew from the case.

Defendant made his first appearance in Calaveras County for arraignment on September 27, 1991. On October 4, 1991, Burt and Lew filed a motion requesting appointment as counsel. The motion included a declaration from defendant stating a desire for Burt and Lew to represent him and to appoint the entire SFPD's office. At a hearing on the matter, Burt explained that his current caseload included preparing two other capital cases for trial. If SFPD were appointed to defendant's case, a second lawyer would get caught up on the case while Burt would supervise the new attorney and Lew. He acknowledged that it was possible sometime in the future he would have a scheduling conflict, but if that were to happen, the second lawyer would be able to handle the matter.

When the court asked Burt if he could give "adequate representation to all three of these cases," Burt admitted that SFPD was "not excluding the possibility" of having a third lawyer work on the case as well. Burt requested the court appoint SFPD generally, rather than him personally, to the case, because he did not believe he could adequately represent defendant alone while also working on the other two cases. The prosecutor argued that if Burt was not personally representing

defendant, "it takes him outside the grounds for *Harris*, where a client imposes a certain trust and confidence in a particular attorney, and that particular attorney has a superior understanding of the facts of the case."[5]  He further expressed concern that if Burt's other cases took too much time, the defense would request further continuances on defendant's case.

The court noted that in a declaration submitted by Lew, Lew stated that his practice would be in "jeopardy of financial ruin" if he were appointed counsel in defendant's case.  Lew said he had been with defendant for seven years and that "was not something that you walk away from over money," but he would need "sufficient time" to tend to other clients and cases.  Lew stated that his estimates on how long it would take to prepare the case for trial were dependent on whether Burt and SFPD were also appointed.

The court denied defendant's motion to have Lew and Burt appointed based on concerns over Burt's availability.  The court appointed Thomas Marovich and James Webster, both of whom had capital case experience.

Defendant made his first appearance with Webster and Marovich on November 1, 1991.  Defendant filed a *Marsden* motion and stated it was "imperative" that Burt and Lew represent him.  The court denied the motion.  Three weeks later, defendant filed a second *Marsden* motion again requesting Burt and Lew as counsel.  The court denied the motion.  Between January 10, 1992, and October 2, 1992, defendant filed nine

---

[5]     *Harris v. Superior Court* (1977) 19 Cal.3d 786 (*Harris*).  In *Harris*, we held that a trial court has the discretion to appoint an indigent defendant's counsel of choice in certain circumstances.  (*Id*. at p. 799.)

more *Marsden* motions, again requesting appointment of Burt and Lew, all of which the court denied. At each hearing, the trial court addressed defendant's concerns and allowed counsel an opportunity to respond.

The preliminary hearing began on October 6, 1992, and ended on November 12, 1992. Between October 6 and October 16, defendant filed five *Marsden* motions again requesting appointment of Burt and Lew; the court denied each one on the day each motion was filed.

On October 28, Webster and Marovich informed the court that defendant was suing them for malpractice. Counsel argued that the lawsuit created a conflict and continuing with the preliminary hearing would violate State Bar rules. After holding a recess to review relevant materials, the court declined to continue the preliminary hearing or find that the lawsuit created a conflict. The court noted that with two exceptions, the lawsuit contained allegations previously addressed in *Marsden* motions. The court stated that if it allowed the lawsuit to create a conflict, then anytime a defendant was denied a *Marsden* motion, the defendant would simply need to file a lawsuit against counsel. Defendant filed three more *Marsden* motions on November 3, 5, and 12, respectively.

On November 20, 1992, the Calaveras County District Attorney filed an information charging defendant with the current offenses, and the case moved from the Calaveras County Justice Court to the Calaveras County Superior Court. On December 2, 1992, the court temporarily reappointed Webster and Marovich. The attorneys objected, arguing that defendant's lawsuit created a conflict of interest. The court declined to dismiss them.

On January 12, 1993, Marovich and Webster filed a motion to set aside their appointment. They also asked the court to designate separate counsel to prepare a motion seeking appointment of defendant's preferred counsel pursuant to *Harris*. The court appointed Ephraim Margolin and Eric Multhaup to prepare the *Harris* motion. The court denied defendant's 21st *Marsden* motion on June 9, 1993.

On July 26, 1993, Margolin and Multhaup filed a combined *Marsden* and *Harris* motion requesting the court discharge Webster and Marovich and appoint Burt and Lew. On September 1, Webster and Marovich filed a motion to withdraw.

On December 8, 1993, the judge who had been handling the case recused himself. The Judicial Council appointed Donald McCartin, a retired judge from Orange County, to the case. McCartin took the bench for the first time on January 21, 1994. He believed it was appropriate to grant the *Marsden* motion but stated the venue change should precede appointment of counsel. McCartin conditionally relieved Marovich and Webster pending the appointment of new counsel after the venue change.

The parties made their first appearance in Orange County on September 30, 1994. The court noted that Burt and the SFPD consented to appointment conditionally but certain of those conditions could not be met, most notably trying the case in San Francisco. The court further noted that even if it appointed SFPD, according to its paperwork, the San Francisco Board of Supervisors and the San Francisco Mayor could abrogate the appointment. The court stated the case had already faced significant delay and a review by the board of supervisors could take years. The court denied defendant's motion to appoint

SFPD as counsel and instead appointed the Orange County Public Defender (OCPD).

On July 29, 1996, defendant made his 23d *Marsden* motion. The court granted the motion, relieved OCPD, and appointed two attorneys from the court's list of available capital case counsel, Gary Pohlson and George Peters as counsel. On August 9, defendant filed another *Marsden* motion seeking to relieve Pohlson and Peters and reappoint OCPD. The court denied the motion. Defendant filed a petition for writ of mandate challenging the court's decision, and on February 14, 1997, the Court of Appeal granted the petition. The appellate court held that the trial court abused its discretion in relieving OCPD and therefore erred in denying defendant's subsequent request to have OCPD reinstated. (*Ng v. Superior Court* (1997) 52 Cal.App.4th 1010, 1023–1024 (*Ng*).) The appellate court ordered the trial court to reinstate OCPD and reassign the case to a different judge. (*Id.* at p. 1024.) The case was reassigned on February 24.

Defendant filed his 25th *Marsden* motion on May 27, 1997. The trial court denied his request for separate counsel to handle the *Marsden* claim and denied the motion. Defendant filed another *Marsden* motion requesting Burt be appointed on August 13, 1997, and again asked the court to appoint counsel to assist him with the motion. On September 12, the court heard argument on appointing Burt as counsel. Burt stated that his office was available to accept appointment "depending upon the circumstances of appointment and specifically issues of where the case gets tried and when it gets tried and issues such as funding." On October 10, the court agreed to appoint Burt as cocounsel if Burt and the presiding judge could agree on Burt's compensation. Defendant withdrew his pending *Marsden* and

*Harris* motions. To accommodate Burt's schedule, the parties agreed to a trial date of September 1, 1998.

On January 16, 1998, defendant filed his 27th *Marsden* motion and said he was reviving all related motions. Additionally, Burt announced he could not accept the appointment because he was not satisfied with the compensation offered by the court. The court denied the *Marsden* motion on February 6. Defendant filed his 28th *Marsden* motion less than two weeks later, which the court denied on March 20.

On March 31, 1998, defendant filed a motion to represent himself, and on April 17, he filed his 29th *Marsden* motion. The court denied the *Marsden* motion and deferred ruling on the *Faretta* motion until the conclusion of defendant's competency hearing. After finding defendant mentally competent on April 20, the court denied the *Faretta* motion. The court ruled that defendant did not want to represent himself, and his real purpose was to obstruct justice and delay proceedings.

On May 8, 1998, defendant filed another *Faretta* motion. At a hearing on the matter, he requested advisory counsel and an investigative team not associated with OCPD. The court again found the motion was made to obstruct justice and denied defendant's request. One week later, on May 15, defendant filed another *Faretta* motion and stated he was willing to accept anyone as his advisory counsel. The court granted the motion and appointed OCPD as advisory and standby counsel.

On May 26, 1998, OCPD filed a motion to withdraw as advisory and standby counsel. The court denied the motion. In written comments on the motion, the court noted that it did its best to try to have Burt appointed as counsel per defendant's

wishes. A few days later, defendant filed a motion to discharge the OCPD as advisory and standby counsel. The court denied the motion.

On August 5, 1998, defendant filed a motion to continue the trial six months, to March 1, 1999. At a hearing on the motion, the court reminded defendant that he had stated that he would be ready to proceed on the scheduled trial date. The court asked defendant if he wanted to continue representing himself; defendant confirmed that he did. The court then asked defendant why he specifically asked for six months. Defendant said that if he was not ready to proceed in six months, then counsel would take over to not cause any further delay. The court stated that it was considering revoking defendant's pro se status and if, at the time trial started, he was ready to represent himself, the court would reconsider a renewed *Faretta* motion. The court ruled that defendant was not willing to cooperate with OCPD in preparation for trial, was not actively preparing for trial, and was "doing everything to avoid trial in the near future." The court revoked defendant's pro se status and stated that if he was able to comply with the rules of the court, it would revisit the issue. The court reappointed OCPD and agreed with OCPD's assessment that the continuance motion was now moot.

On August 26, the defense moved for a six-month continuance. The court denied the motion and instead granted a two-week continuance. Defendant filed his 30th *Marsden* motion on August 28, 1998, which the court denied.

Jury selection began on September 14, 1998. Defendant filed his 31st *Marsden* motion the following day. The court found that defendant was attempting to manufacture a conflict and create a delay and denied the motion.

Defendant filed two more *Marsden* motions during the remainder of jury selection, both of which the court denied.

Defendant filed his 34th *Marsden* motion during the prosecution's case-in-chief, and his 35th motion during the defense case. The court denied both motions. Defendant filed his 36th *Marsden* motion after the prosecution finished its closing argument; the court denied the motion.

After the jury returned its guilty verdicts, the court learned that defendant had filed a malpractice lawsuit against the OCPD. The lawsuit named defendant's lead attorney and one other deputy public defender as codefendants.

On June 3, 1999, after the conclusion of the penalty phase, defendant filed his 37th *Marsden* motion. The court denied the motion on June 30.

### 2. *Public Defender's Role*

After granting defendant's motion to represent himself, the trial court appointed OCPD as standby counsel and instructed OCPD to continue preparing for trial. Defendant now contends the manner in which OCPD prepared for trial conflicted with his own trial strategies. This conflict, he asserts, interfered with his right to represent himself and thus violated his rights pursuant to *Faretta*. Defendant specifically argues that the instructions provided to a mental health expert by OCPD conflicted with his own instructions, which caused the expert to resign. He does not, however, explain what conflicting instructions were provided to the expert and, as discussed below, the record does not support his contention.

As previously noted, the trial court granted defendant's *Faretta* motion on May 15, 1998. The court appointed OCPD as advisory and standby counsel. Counsel William Kelley opined

that this put OCPD in conflicting positions. He said, "The advisory counsel role, that we do just that, we advise Mr. Ng. He is making the decisions on the case. We may say we think that is a bad decision, but he can say, 'Too bad. That is what we are going to do,' and then he is going to do what he is going to do. Whereas, my role or our role as standby counsel would be to go ahead and independently proceed and prepare as if we are still the attorney of record, and that is that. My question to you is what happens when those two roles clash? We say as attorney of record in a standby role we think we need to go down this road and as an advisory counsel we are advising Mr. Ng we have to go down this road. He goes, 'Nope. I am the attorney of record on this case. We go down that road.' " The court replied, "Go down both roads." The court acknowledged the possibility of problems but told Kelley, "I want you to do exactly what you have been doing, and that is putting all your resources towards trying this case in Mr. Ng's best interest, and you are going to do that as standby counsel. As advisory counsel, you are there to advise Mr. Ng." The court clarified that the government had invested a lot of money in OCPD to represent defendant, and the office had put in significant time and effort into preparing his defense. The court explained it "is not a willy-nilly thing that I am appointing your office over your objection to assist" defendant as advisory counsel. The court warned that if defendant made any attempt to disrupt proceedings or delay trial, OCPD would be reinstated as counsel.

Just two weeks later, on May 26, 1998, OCPD filed a motion to withdraw as advisory and standby counsel. Carl Holmes, the Orange County Public Defender, explained that he brought the motion "with great reluctance," but his office reached a point where acting as advisory and standby counsel to

defendant would "compromise [their] ethical duty" to provide a meaningful defense. Holmes continued that he could not, without divulging confidence of defendant, reveal "how deep and serious his mistrust of the Public Defender's Office is." The court opined that defendant did not simply mistrust OCPD; he mistrusted anyone who was not Burt. Holmes agreed with the court's assessment. The court stated that it had recently asked defendant for an example of a true conflict between himself and Kelley, and defendant could not provide one. The court continued, "Appointing a different . . . advisory counsel will not help at all. We will hear exactly the same thing we have been hearing since day one. And that is why I asked you for examples in camera, and those are the same problems you are going to have with any attorney." The court also stated that defendant created a breakdown in his relationship with counsel, rather than counsel's actions or inactions causing a breakdown, and his distrust of OCPD was because he did not *want* to trust OCPD. The court denied the motion, finding no conflict, but stated that if a true conflict arose the court would address it.

On June 8, defendant filed his own motion to discharge OCPD as standby counsel. The court denied the motion, reminding defendant that he had been willing to accept OCPD as standby counsel when he filed his *Faretta* motion a few weeks prior.

On July 21, both OCPD and defendant were directed by the judge assigned to handle section 987.9 matters[6] to share

---

[6] Section 987.9 authorizes a capital defendant to "request the court for funds for the specific payment of investigators, experts, and others for the preparation or presentation of the defense." (*Id.*, subd. (a).)

previously retained experts and separately apply for their own funding for each expert, in lieu of requiring defendant to locate and retain his own experts now that he represented himself. The court explained that the experts had been in place for quite a while, and it would be impossible for defendant to find new qualified experts, get them caught up on his case, and conduct testing and interviews by the September 1 trial date. The court further explained that the defense had already retained top caliber experts, and requiring defendant to select new experts would, in essence, punish him by excluding those experts from his defense. The court acknowledged the plan was not perfect but believed that using the existing defense experts would best facilitate defendant's preparations for trial.

Kelley noted that using the same experts would require him to know what the experts were working on for defendant, but defendant told the experts not to disclose that information to Kelley. He explained that this put him in a difficult position and that the experts were "still giving [him] some general ideas because they are uncomfortable with their role. Four experts have called me up independently and said so." Kelley agreed, however, with the court's statement that it would be a "real gross violation" of defendant's due process rights, given all of the experts the defense had lined up, to suddenly require he find his own experts. He argued that nonetheless, the experts were "having difficulty with the position this puts them in." The court again acknowledged that "it's not a perfect world" and that Kelley was in an unusual position, and said that defendant could get separate funding for his use of the experts without Kelley's assistance to avoid defendant needing to tell Kelley what he uses the experts for. When the court asked defendant if he had any concerns with the arrangement, he said not at that time.

Approximately one month later, the court revoked defendant's pro se status and reappointed OCPD as counsel.

On August 25, after Kelly was reinstated as counsel, he filed a motion to continue. He explained that a key expert witness had resigned as a result of the different directives she received from him and from defendant, and she could not perform antithetical tasks. Kelley explained to the trial court, "When [defendant] was given his pro. per. status, she was having problems because, you know, I would want her — I am interested in her developing information that I believe to be pertinent to the defense of the substantive case, and [defendant] was having her go in a different direction, and she was in a bit of a dilemma because the direction he was having her go in was going to put her in direct conflict with me. And she called me up one day very disturbed and distraught about it and couldn't deal with it and felt she had a conflict of interest and told me she had to resign from the case."

Defendant now argues that there was significant conflict between himself and OCPD regarding the strategy for developing evidence. He asserts that the trial court's insistence that OCPD continue preparing for trial with strategies that conflicted with his own violated his *Faretta* rights. But he points to nothing specific in the record except for one example: defendant asserts that his and OCPD's conflicting instructions to mental health expert Dr. Kaser-Boyd, and her subsequent resignation interfered with his ability to represent himself. Aside from vaguely asserting that he and OCPD instructed her to prepare for trial in a "conflicted manner," defendant does not provide any additional information regarding how they each provided conflicting instructions.

The Attorney General asserts that defendant abandoned his right to self-representation by failing to renew his request to represent himself and thus acquiesced in subsequent representation. Because defendant waived his Sixth Amendment claim by failing to renew his request, the Attorney General argues, defendant cannot claim on appeal that the trial court violated his rights pursuant to *Faretta* by appointing OCPD as standby counsel. After the trial court revoked defendant's pro se status, the court stated that if, at the time trial started, he was ready to represent himself, the court would reconsider a renewed *Faretta* motion. (See *People v. Dunkle* (2005) 36 Cal.4th 861, 909 [the 6th Amend. self-representation right may be waived or abandoned when a defendant prior to or during trial acquiesces in the assignment or participation of counsel in the defense].) Defendant counters that renewing his request would have been futile because self-representation would have been accompanied by the same allegedly unconstitutional conditions the trial court had previously imposed, namely requiring OCPD to remain as standby counsel. We need not decide whether defendant waived his claim, because there was no Sixth Amendment violation regardless.

The United States Supreme Court examined the role of standby counsel in *McKaskle v. Wiggins* (1984) 465 U.S. 168. "In determining whether a defendant's *Faretta* rights have been respected, the primary focus must be on whether the defendant had a fair chance to present his case in his own way. *Faretta* itself dealt with the defendant's affirmative right to participate, not with the limits on standby counsel's additional involvement." (*Id.* at p. 177.) Standby counsel unconstitutionally violates a defendant's *Faretta* right if counsel's "participation over the defendant's objection

effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak *instead* of the defendant on any matter of importance." (*Id.* at p. 178.) Counsel also violates a defendant's right if, without the defendant's consent, counsel destroys the jury's perception that the defendant is representing himself. (*Ibid.*)

Because defendant did not represent himself by the time voir dire began, we assess whether his *Faretta* rights were vindicated with regard to proceedings occurring outside the presence of the jury only. "*Faretta* rights are adequately vindicated in proceedings outside the presence of the jury if the *pro se* defendant is allowed to address the court freely on his own behalf and if disagreements between counsel and the *pro se* defendant are resolved in the defendant's favor whenever the matter is one that would normally be left to the discretion of counsel." (*McKaskle v. Wiggins, supra,* 465 U.S. at p. 179.)

Defendant contends the court's insistence that he and OCPD continue trial preparations irrespective of any conflict "virtually guaranteed" that OCPD would substantially interfere with his ability to make tactical decisions, but he cites only the resignation of Dr. Kaser-Boyd as an example of how OCPD allegedly interfered with his ability to prepare his defense. Defendant contends he lost Dr. Kaser-Boyd as an expert witness because she found it untenable to work for him and OCPD at the same time, due to receiving conflicting instructions on how to prepare for trial. Defendant, however, misapprehends the reason Dr. Kaser-Boyd resigned from his case. Importantly, Dr. Kaser-Boyd initially expressed concern about assisting defendant *before* the court ruled that he and OCPD must share experts. Dr. Kaser-Boyd wrote two letters to defendant. The

first letter was written on July 15, 1998, two weeks before the court ordered defendant and OCPD to share experts. The second letter was written on July 30, shortly after the court's order. Together, these letters support a finding that, even before the court issued the order that defendant claims resulted in Dr. Kaser-Boyd's resignation, she informed defendant of her desire to resign for two different reasons: (1) she sought to resign because of defendant's desire to have her assist him in having OCPD removed as advisory counsel, and (2) she sought to resign due to defendant's generalized distrust of her and OCPD.

In her first letter, Dr. Kaser-Boyd explained that defendant's request that she actively assist him in having OCPD removed as advisory counsel likely created a conflict of interest. She explained that because she was working with OCPD on other matters, she could not also litigate against OCPD. Thus, the dispute Dr. Kaser-Boyd described was not about receiving conflicting tactical instructions from OCPD and defendant with respect to her anticipated trial testimony. Instead, the issue was that because she was working with OCPD on other matters, she could not also assist defendant in litigating *against* OCPD. This issue was not occasioned by the sharing of experts but, instead, was created by the fact that, as Dr. Kaser-Boyd explained in the letter, she "believe[d] that it likely would be a conflict of interest for me to carry several open cases with [OCPD] at the same time that I support your motion to have [OCPD] removed as legal advisor for you."

Dr. Kaser-Boyd also expressed concern in her first letter that defendant "will never be sure that I am in your camp and therefore supporting your best interests, and that this will seriously undermine your trust of me." She continued, "The relationships are further contaminated by the fact that I was

47

originally retained by [Kelley], against whom you now struggle." Dr. Kaser-Boyd concluded it would be better for defendant to retain an expert that did not have any ongoing work with OCPD and offered to help him find one. Thus, the record does not compel defendant's interpretation that he lost Dr. Kaser-Boyd as an expert because he and OCPD were giving her conflicting instructions.

Dr. Kaser-Boyd emphasized these same two reasons for wanting to end the retention in a second letter on July 30, 1998. She again explained that "after careful deliberation and consultation with psychology and legal experts," it would create a conflict of interest for her to help defendant litigate to have OCPD removed and also work with OCPD on other matters. She again referenced defendant's profound distrust of her and OCPD. ("I regret that you feel that failing to help you on this issue would mean that you would not speak to me on the main issues of your case for which [Kelley] hired me"; see also the July 15, 1998 letter stating, "[You] will never be sure that I am in your camp and therefore supporting your best interests, and that this will seriously undermine your trust of me.") Defendant highlights the fact that Dr. Kaser-Boyd's second letter also referenced that the court's recent ruling on sharing experts put her in an "untenable position," and she could not "serve two masters." It is clear from the letters, however, that Dr. Kaser-Boyd expressed a desire to resign before the court issued its ruling. Although she does indicate in her second letter that the court's ruling was another "reason" for her decision to resign, she had already articulated in her first letter that she needed to withdraw because defendant simply did not trust her or OCPD. As the court explained to the public defender, "It is not his mistrust of your office. It is his mistrust of anybody except

Michael Burt." During the hearing on OCPD's motion to withdraw as advisory counsel, the trial court further underscored defendant's distrust, stating, "It doesn't matter who is here [as advisory counsel], we are still going to have this conflict because [defendant] is going to say, 'Unless it comes from Mr. Michael Burt, I disagree.' That is what is going to happen." The record thus supports the finding that Dr. Kaser-Boyd had decided to withdraw *before* the court issued its ruling for reasons completely independent of that ruling.

Finally, even if Dr. Kaser-Boyd did ultimately resign in part because of the directive to work on different tasks for defendant and for OCPD, defendant has not shown that the trial court's order to share experts violated his constitutional rights by preventing him from presenting his defense in his own way. Specifically, defendant does not show that even if the defense intended to call her as a witness and could not, the defense was unable to introduce similar testimony from another expert. In her July 15 letter, Dr. Kaser-Boyd opined that Dr. Nievod would be a suitable alternate expert. Indeed, Dr. Nievod, who had initially been appointed by OCPD, continued working with defendant while defendant represented himself, including evaluating defendant one day after the court's order to share experts and writing a declaration on defendant's behalf nearly two weeks later. The declaration, submitted along with defendant's motion for a renewed competency hearing, suggests that Dr. Nievod planned to continue working with him despite the court's order to share experts, had the court granted defendant's motion for a competency hearing. Dr. Nievod continued working with the defense once OCPD was reinstated as counsel; the defense introduced his testimony on defendant's mental health during the penalty phase.

In addition to arguing that OCPD's interference with experts led to defendant's inability to represent himself, defendant further argues that OCPD interfered with his rights by interviewing witnesses on topics that were unlike those that he sought to develop. Defendant does not cite anything in the record to support his contentions. He does not identify specific witnesses OCPD interviewed, and he does not identify on which topics they were interviewed. Further, he does not identify how OCPD possibly doing these things affected his ability to represent himself or develop a defense.

In *McKaskle v. Wiggins*, *supra*, 465 U.S. 168, as in this case, most of the incidents the defendant complained of occurred outside of the presence of the jury. The high court noted that on several occasions, the defendant adopted standby counsel's initiatives, and on several other occasions the defendant opposed counsel's initiatives. (*Id.* at p. 180.) The high court found that standby counsel's actions did not violate the defendant's *Faretta* rights because the defendant "was given ample opportunity to present his own position to the court on every matter discussed. He was given time to think matters over, to explain his problems and concerns informally, and to speak to the judge off the record. Standby counsel participated actively, but for the most part in an orderly manner." (*Id.* at p. 181.) Importantly, at no point did the trial court adopt standby counsel's position over the defendant's "on a matter that would normally be left to the defense's discretion." (*Ibid.*)

Like in *McKaskle v. Wiggins*, *supra*, 465 U.S. 168, the trial court here gave defendant ample opportunity to present his positions on every matter discussed. Moreover, at no point here did the trial court resolve a disagreement in OCPD's favor, rather than defendant's favor. Although defendant opposed the

order to share retained witnesses, OCPD strongly opposed the court's order as well. Defendant remained free to pursue his defense in his own way and to address the court freely. Because OCPD acting as standby counsel did not violate defendant's Sixth Amendment rights, the trial court did not err in appointing OCPD and ordering counsel to continue to prepare for trial.

### 3. *Revocation of Self-Representation*

Defendant contends the trial court erroneously revoked his right to represent himself without justification.

As previously noted, the trial court granted defendant's *Faretta* motion on May 15, 1998. When the court asked defendant if he would be ready for the scheduled trial date of September 1, defendant replied that he would try his best. On August 5, less than one month before the scheduled trial date, defendant filed his motion to continue the trial for six months.

Two weeks later, on August 19, defendant filed a motion for a new competency trial under section 1368. The court held a hearing on the motion two days later. Defendant argued he was not competent to proceed and requested the court call Dr. Nievod to the stand. When the court asked what Dr. Nievod would testify about, defendant said he did not sleep well the previous night, was "real tired and confused," and was unable to concentrate on the hearings scheduled for that day. The prosecution questioned whether the issue was competency or whether defendant was fatigued that day; the court did not know, either. When the court again asked defendant what Dr. Nievod would testify to, defendant responded that he did not know exactly and just wanted to establish for the court that he had been up late the previous night and was tired. The

prosecution argued that defendant was trying to delay and manipulate proceedings. She[7] pointed out that the court had four hearings scheduled for that day, and they had witnesses who traveled great distances to be present. When the court asked defendant if he wished to be heard on anything else, defendant continued questioning the court's decision to not have Dr. Nievod testify and did not present any additional information. The court stated that it had been watching and listening to defendant, and there was nothing wrong with his mental ability. The court found that defendant's competency motion was related to his motion to continue, that he was not preparing for trial, and he was instead spending time and money trying to delay trial. The court denied defendant's competency motion.

The court then turned to the continuance motion. The court repeatedly asked defendant if he wanted to continue to represent himself; he did not answer. The court asked defendant when he expected to finish writing and filing his pretrial motions, but he could not give an estimate. The court asked defendant if he could estimate how long trial would take, and he replied that he was "not thinking clearly right now" and was "emotionally upset." The court ordered a recess to allow defendant a chance to gather his thoughts and present an argument.

When proceedings resumed, the court again asked defendant if he wanted to continue representing himself, and he said that he did. The court asked defendant when he would be

---

[7]    The prosecution team consisted of one female prosecutor and one male prosecutor. "She" and "he" are therefore both used when referencing the prosecution.

ready to go to trial, and he replied that he would be ready in six months, as his motion for continuance indicated. Defendant said that if he were not ready within that time frame, OCPD would take over as counsel. The court again asked defendant how long it would take to complete pretrial motions. When defendant said he did not know, the court reminded defendant that trial was scheduled to begin only 10 days later.

The court said that it was considering revoking defendant's pro se status, but if he was ready to represent himself at the start of jury selection, the court would reconsider. The court opined that defendant had not put any thought or effort into getting ready for trial. The court commented that defendant engaged in "games within games within games." The court found that defendant had not been sincere at his *Faretta* hearing and was not willing to cooperate with OCPD in the preparation of his trial. The court noted that defendant made "unfavorable comments" every time a ruling was not in his favor, and while it could not revoke defendant's status because he refused to prepare for trial, it could when defendant was unwilling to abide by the rules of procedure and courtroom protocol. The court noted that they were on the eve of trial, and defendant was trying to obstruct and delay proceedings.

The court revoked defendant's pro se status. The court ordered the sheriff to permit defendant to retain his pro se materials at the county jail, noting that it gave defendant the option to make a renewed *Faretta* motion at or after the beginning of his trial if he could do so in good faith and was ready to proceed immediately.

A defendant's *Faretta* right is subject to termination whenever he engages in " 'deliberate dilatory or obstructive

behavior' [that] threatens to subvert 'the core concept of a trial.'" (*People v. Carson* (2005) 35 Cal.4th 1, 10 (*Carson*).) "When determining whether termination is necessary and appropriate, the trial court should consider several factors in addition to the nature of the misconduct and its impact on the trial proceedings," including: (1) "the availability and suitability of alternative sanctions," (2) "whether the defendant has been warned that particular misconduct will result in termination of in propria persona status," and (3) "whether the defendant has 'intentionally sought to disrupt and delay his trial.'" (*Ibid*.) The intention to disrupt and delay trial is, in many instances, sufficient to order termination. (*Ibid*.)

The trial court must make a thorough record establishing the basis for termination. The record must include "the precise misconduct on which the trial court based the decision to terminate. [Citation.] The court should also explain how the misconduct threatened to impair the core integrity of the trial. Did the court also rely on antecedent misconduct and, if so, what and why? Did any of the misconduct occur while the defendant was represented by counsel? If so, what is the relation to the defendant's self-representation? Additionally, was the defendant warned such misconduct might forfeit his *Faretta* rights? Were other sanctions available? If so, why were they inadequate? In most cases, no one consideration will be dispositive; rather, the totality of the circumstances should inform the court's exercise of its discretion." (*Carson*, *supra*, 35 Cal.4th at pp. 11–12, fn. omitted.) The trial court has considerable discretion in determining whether termination of *Faretta* rights is necessary to maintain the integrity and fairness of proceedings. (*People v. Becerra* (2016) 63 Cal.4th 511, 518.) A court's decision will not be disturbed absent a strong

showing of clear abuse. (*Ibid.*; see *People v. Welch* (1999) 20 Cal.4th 701, 735.)

Defendant contends the trial court revoked his pro se status on two grounds — he engaged in dilatory tactics and he failed to abide by courtroom protocol — and that neither are supported by the record. Defendant is mistaken. Substantial evidence in the record supports the trial court's decision that defendant was engaging in dilatory tactics with the intent to delay trial. After his extradition in 1991, defendant's dozens of motions continued proceedings until trial finally began in 1998. Defendant filed a total of 37 *Marsden* motions, several of which contained allegations that suggest the motions were not made in good faith: counsel forgot information due to their old age and "possibly their alcohol and drug use"; counsel were allied with the prosecution; and counsel were participating in a conspiracy to deprive him of his constitutional rights.

After the trial court granted his 23d *Marsden* hearing and relieved OCPD as counsel, the prosecution filed a motion asking the court to reconsider. The motion included a declaration from Deputy Sheriff Dean Weckerle. Weckerle heard defendant tell another inmate that when his case got close to trial date, the inmate could file a *Marsden* motion so that his case would have to start all over again. Defendant told the inmate that this would stretch his trial into the following year, at which time the inmate could make another *Marsden* motion and start the process again with new lawyers. The court acknowledged that it "had not fully appreciated all the things that have gone on before" but denied the prosecution's motion to reconsider.

One week after the court granted the *Marsden* motion, defendant filed a motion requesting the court reinstate OCPD.

The court denied the motion, and the subsequent litigation led to a nearly six-month delay. Three months after the Court of Appeal ordered the trial court to reinstate OCPD, defendant filed yet another *Marsden* motion.

When counsel filed a motion declaring a doubt as to defendant's competency, defendant argued they were doing so over his objection. After the court granted his request to represent himself, he filed a motion arguing he was not competent after all and requested a renewed competency hearing along with his motion to continue.

Before the court granted defendant's *Faretta* motion, defendant assured the court he would accept OCPD as advisory counsel. Just three weeks later, he moved to discharge OCPD as advisory counsel, ostensibly as a dilatory tactic, knowing that it would take new counsel several months to get caught up on his case. The length of time needed for any attorney other than OCPD to review the case was well known to the parties and defendant; when the court granted the *Faretta* motion and contemplated the appointment of advisory counsel, it opined that it would take at least six months for an attorney to simply review the case to determine if they *could* advise him. The prosecution opined it could take an attorney up to one year.

Defendant's request for a renewed competency hearing further supports a finding that he engaged in dilatory tactics. When OCPD filed a competency motion in early 1998, defendant made clear that counsel was doing so over his objection. Indeed, he accused counsel of using the competency proceedings to "discredit [his] colorable claims against them and to falsely project the possibility of reconciliation." Two weeks after defendant began to represent himself, in mid-May, he requested

funding to employ a psychologist to evaluate his mental state and subsequently filed a motion for a new competency trial. Defendant argued he had a substantial change in circumstances to warrant a new hearing, without providing evidentiary support for his position. The court concluded defendant was trying to delay proceedings when it denied his request, and the record supports the court's finding.

Defendant asserts that he worked diligently in the jail to prepare and that jail personnel could attest to his hard work. Although that may be true, the trial court acted well within its discretion when it found, based on the record before it, that defendant was using his pro se status to disrupt and delay trial. The court did not abuse its discretion when it revoked his self-representation on that ground.

Defendant further contends the trial court erroneously revoked his pro se status because he was unable to abide by courtroom protocol. The record, however, does not suggest the trial court relied on this basis for terminating defendant's status. The trial court talked at length regarding defendant's many *Marsden* motions and the long delay preceding trial. The court reminded defendant that when he refused to cooperate with OCPD and had counsel relieved, he then requested OCPD and Kelley be reappointed "after another tremendous amount of time and money." After defendant began to represent himself, he again refused to cooperate with OCPD as standby counsel, was not preparing for trial, and was "doing everything to avoid trial in the near future." The court further stated that the case was "at the eve of trial," and that defendant was "just trying to obstruct" and "just trying to delay. And that is not allowed." Although the trial court also noted that defendant made inappropriate remarks when a ruling was made not in his favor,

as described above, it does not appear that the court relied on that as a basis for revoking his status. Defendant argues nonetheless that the trial court failed to warn him that his pro se status could be revoked. The record does not support this assertion. When the trial court granted his *Faretta* motion, it warned defendant that if he attempted to delay or disrupt trial, OCPD would be reinstated as counsel. On the day the court terminated his pro se status, the court explained it was considering revoking defendant's status and ordered a break to allow defendant to gather his thoughts and make an argument.

Finally, defendant contends the court failed to consider alternative sanctions. Defendant points to his own suggested sanction — that if he was not ready to proceed with trial in six months, after his continuance, he would relinquish his pro se status and proceed with OCPD as counsel. Based on defendant's frequent change of position regarding representation, however, the record supports the trial court doubting defendant's assertion that he would step aside after six months and allow OCPD to represent him. As previously noted, two weeks after the trial court granted a *Marsden* motion to relieve OCPD in 1996, defendant sought to have OCPD reappointed. A few months after OCPD's reappointment, he filed another motion to have them relieved. Defendant promised the trial court he would accept OCPD as advisory counsel, and the court granted his *Faretta* motion; just 12 days later, defendant filed a motion to discharge OCPD as counsel. It was reasonable for the trial court to believe that defendant would refuse to have OCPD appointed six months later and demand new attorneys, further delaying his trial.

Moreover, the trial court was not required to consider any alternative sanctions. In *Carson*, we explained that when

determining whether termination is necessary, the trial court should consider, among several factors, the "availability and suitability of alternative sanctions." (*Carson, supra*, 35 Cal.4th at p. 10.) Unlike in defendant's case, the trial court in *Carson* terminated the defendant's self-representation because of out-of-court conduct. When misconduct "is more removed from the trial proceedings" or "otherwise less likely to affect the fairness of the trial," a complete termination of the defendant's pro se status may not be justified. (*Ibid*.) Out -of -court misconduct, such as that in custody, for example, may not warrant revoking a defendant's status. (*People v. Butler* (2009) 47 Cal.4th 814, 826.) Here, defendant's misconduct was not removed from the proceedings; rather, his disruptions and attempt to delay were central to them. We stated in *Carson* that intentionally disrupting or delaying trial would often suffice as a reason to terminate a defendant's self-representation. (*Carson*, at p. 10.) Thus, the trial court did not abuse its discretion under *Carson* when it revoked defendant's self-representation.

### 4. *Denial of Marsden Motion*

Defendant contends the trial court deprived him of his constitutional rights when it denied his 31st *Marsden* motion, made just after jury selection began.[8] He specifically contends the court erroneously denied his request to call witnesses to testify at the *Marsden* hearing, and the court should have ordered OCPD to dismiss Kelley as his lead attorney.

---

[8]   Defendant claims the denial of some of his earlier *Marsden* motions may have been error but notes that any error was likely purged by the court's grant of his *Faretta* motion in May 1998. He is challenging the denial of his *Marsden* motion brought after the court revoked his pro se status.

Defendant filed his 31st *Marsden* motion on September 15, 1998, the day after jury selection began. In his motion, he asked to call one of his attorneys, Deputy Public Defender Lewis Clapp, as a witness at the *Marsden* hearing. In defendant's offer of proof, he explained that Clapp would testify that he tried to cooperate with Kelley, he was not using his *Marsden* motions to delay proceedings, he could trust other members of the defense team but not if they worked under Kelley, and substantial impairments to his representation had already occurred.

A few days later, on September 21, defendant filed a request to also call Allyn Jaffrey, a deputy public defender with OCPD, and Dr. Nievod to testify as witnesses at the *Marsden* hearing. In his offer of proof, defendant explained that Jaffrey observed his interactions with Kelley and personally witnessed Kelley mistreating and provoking him, as well as undermining his confidence. He stated that Jaffrey was willing to testify in support of his motion to dismiss OCPD as counsel. In his offer of proof regarding Dr. Nievod, defendant explained that the psychologist would testify that his breakdown with Kelley resulted from his mental state and that Kelley contacted Dr. Nievod to dissuade him from testifying, threatening to rescind his expert witness retainer.

The court held a hearing on September 21. Defendant told the court that the witnesses would testify that there was an irremediable breakdown between Kelley and himself, "and the breakdown has permeated the rest of the defense case. And the cause of the breakdown is not Michael Burt, but it is Mr. Kelley." Defendant complained that he was unfairly viewed as an escape risk, and his attorneys did little to fight that assumption. Kelley explained that he was struggling to find penalty phase evidence to evoke sympathy and noted that defendant's family was not

cooperating. Because defendant's family lived in Canada and Hong Kong, Kelley could not subpoena them. Defendant argued that Kelley was trying to place blame by insinuating that his family was choosing not to cooperate, but rather they too just did not trust Kelley. He told the court that Kelley was engaging in "deception" because he did not want to relinquish control of the case. Kelley responded that defendant "speaks very generally" which makes it hard for him to respond and that defendant could not cite to anything specific he had done that suggested he was not working toward preparing the case.

The court asked defendant if he believed Kelley could "just step down" from the case. Defendant opined that Kelley could step down. The court asked defendant if he believed Carl Holmes, the public defender, could override the court's decision. Defendant said no, but he thought Holmes could be more truthful about the situation rather than "acting like there is no conflict." The court reminded defendant that Holmes never denied a conflict existed between defendant and OCPD.

The court denied defendant's request to call Dr. Nievod, Clapp, or Jaffrey to the stand. The court stated that most of what defendant wanted Clapp to testify about "are opinions that he cannot make." The court also noted that it was already aware of most of the information contained in Jaffrey's offer of proof. The court further stated that it was "not going to take part in creating a conflict between attorneys representing you," which it opined was what defendant was trying to do. The court later continued, "I just think it is poor policy for the court to say, 'Okay. You have three attorneys on your team. We are going to divide them up. Put one on after another to see what they have to say about your relationship with one of them.' I am not going to do that. In other words, Mr. Ng, I am willing to agree that

there is a problem between you and Mr. Kelley, and you don't need Mr. Clapp or Miss Allyn Jaffrey to corroborate that."

The court found that defendant was attempting to manufacture a conflict and create a delay. The court denied the *Marsden* motion.

"When a defendant seeks substitution of appointed counsel pursuant to *People v. Marsden* [(1970)] 2 Cal.3d 118, 'the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance. A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.' " (*People v. Taylor* (2010) 48 Cal.4th 574, 599.) We review a trial court's denial of a *Marsden* motion for abuse of discretion. (*Ibid.*) "Denial is not an abuse of discretion 'unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel.' " (*Ibid.*)

Defendant first contends the trial court erred when it denied his request to have Clapp, Jaffrey, and Dr. Nievod testify at the *Marsden* hearing. The trial court, however, was not required to call witnesses to adequately evaluate defendant's *Marsden* motion. Defendant cites several cases arguing otherwise, but we do not understand these cases to stand for the proposition, as he suggests, that a defendant *must* be permitted to call live witnesses in a *Marsden* hearing. Rather, we read these cases only to require that a trial court make an adequate inquiry into the defendant's motion, which in some instances *may* include the calling of witnesses. (See *U. S. v. Nguyen* (9th

Cir. 2001) 262 F.3d 998, 1005, 1003 [trial court did not conduct a hearing, did not hear from available witnesses, and asked "only a few cursory questions" before denying motion for new counsel "without explanation"]; *Schell v. Witek* (9th Cir. 2000) 218 F.3d 1017 [court failed to hold a hearing or rule on the defendant's motion]; *U. S. v. Gonzalez* (9th Cir. 1997) 113 F.3d 1026 [court refused to hold a hearing after the defendant accused his attorney of physically intimidating and coercing him into accepting a plea deal; Ninth Circuit held the trial court abused its discretion by not holding an evidentiary hearing because a witness had allegedly seen the altercation between the defendant and his attorney]; *People v. Stankewitz* (1982) 32 Cal.3d 80 [court acknowledged that the defendant could not cooperate in a rational manner with his attorney but refused to hold a competency hearing or grant a request to substitute counsel].) The cases on which defendant relies, particularly *Nguyen* and *Gonzalez*, are very different from the facts here. Importantly, the trial courts in those cases failed to conduct a hearing to determine the bases for the defendants' motions. Here, the trial court held a hearing on defendant's motion and inquired into the nature of the witnesses' proffered testimony before denying defendant's request to call them. Additionally, the trial court was well-versed in the conflict between defendant and OCPD, and the proffered witnesses' testimony offered no information that the court did not already know.

The trial court had substantial information before it on which to rule on the motion without needing to hear from additional witnesses. This was defendant's 31st *Marsden* motion in which he largely repeated previous allegations. The hearing on the motion lasted nearly three hours, during which defendant detailed his complaints against counsel, and Kelley

gave extensive responses. More importantly, defendant points to no information that Clapp, Jaffrey, or Dr. Nievod would have provided as witnesses that the court did not already have in other forms.

Defendant also asserts the trial court erroneously failed to direct OCPD to remove Kelley from the case and appoint alternative trial counsel. Defendant argues that OCPD reassigning a different deputy public defender to the case "would have conserved much if not all of the prior work that the [previous attorneys] had put into the case." Defendant ignores the fact that it would still take a new attorney a significant amount of time to get caught up on the case and be ready to proceed with trial. The trial court denied defendant's motion because it found he was attempting to create a delay; appointing new counsel, even within OCPD, would have created a delay regardless. (See *People v. Smith* (2003) 30 Cal.4th 581, 607 [" 'It is within the trial court's discretion to deny a motion to substitute made on the eve of trial where substitution would require a continuance' "].) Furthermore, based on the proceedings before it, the trial court had reason to believe defendant would refuse to cooperate with any counsel, and thus, replacing Kelley would be fruitless.

The trial court did not abuse its discretion when it denied defendant's *Marsden* motion.

### 5. *Refusal To Appoint Counsel*

Defendant contends the trial court abused its discretion when it declined to appoint the SFPD and Michael Burt to represent him in 1994 and again in 1998.

### a. 1994 Request

As previously discussed, Burt and Lew were appointed to represent defendant prior to his extradition from Canada and then subsequently removed when the Calaveras County Justice Court determined it lacked jurisdiction to appoint counsel. Defendant made his first appearance in Calaveras County for arraignment on September 27, 1991. On October 4, 1991, Burt and Lew filed a motion requesting appointment as counsel. The court denied the request due to concerns regarding Burt's availability and appointed attorneys Webster and Marovich. Defendant subsequently spent several years attempting to get Burt reappointed as counsel.

On January 21, 1994, the Calaveras County Superior Court conditionally relieved Marovich and Webster pending the appointment of new counsel after the venue transfer. After the transfer to Orange County, on September 19, 1994, defendant and the SFPD jointly filed a notice of conditional intent to represent defendant and requested a hearing for "confirmation of representation." The pleading noted that seven of the charges had vicinage in San Francisco, and it was "highly likely" that all counts would ultimately be transferred to San Francisco. The pleading included a declaration from Holmes, the Chief Deputy Public Defender for Orange County. Holmes agreed that SFPD should be appointed as counsel.

On September 20, SFPD sent the court a letter enumerating its conditions for accepting appointment. SFPD required an advanced approval of sufficient funding, a "guarantee of the full amount of time which we will require" to effectively represent defendant, and a "forum convenient to this office trying the case." SFPD suggested San Francisco as the

appropriate forum. SFPD further explained that any tentative agreement required approval by the SFPD, the San Francisco Board of Supervisors, and the Mayor of the City and County of San Francisco.

On September 28, SFPD filed a status report, noting that they had been "making every effort to resolve administrative and logistical issues affecting their ability to provide effective representation" on the charges. SFPD identified three issues that required resolution prior to appointment: the procedure for providing compensation, the procedure for providing ancillary defense funds pursuant to section 987.9, and an "assurance" of at least two years to prepare for trial. SFPD requested the trial court continue the hearing regarding representation for 30 days to allow time to finalize the necessary arrangements.

The parties made their first appearance in Orange County on September 30, 1994. The prosecution objected to the continuance and requested the court appoint counsel at the hearing. The court stated that counsel's monthly bills had been reviewed and paid until that point, and it did not understand why SFPD needed another 30 days to determine payment on ancillary funds. The court noted SFPD's estimate that it would need two years to prepare for trial and that new counsel would need three years, along with SFPD's request for a guarantee that trial would not start for at least two years. The court found it "absolutely unbelievable" that it would take Burt "or any other competent defense death penalty counsel" two years to begin the case. The court stated that "thirty days won't help resolve these issues" and denied the motion to continue.

The court moved on to the issue of representation. Defense Counsel Multhaup explained that under section 987.05,

both the defense and the prosecution had the right to present evidence regarding the time necessary to prepare for trial, and the court should then appoint counsel based on the ability of the prospective defense attorneys to meet that reasonable date. The prosecution responded that the Calaveras County court had given Burt "a considerable amount of time" to make a reasonable estimate of when he could be ready for the preliminary hearing, that the defense had provided no documentation justifying why it needed the time requested, and that new counsel would need eight months to prepare. Multhaup requested a hearing to determine the time required to prepare.

The court acknowledged that defendant had developed a rapport with Burt but noted that Burt had only appeared for defendant at one evidentiary hearing in 1991. The court stated that the "interests of justice just can't handle another delay of two or more years which is required" and opined that any competent attorney should be prepared to try the case in a significantly shorter time. The court noted that regardless of the amount of time required, SFPD has not consented to appointment; consent was conditional, and the condition of requiring a forum convenient to SFPD could not be met. The court acknowledged that SFPD had "good reasons" for wanting the case to be tried in San Francisco, but "that decision has been decided adversely to their position."

The court further noted that even if SFPD and Burt consented to the appointment, it could be abrogated by the San Francisco Board of Supervisors and the mayor, "so literally the decision to accept is out of their control." The court stated that "it would be reasonable to assume that a political governing body would have to take a close look at lending one of their most experienced attorneys to another county for two to three or more

years.  They would have to look at it.  There has been far too much delay in this case, it's time to get it moving."  The court denied the motion and appointed OCPD.

Defendant asserts the trial court erred in several ways when it declined to appoint Burt and SFPD as counsel:  (1) the court misinterpreted SFPD's request to try the case in San Francisco and abused its discretion in determining that SFPD had not consented within the meaning of section 987.2, subdivision (g); (2) the court ignored the requirements of section 987.05 when it appointed OCPD without conducting a hearing as to readiness; and (3) the court failed to properly apply the factors provided in *Harris*, *supra*, 19 Cal.3d 786.  We conclude none of these arguments are meritorious.

Section 987.2, subdivision (g), states that when an indigent defendant is charged in one county and establishes a relationship with the public defender and is subsequently charged in a second county, the trial court in the second county may appoint the public defender from the first county to represent the defendant in both counties as long as three conditions are met:  (1) the offense charged in the second county could be joined for trial with the offense charged in the first county if it took place in the same county or involves evidence which would be cross-admissible; (2) the trial court finds that the interests of justice and economy will be best served by unitary representation; and (3) counsel appointed in the first county consents to the appointment.

"The appointment of counsel for indigent defendants under section 987.2 rests within the sound discretion of the trial court."  (*People v. Horton* (1995) 11 Cal.4th 1068, 1098; see *Drumgo v. Superior Court* (1973) 8 Cal.3d 930, 934–935.)  "An

abuse of discretion is not demonstrated, however, simply by the failure of a trial court to appoint a particular counsel whom the defendant has requested and who is willing to undertake the appointment." (*Horton*, at p. 1098.)

Section 987.05 states that a trial court shall appoint an attorney who represents, on the record, that he or she will be ready to proceed with the preliminary hearing or trial within the statutory time or, in unusual circumstances, by a reasonable time as determined by the court.

Taking each of defendant's arguments in turn, first, the trial court did not misinterpret SFPD's request to try the case in San Francisco. SFPD clearly informed the trial court that it had three terms which the office "required" prior to accepting appointment. One of those terms was a "forum convenient to this office trying the case." Defendant asserts that SFPD did not demand the trial be held in San Francisco; they merely noted it would be most convenient, and therefore SFPD did consent to appointment. The trial court, however, did not abuse its discretion when it determined that SFPD was requesting a different forum. If SFPD considered Orange County a convenient forum to try the case, they would not have had a reason to include that as a condition of appointment. And as the trial court noted, the venue for the case had already been decided and there was no expectation that it would be transferred again.

Second, defendant cannot establish prejudice from the trial court's refusal to conduct a readiness hearing pursuant to section 987.05 regarding SFPD's request for at least two years to prepare for trial. Defendant argues that if the court had held a readiness hearing prior to appointing OCPD as counsel, OCPD

would "presumably" have presented evidence in support of a trial two years more in advance of the date of appointment, after which the trial court "would have been forced to reconsider its refusal to appoint [SFPD] on that basis." Defendant's multiple presumptions — that OCPD would have required at least two years to prepare for trial and that the trial court would have thus reconsidered its ruling regarding SFPD — are simply too speculative to establish that he was prejudiced by the court's denial of his request to hold a hearing.

Third, the trial court did not fail to properly apply the factors provided in *Harris*, *supra*, 19 Cal.3d 786. In *Harris*, we held the trial court abused its discretion when it refused to appoint requested counsel for two indigent defendants. A complaint was initially filed in the municipal court, and after the public defender declared a conflict, the municipal court appointed counsel requested by the defendants. (*Id*. at p. 789.) After an indictment was filed in the superior court on the same matter, the People moved to dismiss the complaint in the municipal court. The defendants requested the same attorneys be appointed in the superior court, but the court denied the request and appointed alternate counsel. (*Id*. at p. 790.) The appointed attorneys joined with the defendants and the original attorneys in a request to have the original attorneys represent them. The court declined the request, stating that it had considered the reputations of the appointed counsel among the local bench and bar, their experience in proceedings of similarly serious cases, and their certifications as criminal law specialists.

On appeal, we held the trial court's refusal to appoint the original attorneys was an abuse of discretion. (*Harris*, *supra*, 19 Cal.3d at p. 799.) We found significant that the requested counsel had previously represented the defendants in related

matters, during which the attorneys had established a close working relationship with the defendants. (*Id.* at pp. 797–798.) We further held that this relationship provided counsel with an extensive background in factual and legal matters that might become relevant in the current proceedings. The newly appointed attorneys had acknowledged to the trial court that it would take substantial amounts of effort and time to attain the necessary background already possessed by the original attorneys. (*Id.* at p. 798.) We also found significant that the appointed attorneys vigorously supported the defendants' requests for the original attorneys to be appointed, emphasizing their unfamiliarity with the facts and legal issues involved. (*Id.* at pp. 798–799.)

In *People v. Daniels* (1991) 52 Cal.3d 815, "we acknowledged that uncertainty existed on the question whether *Harris,* which permits discretionary appointment of counsel for indigent criminal defendants, was applicable to situations where the public defender was available for appointment. Ultimately, however, we declined to address the question because the facts presented in *Daniels* were factually distinguishable both from *Harris* and from the situation where a defendant is unable to cooperate with the available public defender." (*People v. Cole* (2004) 33 Cal.4th 1158, 1186.) We again declined to address this question in *Cole*, noting that the record in that case did not demonstrate that the relationship between the defendant and the requested counsel ever approached the depth of the relationship between the attorneys and defendants in *Harris*. (*Id.* at p. 1187.) We further noted that in *Cole*, unlike in *Harris,* the appointed attorney did not seek to withdraw or actively support the other attorney's appointment.

We need not now determine whether *Harris* applies when the public defender is available because regardless, the trial court did not abuse its discretion here. Like in *Cole*, the record here does not suggest that defendant and Burt had formed the relationship that existed between the attorneys and defendants in *Harris*. The defendants in *Harris*, a husband and wife, requested the appointment of Leonard Weinglass and Susan Jordan, respectively, for the proceedings in 1976. Prior to that, Weinglass had represented Mrs. Harris between October 1975 and August 1976 in proceedings brought on by an 11-count indictment, including numerous pretrial motions and a six-week trial. At the time of the *Harris* proceedings, he represented both defendants on appeal from the prior judgment. (*Harris*, *supra*, 19 Cal.3d at p. 757, fn. 10.) In connection with that defense, he coordinated facts and trial strategies with eight other people also subject to criminal proceedings for activities in connection with the so-called Symbionese Liberation Army; representation in the current proceedings would require familiarity with hundreds of pages of overlapping materials and many common witnesses. Jordan had represented Mrs. Harris in federal proceedings and consulted with her during the previous proceedings with Weinglass.

In the present case, Burt had represented defendant on September 27, 1991, at defendant's first appearance after being extradited from Canada. His prior representation had been terminated in 1988 when the Calaveras County Justice Court determined it lacked jurisdiction over defendant while awaiting extradition. There is nothing in the record to support a finding that Burt had devised defense strategies, researched legal issues, or interviewed witnesses. Quite the opposite, in a declaration to the court dated October 23, 1991, Burt

acknowledged that he had conducted only a preliminary review of minimal discovery materials and had yet to meet with defendant since his return to California.

It is true that here, unlike in *Cole*, OCPD agreed to withdraw from representation and supported defendant's motion to appoint Burt and SFPD. However, we find the lack of depth in the relationship between SFPD and defendant to be more significant here, and notably, unlike in *Harris* and in *Cole*, SFPD did not fully consent to appointment. SFPD conditioned its acceptance as counsel on specific terms that the trial court could not meet; neither counsel in *Harris*, nor in *Cole*, presented conditions to the court when requesting appointment.

The trial court did not abuse its discretion when it denied defendant's request to appoint SFPD in 1994.

### b. *1998 Request*

Following defendant's 26th *Marsden* motion in August 1997, Burt told the trial court that his office was available to accept appointment "depending upon the circumstances of appointment and specifically issues of where the case gets tried and when it gets tried and issues such as funding." On October 10, the court agreed to appoint Burt as cocounsel if Burt and the presiding judge could agree on Burt's compensation. To accommodate Burt's schedule, the court set a trial date of September 1, 1998. On January 16, 1998, Burt told the trial court that "there has been discussion, various proposals, counter proposals . . . we are at a point where I don't think there is going to be a resolution of this issue. I believe I have made my best proposal. That has been rejected, and I don't think there is any further room to move at this point." The court had offered to pay Burt a salary, but he insisted on hourly compensation.

On March 20, 1998, Burt told the trial court that he was willing to pursue the option of replacing Kelley as lead counsel. The court pointed out that it had previously been willing to appoint Burt but that the financial arrangement did not work out. Burt told the court that when they had previously discussed his appointment, the plan was for him to join the existing team with Kelley as lead counsel, and he would assist defendant and Kelley in resolving their problems. When he previously told the court that the financial arrangement did not work out, he also believed "that the larger problem" was joining an existing team, and he wanted to be lead counsel with a new team. Burt explained that he was now willing to replace Kelley and keep the rest of the OCPD team in place.

Burt noted that such an appointment would require additional conversations with another judge about compensation. Burt further stated that if he replaced Kelley, he did not believe he would be ready by the trial date of September 1. He asked for the opportunity to take some time and then report back to the court if he could be ready by September 1.

The prosecution did not oppose the appointment of Burt but opposed a further delay in trial. She acknowledged that defendant's lack of cooperation made preparation difficult for his attorneys but opined that the prosecution "should not be penalized by delay of the trial." In response, Burt explained that he had not been connected to the case since 1991, and he needed to review more than 100,000 pages of discovery. The court told Burt that it was "not going to play that game," and Burt should not accept appointment unless he could be ready by September. Burt replied that he could not commit to the September 1 trial date without taking additional time to consider its feasibility.

The court noted that Burt was still representing defendant on separate San Francisco charges, which "has to include every bit of what is going on" in Orange County. The court was, therefore, surprised that Burt said he had not been involved in the case since 1991. The court continued, "If you can make a good faith representation that you could be ready, again understanding that things do change, but a good faith representation that you could be ready by September 1, fine; come aboard. But just to get another delay, that won't work." The court pointed out that it had "tried very hard" to have Burt join defendant's team, and it had previously set a trial date of September 1 per Burt's request. Burt declined to meet with the presiding judge to discuss compensation, and the case proceeded with Kelley as lead counsel.

Defendant contends the trial court's refusal to appoint Burt was "arbitrary on its face, and contrary to the spirit of Penal Code section 987.05." Defendant does not assert the trial court actually committed legal error when it declined to appoint Burt as counsel. To the extent we construe defendant's claim as one asserting error, we conclude the trial court did not abuse its discretion. Burt had been seriously considering appointment for several months prior to March 1998, and thus had ample time to determine if he could be ready by September 1. When he requested more time to decide, he did not provide the trial court with a set date for when he would know if he could proceed, nor did he provide the court with an estimate for how long a review of the case would take. The trial court was not obligated to provide Burt with more time, and defendant does not cite any law suggesting otherwise. As the court explained at length on the record, the court did not want to delay the case any further and did not understand why Burt did not have enough

75

information about the case to make a determination regarding timing; when the court expressed confusion on this, Burt did not offer an explanation. Additionally, Burt would not consent to appointment on the date of the hearing. The trial court did not abuse its discretion in refusing to appoint him as counsel.

## B. Venue Change Proceedings

Proceedings in this case began in Calaveras County before they were moved to Orange County, following a venue change motion. Defendant contends the trial court made multiple erroneous rulings and engaged in misconduct during venue-related proceedings in both counties. He further contends the trial court erroneously failed to transfer six counts from Orange County to the City and County of San Francisco.

### 1. *Procedural History*

On April 24, 1991, while the case was still in the Calaveras County Justice Court, defendant filed a motion to exclude the public from the preliminary hearing. At a hearing on the motion, defendant presented evidence that an "unusually high" percentage of the public in Calaveras and Contra Costa Counties had already prejudged defendant, as compared to other high-profile cases.

In July 1993, defendant filed a motion to dismiss the information pursuant to section 995, in which he argued that Calaveras County lacked territorial jurisdiction over counts 2 through 7 — the Dubses, Cosner, Peranteau, and Gerald murders — and instead, San Francisco was the proper venue. Defendant further argued that trying those charges in Calaveras County would violate his right to a jury drawn from the vicinage where the crimes occurred, but a trial in San Francisco would satisfy that requirement. The prosecution

argued that Calaveras County did have territorial jurisdiction and that the vicinage issue was unripe because defendant had indicated he would waive vicinage by moving for a venue change.

On December 8, 1993, the Calaveras County Superior Court judge who had been overseeing proceedings recused himself from the case. The presiding judge of the Calaveras County Superior Court, who had previously been disqualified from the case, asked the Judicial Council to assign a new judge. In a letter to the Judicial Council, the prosecution stated that all parties assumed venue would be transferred to another county. The prosecution expressed a preference for Southern California because of a reduced amount of publicity surrounding the case. On December 30, 1993, the Judicial Council assigned Judge Donald McCartin, a retired judge from Orange County, to the case.

Judge McCartin held a status conference on January 21, 1994. Several issues were pending at the time, including defendant's motion to discharge Webster and Marovich, his court-appointed attorneys, and replace them with Burt and Lew. Webster and Marovich had also filed a motion to withdraw from the case. At the hearing, defense counsel explained that both parties stipulated that venue would be transferred out of Calaveras County and that a change of venue was "a necessity." The prosecution agreed that a change of venue was needed but did not believe that the City and County of San Francisco "has any more right to the case than any other county in the state." The prosecution also noted that when the defense moved to close the preliminary hearing, they presented opinion surveys done in Contra Costa County, and defense experts testified that defendant could not receive a fair trial in Contra Costa County.

The prosecutor argued that San Francisco received the same media as Contra Costa.

Judge McCartin stated that he wanted to take care of the *Marsden* matter first. He indicated that it was appropriate to grant the *Marsden* motion but wanted to wait to appoint new counsel until the new venue had been selected. He opined that wherever the case was assigned, it would be in a county large enough to have qualified death penalty attorneys to handle the case.

Defense counsel asked the court to address the vicinage issue before venue, because if vicinage belonged in San Francisco, it could affect the decision regarding venue. The prosecution asked the court to rule on venue first. Judge McCartin suggested the parties first stipulate to a venue change, then refer the matter to the Judicial Council to select a venue, and then raise any vicinage concerns after the case had been transferred. He noted that publicity might be a concern in San Francisco, but he had not read anything about the case in Los Angeles or Orange Counties. Defense counsel agreed to transfer the matter to the Judicial Council for a venue change but stressed that any stipulation to a venue transfer would not waive the vicinage issue. Judge McCartin told the parties to submit documents for the court to forward to the Judicial Council. Judge McCartin conditionally relieved defense counsel pending the appointment of new counsel after the venue transfer.

The parties stipulated to having the change of venue matter referred to the Judicial Council. Defense counsel again clarified that defendant reserved the right to challenge vicinage for counts 2 through 7. Judge McCartin told the parties that

they could submit additional materials to the court to be forwarded to the Judicial Council for consideration.

Six days later, on January 27, Judge McCartin issued a supplemental minute order informing the parties that he had been mistaken about the procedure for changing the venue. He explained that the Judicial Council would identify which counties would accept the case, after which the court would conduct an evidentiary hearing pursuant to *McGown v. Superior Court* (1977) 75 Cal.App.3d 648 (*McGown*) to select a new venue.[9]   Judge McCartin reappointed defense counsel to represent defendant at the *McGown* hearing.

Both parties submitted letters to the court, to forward to the Judicial Council, explaining their positions on venue and vicinage. On February 1, 1994, the court forwarded to the Judicial Council a set of relevant documents, including the letters submitted by the parties.

On March 3, 1994, the Judicial Council informed the court that Orange County and Sacramento County were willing to accept the case. John Toker, an attorney for the Judicial Council, explained that he had contacted the San Francisco Superior Court, and they were not willing to accept the case. A few days later, Toker sent a letter to the court stating that his office received the documents sent by the parties in early February, but they had been misplaced and he did not receive

---

[9]     *McGown, supra,* 75 Cal.App.3d 648 held that after a motion to change venue is granted, the court must hold an evidentiary hearing before determining where the case should be transferred. (*Id* at p. 652.)  Especially when the parties disagree as to where the case should be transferred, a hearing allows the court to resolve any factual issues contested by the parties. (*Ibid.*)

them until March 4.  Toker explained, however, that the Judicial Council's role in the venue change matter was "ministerial," and it would not review any papers submitted "for legal or judicial purposes."  Rather, the Judicial Council would rely on information from the court based on its own review of any pertinent evidence.

The court set a *McGown* hearing for April 8, 1994. Because Judge McCartin was from Orange County, one of the possible trial sites, the Judicial Council assigned a retired judge from Siskiyou County to preside over the *McGown* hearing.

On March 14, 1994, defendant filed a motion requesting the appointment of the SFPD — specifically, Burt — for the limited purpose of the *McGown* hearing.  The court denied the motion, stating that Burt could seek appointment as counsel after the selection of a new venue and transfer of the case.  The court acknowledged Toker's note that the Judicial Council would not consider the parties' letters and explained that it had "specifically advised" Toker that defendant requested San Francisco while the prosecution preferred Southern California. The court said that it had spoken with Toker, who had indicated he was having difficulty finding counties that would accept the case and that "San Francisco County specifically refused and stated it cannot handle this particular case under any circumstances."  The court concluded that it "has been obvious from the beginning, and both parties have repeatedly stated, that trial cannot be conducted in Calaveras County, and the defendant's statement that he cannot accept a choice of counties that does not include San Francisco as a possible trial site is beyond the power of this court to attempt to remedy."

On April 5, 1994, defendant filed a motion attempting to revoke his agreement to have counts 2 through 7 transferred to an alternate county unless that county was San Francisco. He argued that those counts had vicinage in San Francisco and must be tried there under the federal Constitution, and the remaining counts should be tried in San Francisco as well to further the interests of justice. He acknowledged that he had previously agreed to have all the counts transferred to the Judicial Council for assignment but asserted this was only on the condition that he could submit materials for the Judicial Council to consider.

That same day, defense counsel filed a motion for a hearing "to correct miscommunications" regarding San Francisco's availability and to continue the *McGown* hearing. Submitted with the motion was a declaration from Defense Counsel Margolin, in which he described a conversation he had with Judge Raymond Arata, the presiding judge of the San Francisco Superior Court. Judge Arata confirmed that he had spoken with the Judicial Council regarding defendant's case but had not been told that there was a related pending case against defendant in San Francisco, had not been informed that defendant had asserted vicinage rights in San Francisco on six counts, had not been informed that a substantial number of witnesses were located in San Francisco, had not been told about defendant's desire to be represented by SFPD, and had not been informed that the parties estimated that trial would still be two or three years away from that date. Judge Arata further stated that he had not categorically refused for the San Francisco Superior Court to take on the case under any circumstance.

Two days later, Webster and Marovich filed a motion to suspend all venue-related proceedings. They asserted that

defense counsel never stipulated to a change of venue for counts 2 through 7 and that the January 21, 1994, minute order incorrectly reflected that defendant had agreed to do so. They requested the minute order be corrected and that all venue change proceedings be suspended because no stipulation had taken place.

The parties met again on April 8 for the *McGown* hearing. Before turning to the hearing, the court addressed the venue change agreement and asked for the prosecution's position on the defense motion to suspend proceedings. The prosecution opined that the defense motion operated as a severance motion and suggested the court exercise its discretion and sever counts 2 through 7 for the remainder of the case. The court stated that it had reviewed all of the materials submitted and most of the record thus far and thought the parties all did "an outstanding job" briefing the vicinage issue, and it was prepared to rule on the vicinage issue if the parties wanted a ruling at that time. Defense counsel again emphasized that defendant was not waiving any rights regarding vicinage or the ability to challenge vicinage at any time in proceedings. After pausing the venue discussion to address press coverage, proceedings resumed at which time defense counsel argued their motion that Burt be appointed for purposes of the *McGown* hearing. The court reiterated that counsel would be appointed after the case was transferred to a new venue.

Defense counsel argued that the court could send counts 2 through 7 to San Francisco based on vicinage. He asserted that San Francisco would have to take those counts, and the SFPD and Burt would then be appointed. Then, he argued, the county would likely have the rest of the counts transferred to San Francisco as well. Counsel asserted that this was their "package

solution, which seems to cut through the heart of the matter." Counsel explained that Burt recently had a "once-in-a-lifetime leave of absence" to work on a high-profile murder trial in Los Angeles, and he would not be able to travel to Southern California "and make a *Harris* pitch" on defendant's behalf. Webster acknowledged that defendant had four attorneys representing him in Calaveras County and Burt present in the courtroom, but no one was prepared to move forward with the *McGown* hearing and although he and Marovich were most familiar with the case, they did not have defendant's cooperation. He asked the court to appoint Burt for the limited purpose of advising defendant on the venue change matter and the *McGown* hearing. The court addressed that request, explaining it was inclined to deny it because defendant had four competent attorneys present for the previous venue discussions and the case needed to move forward. The court opined that "all the hue and cry has arisen because San Francisco didn't end up as one of the trial sites."

As to the Judicial Council's selection of counties available to hear the case, the court explained that, according to Toker, the Judicial Council's sole job was to determine which counties would not be unduly burdened by the trial. The Judicial Council did not consider vicinage "and all these other factors," and it was the trial court's responsibility to hold an evidentiary hearing to best serve the interests of justice. The court denied defendant's motion to refer the matter back to the Judicial Council, noting that the council would not consider any additional information regardless.

The court turned to the motion to continue the *McGown* hearing. When Judge McCartin asked the defense why it needed 60 to 90 days, counsel responded that they wanted to

determine the levels of publicity in Sacramento and Orange Counties and wanted to determine the racial compositions of the potential jury pool in each county. The court stated it did not know what the publicity was like in Northern California, but in Southern California, the publicity was "nil." The court denied defendant's motion to continue the *McGown* hearing, subject to reconsideration by the judge presiding over the *McGown* hearing. Judge McCartin noted that the parties could submit additional materials within 30 days of the hearing if new data warranted submission.

The court also ruled that it was clear from the record that defendant did not waive any vicinage claims regarding counts 2 through 7, and the prosecution was estopped from raising any waiver arguments on those counts resulting from defendant's stipulation to a venue change.

Lastly, the court denied the defense's motion to correct the "miscommunication" regarding San Francisco's availability.

When Judge Kleaver took the bench later that same day for the *McGown* hearing, he stated that the court would not review any decisions made by Judge McCartin that morning. Judge Kleaver noted that all parties agreed a venue change was necessary due to pretrial publicity in Calaveras County. Judge Kleaver stated that under *McGown*, and pursuant to California Rule of Court, former rule 842 (rule 842), he did not have the authority to order the venue be transferred to an undesignated county and was limited to the two options that the Judicial Council had presented.[10]

---

[10] Former rule 842 was amended and renumbered to California Rules of Court, rule 4.152 in 2001.

The court stated that "there are a number of matters on the record" between Sacramento County and Orange County, that "would make it a rather easy conclusion which of the two is the more suitable site for any transfer." The court noted that two or three Sacramento television station trucks were parked outside the courthouse, while the record indicated that interest in Orange County was rather minimal. Defense counsel responded that the court did not hear any arguments as to why Orange County was inappropriate, and it needed more time to determine why Orange County might not be a proper venue. The prosecution argued that, based on the record, it was not necessary for the defense to have a pretrial survey done. He further argued that the defense's conclusions about what may be found in the survey "are completely speculative" and based on the record, the court could order a change of venue to Orange County.

Judge Kleaver questioned the defense why nothing had been done since January, aside from requesting funding for the pretrial survey. Defense counsel responded that it was "not true that nothing was done." He explained that the defense had "raised the issue" with the National Jury Project, applied for funding, and done the preparatory work. Counsel found out on March 7 that they needed to be prepared for the *McGown* hearing on April 8. They had conversations with the director of the National Jury Project and "boiled down the issues to publicity, one; number two, prejudgment, which is a separate issue from publicity; and number three, the demographics." The director told him it would take 60 to 90 days to complete the survey, and they simply did not have enough time.

The prosecution argued that if the case would be further delayed by appeals on the court's ruling, "and it appears obvious

that it is, we should have as many rulings in as possible, and the People would ask for the venue order." The court agreed.

Defense counsel argued that it had never actually stipulated to a venue change for counts 2 through 7. The court responded that it would include all counts in the transfer order. The court denied the request to continue the hearing for the purpose of conducting a pretrial survey, denied the request to consider the City and County of San Francisco as being beyond the scope of the *McGown* hearing and former rule 842, and ordered all counts be transferred to Orange County.

One month later, the defense filed a motion in Calaveras County to set aside the venue transfer agreement on January 21, 1994. On June 30, 1994, Judge Curtin with the Calaveras County Superior Court denied the motion.

On January 13, 1995, in the Orange County Superior Court, defendant filed a motion to have the case transferred to San Francisco. The court denied the motion on March 24.

Two years later, on April 22, 1997, the defense filed a motion to transfer counts 2 through 7 to San Francisco on the ground that San Francisco had territorial vicinage to try the counts. At a hearing on the motion, the trial court stated that Calaveras County had vicinage for every count because there was a high likelihood that every victim had been killed in Calaveras County. The court denied the motion.

Defendant raised venue and vicinage challenges several more times, including in his motion for a new trial at the conclusion of the penalty phase.

### 2. *Venue Errors*

Defendant contends the courts in Calaveras and Orange Counties made multiple erroneous venue-related rulings that deprived him of due process. As an initial matter, we conclude that all of defendant's claims fail based on a lack of prejudice. Defendant's primary goal in the trial court was not simply to change venue, but to specifically transfer the case to San Francisco. As defendant himself acknowledges, from the beginning of trial site selection proceedings, he "proceeded on the basis that if administrative or judicial authorities considered the merits of a transfer to San Francisco, the overwhelming array of factors favoring San Francisco would make the result a virtual foregone conclusion." When defendant was proven wrong and the City and County of San Francisco was not a viable option, he sought to delay proceedings to find a way to have San Francisco nonetheless considered. When proceedings were instead transferred to Orange County, he refused to accept the trial court's decision.

A defendant seeking a change of venue is not entitled to choose the venue; the court makes that decision. (*People v. Cooper* (1991) 53 Cal.3d 771, 804 (*Cooper*); former rule 842.) When a trial court denies a defendant's motion to change venue, as the court did once the case moved to Orange County, "the defendant must show both that the court erred in denying the change of venue motion, i.e., that at the time of the motion it was reasonably likely that a fair trial could not be had in the current county, and that the error was prejudicial, i.e., that a fair trial was not *in fact* had." (*Cooper*, at pp. 805–806.) The record does not support a finding that defendant could not receive a fair trial in Orange County at the time he made the

motion, nor does it support a finding that he did not ultimately receive a fair trial.

Defendant provides statistics comparing the Chinese American and Vietnamese American populations in Orange County and in the City and County of San Francisco. Regardless of the fact that an appellate court does not review information outside of the trial record (see *Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2), this information is irrelevant to the determination of a venue between Sacramento and Orange Counties. Defendant contends that if the case had been in the City and County of San Francisco, his jury would have included more Chinese Americans. He further contends that Chinese Americans would have evaluated the evidence differently than other jurors. These assertions, however, are impermissible speculation. Furthermore, had the defense presented the above statistics regarding Orange County to the trial court, the alternative would have been Sacramento County, not San Francisco, because San Francisco was not under consideration.

Defendant further contends that he was prejudiced because Orange County lacked jurisdiction over his case. His contention lacks merit. We have previously stated that "it is beyond dispute that a change of venue may be ordered in a criminal case under appropriate circumstances, and also beyond dispute that any superior court to which a felony proceeding has been transferred has subject matter jurisdiction over the proceeding . . . ." (*People v. Simon* (2001) 25 Cal.4th 1082, 1097 (*Simon*).)

Thus, his claims fail. Nonetheless, we address each claim in turn.

### a. Trial Site Agreement

Defendant first contends the trial court deprived him of due process by abrogating the terms of the venue change agreement.  Specifically, he asserts that his initial consent to refer the matter to the Judicial Council was vitiated by (1) the Judicial Council's refusal to consider the documents he submitted; (2) the subsequent failure to inform him that the Judicial Council knew the prosecution wanted the case tried in Orange County; and (3) the failure of Judge McCartin to recognize his revocation of consent.

Defendant likens his agreement to change venue to that of a plea bargain and asserts that the principles of due process that govern judicial review of plea bargains must guide review of his "venue bargain."  An agreement to change venues, however, is not comparable to a plea agreement.  "Plea negotiations and agreements are an accepted and 'integral component of the criminal justice system and essential to the expeditious and fair administration of our courts.' " (*People v. Segura* (2008) 44 Cal.4th 921, 929.)  During the process of negotiating a plea, a defendant pleads guilty in order to obtain a reciprocal benefit from the prosecution, generally consisting of a less severe punishment.  (*Id.* at p. 930.)  A trial court may decide not to approve the terms of a negotiated plea agreement.  (*Id.* at p. 931.)

" 'Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial.' " (*People v. Farwell* (2018) 5 Cal.5th 295, 299, quoting *Boykin v. Alabama* (1969) 395 U.S. 238, 243.)  These rights include the right to a trial by jury, the privilege against

self-incrimination, and the right to confrontation. (*Farwell*, at p. 299.)

The agreement between the parties was not the product of bargaining between the defense and the prosecution. Both parties agreed that none of the counts should be tried in Calaveras County due to pretrial publicity, and as a result, the trial court advised the matter be referred to the Judicial Council to select a venue. Furthermore, the agreement to transfer venue did not require defendant to waive any constitutional rights. The agreement did not serve as an admission of defendant's guilt nor did it relieve the prosecution of its burden of proof.

Defendant contends the court violated the terms of the venue change agreement when the Judicial Council failed to review the materials he submitted for consideration. To compare the venue change agreement to a plea bargain would mean that defendant agreed to change venue *only* on the condition that the Judicial Council review his materials, and no such promise was made here. The trial court told the parties to submit materials to the court that it would forward to the Judicial Council for review, but nothing was promised and no bargain was made dependent on the Judicial Council's review. Thus, under defendant's own analogy, his claim fails.

Defendant argues the venue change agreement was further vitiated by the fact that at the time the parties made the agreement, Judge McCartin knew that the Judicial Council was aware the prosecution favored Orange County. He further argues that the trial court affirmatively recommended Orange County to the Judicial Council. He asserts that the court did not disclose this information, and if it had done so, he would not have agreed to change venue.

Defendant cites the hearing on the defense's motion to withdraw the venue change stipulation as support for his argument. At the hearing, Judge McCartin testified about his conversation with Chris Hoffman, a secretary for the Judicial Council's Judicial Assignment Commission. Hoffman knew that the prosecution preferred Southern California, and the defense preferred San Francisco. John Toker, the Judicial Council attorney, testified at the hearing that Hoffman told him Orange County was available but did not direct him to push the case toward Southern California.

The record does support a finding that the Judicial Council knew the prosecution preferred Southern California, but defendant ignores that the record also shows that the Judicial Council knew that defendant preferred San Francisco. Aside from asserting he would not have entered the agreement otherwise, defendant does not establish what was improper about the Judicial Council knowing each party's preference nor does he establish *why* he would not have entered the agreement had he known.

Finally, he asserts the agreement was vitiated by Judge McCartin's failure to recognize defendant's revocation of consent after he learned that the Judicial Council would not review the materials he had submitted. Defendant's argument is based on the premise that he was entitled to withdraw his consent similarly to a defendant whose consideration was nullified following a broken plea bargain. Because defendant's venue change stipulation is not equivalent to a plea bargain and his request to revoke his consent is not equivalent to a broken plea bargain, his claim fails.

In any event, defendant's argument that the venue change agreement was vitiated ignores the basic fact that the Judicial Council did consider San Francisco as a venue despite the lack of materials from defendant.  It also ignores that the trial court, not the Judicial Council, was ultimately responsible for choosing the proper venue.  The Judicial Council's role was to identify all available counties, and that included inquiring with San Francisco.  Defendant was not misled into believing that his case would end up in San Francisco; his only reason for believing San Francisco would be chosen was his own insistence that the case be tried in San Francisco, not because the prosecution, the court, or the Judicial Council had so indicated.

### b.  *McGown Hearing*

Defendant next contends the trial court deprived him of due process when it refused to continue the *McGown* hearing and denied him the opportunity to present evidence regarding the unsuitability of Orange County.

On January 27, 1994, six days after the parties stipulated to a venue change, Judge McCartin informed the parties that he had been mistaken about the procedure for changing venue.  He explained that the court would conduct an evidentiary hearing to select a new venue after the Judicial Council reported its findings regarding availability.   The court scheduled the *McGown* hearing for April 8, 1994.

On April 5, defendant filed a motion to continue the *McGown* hearing.  He argued he needed further proceedings to determine the availability of San Francisco as a venue and more time to conduct jury surveys regarding the suitability of Sacramento and Orange Counties.   Judge McCartin had previously directed the parties to conduct the jury surveys by

April 8, but after applying for necessary funding, defendant said it could not reasonably have been done in the time set by the court. The defense also asked for more time so the court could refer the case back to the Judicial Council to again inquire whether San Francisco would accept the case.

Judge McCartin declined to refer the case back to the Judicial Council to reconsider San Francisco's availability. He stated that the factors the defense wanted the Judicial Council to consider, such as pretrial publicity and witness hardship, were matters for the court to consider following the *McGown* hearing, not the Judicial Council. Judge McCartin asked the defense what information it wanted to obtain through jury polling. Counsel explained that the defense wanted to determine the publicity and prejudgment levels in the prospective counties and also wanted to "get an idea of the County's position as far as racial factors which might adversely affect the fairness of the trial."

Defense counsel further argued that under former rule 842, the court could transfer the case to a county that the Judicial Council had not designated. Judge McCartin told the parties that, based on his conversation with Toker, San Francisco "wasn't available, period." According to Toker, San Francisco had accepted another high-profile case, had a case transferred from Contra Costa County, and had several capital cases "coming down the lane." Regarding a continuance to conduct polling, Judge McCartin said that he was knowledgeable about the media coverage in Southern California and did not remember seeing anything about the case except for perhaps one article. He stated that he did not know the level of publicity in Northern California but believed that information could be obtained within 30 days and offered the parties the

opportunity to submit publicity information within 30 days of the hearing. Neither party submitted additional information.

Later that afternoon at the *McGown* hearing, the prosecutor argued that a continuance should be denied because the record contained sufficient information for choosing a new venue. He said that the case had attracted substantial publicity in Sacramento, and the defense had previously submitted "numerous news articles from Sacramento, as well as television media accounts from Sacramento." Defense counsel conceded that there was no reason to doubt Judge McCartin's statements concerning the lack of publicity in Orange County and conceded there was a high level of publicity in Sacramento. Judge Kleaver denied the motion to continue the hearing and transferred the case to Orange County.

Defendant contends the *McGown* hearing was a "sham" and fell "woefully short" of what California law requires. Defendant is mistaken.

At a *McGown* hearing to determine the proper venue to transfer a case, "the court should consider such factual issues as the 'presence or absence of prejudicial publicity' in a possible new county, and the 'relative hardship involved in trying the case in various locations.' [Citation.] The decision of where to transfer the case lies within the discretion of the court, which must consider the 'interest of justice.' " (*Cooper, supra,* 53 Cal.3d at p. 804.) The record in this case included information regarding pretrial publicity, and the court did not abuse its discretion in considering the pretrial publicity in both Sacramento County and Orange County. Although the parties did not discuss any potential hardship of moving the case to Orange County, defendant does not assert on appeal that

counsel would have provided such information to the court if it had more time. Nor does defendant assert that counsel would have presented evidence of pretrial publicity that contradicted the trial court's understanding. Rather, defendant now argues that he wanted a continuance to reexamine San Francisco's availability. However, he again ignores that the court was only choosing between Sacramento and Orange Counties. The Judicial Council followed a process set out by the rules of court, and pursuant to that process, San Francisco was not an option. Defendant thus cannot establish the court abused its discretion when it denied his motion for a continuance. (See *People v. Rhoades* (2019) 8 Cal.5th 393, 451 [a trial court's denial of a motion to continue is reviewed for abuse of discretion].)

### c. Consideration of San Francisco

Defendant contends the trial court deprived him of due process when it erroneously and arbitrarily interpreted former rule 842 as prohibiting its consideration of San Francisco as a venue at the *McGown* hearing.

Former rule 842 provided that after a trial court grants a motion to change venue, " 'it shall advise the Administrative Director of the Courts of the pending transfer.' " (*Cooper*, *supra*, 53 Cal.3d at p. 803.) "The director shall, 'in order to expedite judicial business and equalize the work of the judges, suggest a court or courts that would not be unduly burdened by the trial of the case.' [Citation.] Thereafter, the court shall 'transfer the case to a proper court as it determines to be in the interest of justice.' " (*Id.* at p. 804.) Former rule 842 is "consistent with the purpose behind a change of venue, which is to ensure the defendant a fair trial [citation], not to encourage forum shopping." (*Cooper*, at p. 804.)

During the *McGown* hearing, Judge Kleaver acknowledged defendant's argument that the court was not bound by the counties designated by the Judicial Council. The judge disagreed, noting that if the court were permitted to send the case to any county it wanted, there would be no need for former rule 842 in the first place. "There would be no purpose to [the rule]. It would, in effect, open up a *McGown* hearing to 57 California counties as being prospective counties to which venue could be transferred. And I suggest that leads to foolishness, looking at the other side of the coin."

As Judge Kleaver noted, defendant's argument conflicts with the purpose of former rule 842. Moreover, San Francisco explicitly told Toker that it could not handle defendant's case. Transferring the case to San Francisco would further defeat the rule's purpose in ensuring the chosen venue was not unduly burdened. (See Cal. Rules of Court, rule 4.152(1) [after receiving notice of a motion for a venue change, the Administrative Director "must advise the transferring court which courts would not be unduly burdened by the trial of the case"].) Forcing defendant's case on a county that did not want it when two counties were readily available would not have been in the interests of justice. Under former rule 842, once a trial court grants a change of venue motion, it cannot transfer the case unless the receiving county is identified as available to take the case by the Judicial Council. The trial court's proper interpretation of former rule 842 to prohibit it from transferring the case to counties not presented did not violate defendant's due process rights.

### d. *Appointment of Counsel*

Defendant asserts the trial court's refusal to appoint Burt as counsel prior to the *McGown* hearing deprived him of due process and the effective assistance of counsel.

As previously discussed, the Calaveras County Justice Court appointed attorneys Marovich and Webster to represent defendant in October 1991. In January 1993, the court appointed Margolin to represent defendant for the limited purposes of preparing *Marsden* and *Harris* motions, and subsequently appointed Multhaup to assist Margolin. One year later, in January 1994, the court conditionally relieved Marovich and Webster pending the appointment of new counsel after the venue change. The court relieved Margolin and Multhaup except for their work on the *Harris* motion.

When Judge McCartin learned that the court would need to conduct a *McGown* hearing prior to changing venue, he reappointed Margolin and Multhaup for the limited purpose of representing defendant at the hearing. On March 14, 1994, the defense filed a motion asking to have SFPD appointed to represent defendant at the *McGown* hearing. The court denied the motion and told the defense that Burt could seek appointment after the transfer.

The trial court's refusal to appoint Burt and SFPD before the *McGown* hearing did not deprive defendant of due process. Defendant contends that his case was "highly unusual because of the interrelationship between appointment of counsel and trial site selection," and the court violated his due process rights by "forcing a trial site selection without a trial attorney able to evaluate the defense case strategy with respect to the choice of county." Defendant's argument is essentially that if Burt had

97

been appointed, he might have had more success in having his case transferred to San Francisco. As previously discussed, however, defendant has no constitutional right to the venue of his choice. And more importantly, San Francisco was off the table as a possible venue regardless of who represented defendant at the *McGown* proceeding because San Francisco would not accept the case.

Further, the court's refusal did not deprive defendant of the effective assistance of counsel. To demonstrate counsel's inadequacy, "the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) Defendant does neither of these. He does not establish that OCPD was performing inadequately and that SFPD was better situated to handle the matter. Nor does defendant cite to any location in the record that suggests Burt was familiar with his case at that time; Burt had not been counsel of record in several years. Finally, even if OCPD had rendered ineffective assistance, defendant cannot establish prejudice. He does not identify any incompetent acts or omissions on behalf of counsel that, but for their performance, the outcome of the proceeding would have been different. (See *ibid*.) The trial court repeatedly told defendant that San Francisco was not an option, and a different attorney would not have changed that.

### e. Referral Back to Judicial Council

Defendant contends the trial court deprived him of due process when it denied his motion to set aside the venue change. Defendant asserts that Judge McCartin made several errors during the process of initially referring the case to the Judicial Council, and referring the case back would have remedied these errors.

After Judge Kleaver ordered the case be transferred to Orange County, the defense filed a motion to set aside the venue change agreement. Judge McCartin recused himself for purposes of hearing that motion only and was replaced by Judge Curtin. Judge McCartin, John Toker, and Mary Beth Todd, the superior court clerk, testified at the hearing.

Judge McCartin testified that he primarily spoke with Toker but he also had "an initial conversation" with Hoffman, the Judicial Council's Judicial Assignment Commission secretary, about selecting a new venue. Hoffman opined it would likely end up in Southern California because of publicity but did not specify which county. She also acknowledged that the defense wanted San Francisco while the prosecution wanted Southern California because of publicity. Judge McCartin told Hoffman that he would stay on as trial judge regardless of which county accepted the case. Judge McCartin did not accept the case on the belief that it would end up in Southern California. He testified that it was "obvious" that defendant was only interested in the case moving to San Francisco, and he emphasized to Toker that the defense wanted the case in San Francisco. Judge McCartin was surprised when San Francisco was not an option and asked Toker if "he did all he could to get it in San Francisco."

Toker explained that the Judicial Council could not review the parties' materials because they were for the court to review; if the council reviewed them, venue change proceedings would be before the council and not the court. Todd had asked Toker to exclude Downtown Los Angeles, and he was not asked to exclude any other county. When discussing what counties should be considered, Todd told Toker that the judge would like Orange as well as the preferred counties of the prosecution and the defense. Toker confirmed that he spoke with someone in San Francisco, who, after speaking with the presiding judge, stated that they would not take defendant's case. Toker knew that defendant had other charges pending in San Francisco and may have discussed that with San Francisco, but he did not recall for certain. He confirmed that convenience of witnesses, along with publicity, are factors "greatly considered" when determining possible venue sites. Toker opined that most, if not all, of the counties in Northern California would have been affected by publicity in defendant's case. On cross-examination, Toker confirmed he had never been directed to try to send the case to Orange County. San Francisco explicitly declined to take the case, and no one from the county ever contacted him to say they were now available to take the case.

After hearing the witness' testimony, Judge Curtin stated he did "not find that there was any sham" or that the matter was intended to be sent to Southern California upon the appointment of Judge McCartin. He found that there was no fraud involved to induce the parties to sign a stipulation to change venue as alleged by the defense. The court did not find that the defense met its burden of proof in showing that the agreement should be set aside for fraud or that the Judicial Council acted in an inappropriate manner. Judge Curtin

concluded that Judge McCartin and the Judicial Council acted in good faith and defendant's due process was not violated in the venue change proceedings.

Defendant contends the evidence at the hearing established that Judge McCartin sabotaged his efforts to have the case transferred to San Francisco and instead orchestrated a transfer to Orange County. Aside from summarizing Judge McCartin's testimony, defendant does not cite the record to support his allegation of fraud.

Substantial evidence supported Judge Curtin's finding that Judge McCartin arranged the venue transfer agreement in good faith, did not use fraud to induce the stipulation, and did not know in advance where the case would be transferred. Judge McCartin testified that he did not express a desire to the Judicial Council for the case to go to a specific county, and Toker testified that no one tried to steer the case toward Orange County. Todd told Toker which counties were preferred by both the defense and the prosecution. Toker knew the defense wanted the case transferred to San Francisco and investigated whether that county would be available to take the case; when Toker revealed that San Francisco would not take the case, Judge McCartin inquired whether enough had been done to have the case sent to San Francisco. Although Orange County as a possible venue did come up in conversation between Judge McCartin and Toker, several other counties did as well. Substantial evidence in the record supports Judge Curtin's finding of no wrongdoing and the subsequent denial of defendant's motion. The court, therefore, did not deprive defendant of due process when it denied his motion.

### f. *Counts 2 Through 7*

Finally, defendant contends the court deprived him of due process when it transferred counts 2 through 7 because he did not stipulate to a venue change on those counts. When viewed in its entirety, the record supports a finding that defendant requested a venue change on all counts but maintained his right to challenge vicinage on counts 2 through 7 after the venue change had been decided. And, as addressed more fully below, defendant continually raised the vicinage argument after the venue change; the court repeatedly considered and ruled on vicinage through the middle of trial in November 1998. The court did not deprive defendant of his due process on this matter.

### 3. *Vicinage Errors*

Defendant contends the transfer of counts 2 through 7 to Orange County, as opposed to the City and County of San Francisco, violated his right to vicinage under the state and federal Constitutions.

While venue concerns the location where the trial is held, vicinage concerns the area from which the jury pool is drawn. (*People v. Clark* (2016) 63 Cal.4th 522, 553 (*Clark*).) We have previously held that "[t]he vicinage clause of the Sixth Amendment has not been incorporated by the Fourteenth Amendment to apply in a state criminal trial." (*Id.* at pp. 554–555, fn. omitted; see *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1063–1069.) We decline defendant's invitation to revisit this holding now.

"For vicinage rights under the state Constitution, 'the vicinage right implied in article I, section 16 of the California Constitution . . . constitutes simply the right of an accused to a

trial by an impartial jury drawn from a place bearing some reasonable relationship to the crime in question.' " (*Clark, supra,* 63 Cal.4th at p. 555.)

Defendant's vicinage claim fails. When a trial court grants a motion to change venue, the Judicial Council must notify the transferring court which counties would not be unduly burdened by the case. (See Cal. Rules of Court, rule 4.152(1) [after receiving notice of a motion for a venue change, the Administrative Director "must advise the transferring court which courts would not be unduly burdened by the trial of the case"].) The City and County of San Francisco explicitly told the Judicial Council it was unavailable. As discussed, pursuant to former rule 842, the trial court did not have the authority to transfer the case to San Francisco once the Judicial Council confirmed that San Francisco could not accept the case.

Defendant speculates that San Francisco might have accepted the transfer of six counts only, but there is no reason to think that is true. San Francisco had clearly indicated it was unavailable to accept the case and a trial ostensibly limited to counts 2 through 7, which concerned the Dubses, Cosner, Peranteau, and Gerald murders, would nonetheless have involved much of the same evidence, and similar burdens, as a unitary trial of all the charged murders. In addition, multiple trials in this case would have been highly inefficient. In light of San Francisco's inability to accept the case, defendant has not demonstrated error based upon the purported failure to inquire whether San Francisco would have accepted the transfer of some rather than all of the relevant counts.

## C. Competency Hearing

Defendant contends the trial court deprived him of due process by its adjudication of competency proceedings.

### 1. Procedural History

At some point prior to trial, Defense Counsel Kelley and James Merwin filed a motion doubting defendant's competency pursuant to section 1368. On October 10, 1997, counsel informed the court that it wanted to withdraw the motion. Burt, who was still participating in the defense at that time, explained that the motion had been focused on representation problems that had since been resolved, and it would be premature to proceed on the motion.

On January 16, 1998, the court held an in camera hearing to allow defendant to argue his 27th *Marsden* motion. During the hearing, Kelley explained to the court that defendant's refusal to cooperate with him, or any attorney who was not Burt, led him to believe that defendant was not competent to proceed.

Merwin told the court that he and Kelley believed they had an ethical obligation to present the section 1368 motion, but it was over defendant's objection. Kelley agreed that they were "driven ethically" to declare a doubt and were "setting the whole case up for a fall on appeal" if they did not file the motion. He continued, "Even though [defendant] is concerned and disagrees with us . . . we have to proceed in a 1368 hearing, and in a jury trial hearing."

Kelley told the court that if they moved forward with a competency hearing, he believed defendant needed independent counsel appointed for the proceedings. He explained that he would need to testify regarding defendant's lack of cooperation, and it would be difficult for him to litigate the proceedings while

also being a witness. Merwin believed that if independent counsel were appointed, defendant would cooperate in the proceedings. The court opined that his cooperation "would be a first." The court reminded the parties that independent counsel had been appointed previously in a *Marsden* setting, and "nothing has ever been achieved by" such an appointment.

On February 6, 1998, the trial court heard two motions filed by the defense: a motion to appoint independent counsel for competency proceedings, and a motion for the OCPD to withdraw for purposes of the competency proceedings. The court stated its belief that Kelley and Merwin did not actually want defendant to be found incompetent but just wanted defendant to cooperate with them. The court opined that independent counsel could do nothing differently except ask for more time to prepare and ultimately present the same information that Kelley and Merwin would present. The court denied the motion for independent counsel and OCPD's motion to withdraw. The trial court suspended proceedings and appointed two mental health experts for purposes of the section 1368 hearing.

Doctors Paul Blair and Kaushal Sharma filed their reports on March 18 and 19, 1998. On April 17, Kelley filed a declaration explaining that defendant had refused to meet with three defense experts retained for purposes of the competency proceedings "without the approval of Michael Burt." As a result, Kelley explained, the defense was unable to submit evidence regarding defendant's "obsession" with Burt and that defendant was suffering from the effects of isolation.

At a hearing on April 20, 1998, the defense submitted without argument, relying on the reports of Drs. Blair and

Sharma, declarations from Kelley and Merwin, and a declaration from Dr. Seawright Anderson, a psychiatrist who had also evaluated defendant and opined in a two-page declaration that he was mentally incompetent. The prosecution submitted on the reports of Drs. Blair and Sharma.

The court stated that Dr. Anderson was the only expert who believed defendant had a mental disorder. Dr. Anderson had opined that defendant had bipolar disorder, a mixed history of major depression, recurrent episodes, and associated obsessive-compulsive disorder. He further opined that defendant's problems would disappear if Burt were appointed, and if Burt was not appointed, defendant may become psychotic.

In his report, Dr. Blair found defendant to be competent, but the court acknowledged that Dr. Blair "probably didn't get a real good shot at evaluating [defendant] because [defendant] controlled the nature of the discussion and limited what Dr. Blair could get in to." Dr. Sharma was able to examine defendant twice, and the court found his report to be "the most telling." Dr. Sharma concluded "with a strong level of confidence" that defendant was competent, and his lack of cooperation with counsel did not stem from mental illness. Dr. Sharma acknowledged that defendant was "obsessed" with Burt and wanted Burt as his attorney, but did not indicate that defendant provided any specific details as to why he was not pleased with the representation received from Kelley and Merwin. Defendant simply kept repeating that he would not accept any lawyer other than Burt as his attorney.

The court found defendant was not mentally incompetent, did not have a mental disorder, and was capable of assisting counsel in a meaningful way if he chose to do so. Two weeks

106

later, defendant accused his attorneys of using the competency proceedings to "intimidate" him so he would not disclose privileged attorney-client communications. On May 15, defendant made another *Faretta* motion which the court subsequently granted.

On June 11, 1998, defendant requested funding to employ Dr. Nievod to evaluate his mental state. The court approved the request.

On August 19, 1998, while defendant still represented himself, he filed a motion for a new competency trial and for the appointment of separate counsel for the proceeding. Defendant argued he was incompetent to proceed and relied on Dr. Nievod's accompanying declaration. Dr. Nievod explained that he had interviewed defendant in 1994 and 1996, as well as four times the previous month. He opined that defendant suffered from dependent personality disorder, anxiety, and depression, and that his conditions had deteriorated from previous levels. Dr. Nievod believed that defendant's rejection of Kelley was the product of his mental condition.

At a hearing on the motion on August 21, defendant argued that the prior competency hearing was "flawed" because Kelley "didn't give certain information" to the mental health experts. He also argued that circumstances had changed in the prior four months, and he was no longer competent to proceed.

The trial court denied the request for a second competency hearing. The court repeatedly told defendant that nothing had changed; defendant only wanted Burt to represent him and the only purpose of the renewed section 1368 motion was to try to have Burt appointed as counsel and to delay proceedings.

On October 8, 1998, after jury selection had begun, Kelley, who had since been reappointed, moved for a renewed competency trial. In support, Kelley cited a "recent report" from Dr. Nievod that had been filed with the court in August. Kelley argued that Dr. Nievod's declaration analyzed and explained defendant's mental state in much greater detail than Dr. Anderson had, which constituted a "significant change" in defendant's condition. The trial court responded that the report did not present anything new, and "if you read between the lines, it is just telling us all that [defendant] on purpose will not cooperate with you and that is not a mental illness." The court denied the motion and stated it had "no doubt, no question at all" that defendant was competent to proceed.

### 2. *Refusal To Appoint Independent Counsel*

Defendant raises two claims related to the trial court's adjudication of his competency. First, he contends the trial court erred when it refused to appoint independent counsel for the April 1998 competency hearing. He argues that Kelley framed the issue in terms of defendant being incompetent because of his obsession with Burt. He asserts that independent counsel "could have framed the issue in a distinctly different manner" that reflected defendant's position: specifically, that defendant and Kelley "had reached an irremediable breakdown in their relationship, likely attributable to personality traits and conduct on *both* their parts, but that the breakdown was independent of [defendant's] preference for Michael Burt." Defendant asserts the disagreement between Kelley and himself created a conflict of interest.

"A criminal defendant is guaranteed the right to the assistance of counsel by the Sixth Amendment to the United

States Constitution and article I, section 15 of the California Constitution. This constitutional right includes the correlative right to representation free from any conflict of interest that undermines counsel's loyalty to his or her client. [Citations.] 'It has long been held that under both Constitutions, a defendant is deprived of his or her constitutional right to the assistance of counsel in certain circumstances when, despite the physical presence of a defense attorney at trial, that attorney labored under a conflict of interest that compromised his or her loyalty to the defendant.' [Citation.] 'As a general proposition, such conflicts "embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or his own interests." ' " (*People v. Doolin* (2009) 45 Cal.4th 390, 417 (*Doolin*).)

"Under the federal Constitution, prejudice is presumed when counsel suffers from an actual conflict of interest. [Citation.] This presumption arises, however, 'only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." ' (*Strickland v. Washington* (1984) 466 U.S. 668, 692 . . . .) An actual conflict of interest means 'a conflict that affected counsel's performance — as opposed to a mere theoretical division of loyalties.' [Citation.] Under the federal precedents, which we have also applied to claims of conflict of interest under the California Constitution, a defendant is required to show that counsel performed deficiently and a reasonable probability exists that, but for counsel's deficiencies, the result of the proceeding would have been different." (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 309–310 [citation omitted].)

The decision to grant or deny a motion to discharge appointed counsel is left to the discretion of the trial judge. (*People v. Jones* (2003) 29 Cal.4th 1229, 1245; see *People v. Clark* (2011) 52 Cal.4th 856, 917 [a trial court is not required to appoint independent counsel to assist a defendant in preparing a *Marsden* motion but has the discretion whether to do so].) A trial court may, but is not required to, appoint independent counsel when the defendant and defense counsel disagree on the defendant's competency. (*People v. Blacksher* (2011) 52 Cal.4th 769, 853 (*Blacksher*).)

To succeed on his claim, defendant must establish an actual conflict, deficient performance, and prejudice. Defendant can demonstrate none of these. Defendant argues Kelley had a conflict of interest because he refused to acknowledge his own role in the breakdown of their relationship. Regardless of whether Kelley played a role in the alleged breakdown of their relationship, Kelley did not have a personal interest in having defendant found incompetent. Further, "counsel does not act against a defendant's interest in pursuing a finding of incompetency even if it is against the defendant's wishes." (*Blacksher*, *supra*, 52 Cal.4th at p. 853.) There was no conflict of interest between defendant and Kelley.

There was likewise no deficient performance. When a conflict of interest causes an attorney to not do something, we examine the record to determine whether the omitted arguments would likely have been made by counsel who did not have a conflict of interest. (*People v. Rices* (2017) 4 Cal.5th 49, 65.) We further determine whether counsel may have had a tactical reason, other than the asserted conflict, that might have caused any omission. (*Ibid.*) The record does not support a conclusion that independent counsel would have presented

different arguments. As the trial court noted when it denied defendant's request, independent counsel would not have presented any new information that Kelley had not presented already, and defendant did not indicate otherwise to the court. The trial court did not abuse its discretion in denying defendant's motion for independent counsel.

Finally, defendant cannot establish prejudice. He contends that Kelley argued defendant's obsession with Burt rendered him incompetent to proceed, but independent counsel would have presented the argument that Kelley was equally to blame for a breakdown in their relationship. Defendant argues that independent counsel would have done a better job presenting his position of competency to the court, but he ignores the fact that the outcome of the competency proceedings resulted in what defendant wanted: a finding of competency. Defendant presents no evidence to establish that having Burt represent him, and thus having evidence presented that Kelley was to blame for the breakdown in their relationship, would have made it more likely that he would have been found incompetent. Further, he does not explain with any specificity what evidence he would have wanted presented but for the fact that Kelley purportedly contributed to the breakdown in the relationship. Defendant can establish neither a conflict of interest from Kelley, nor any prejudice resulting from an asserted conflict.

### 3. Renewed Competency Hearings in August and October 1998

Secondly, defendant contends the trial court abused its discretion when it refused to order a renewed competency hearing in August 1998. Defendant contends the court again abused its discretion when it declined to order a renewed

competency hearing in October 1998, following the guilt phase, based on Dr. Nievod's August declaration. Defendant again asserts the more recent psychological evaluations provided sufficient basis to require further competency proceedings.

" ' "When a competency hearing has already been held and defendant has been found competent to stand trial . . . . a trial court need not suspend proceedings to conduct a second competency hearing unless it 'is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of that finding." ' " (*People v. Lawley* (2002) 27 Cal.4th 102, 136.) "A trial court may appropriately take into account its own observations in determining whether the defendant's mental state has significantly changed during the course of trial." (*Ibid.*) We review a trial court's determination concerning whether a new competency hearing must be held for substantial evidence. (*People v. Huggins* (2006) 38 Cal.4th 175, 220.)

Defendant failed to show a substantial change in circumstances when he submitted Dr. Nievod's declaration on August 19, 1998. Dr. Nievod had interviewed defendant in 1993, 1994, 1996, and in July 1998. Dr. Nievod did not interview defendant between 1996 and July 1998. Because he did not evaluate defendant before the competency hearing in April 1998, he could not speak to how defendant's circumstances had changed between the previous competency hearing and the request for a new one. Moreover, although Dr. Nievod did opine that defendant's conditions had "deteriorated markedly from previous levels," he also stated that when comparing his 1998 findings with his 1994 and 1996 findings, the test results and results of his clinical interviews "have been consistent throughout." Furthermore, he did not interview defendant at

the same time as Drs. Sharma and Blair before the April competency hearing. Dr. Nievod, therefore, could not actually speak to whether defendant's condition had deteriorated during the relevant time period, i.e., in the months since the competency hearing in April 1998, thus warranting the need for a renewed hearing.

For the same reasons, the court did not err when it denied defendant's request for a renewed competency hearing in October 1998.

### D. Use of Restraints

Defendant contends the trial court deprived him of due process when it subjected him to physical constraints.

Defendant first appeared in Orange County Superior Court on September 30, 1994. He wore a stun belt, a waist chain, and ankle chains. His right hand was released from the waist chain upon arrival to the courtroom to allow him to write. The court ordered the ankle chains to be removed and suggested a future hearing to determine whether the stun belt was necessary. At a hearing on October 21, 1994, defense counsel indicated that defendant's restraints "have been somewhat reduced" and he was not wearing the stun belt.

On April 22, 1997, the defense filed a motion to remove all restraints from defendant. At a hearing on the motion, Burt and Marovich testified that they had never seen defendant create a disturbance in the courtroom or in custody. Marovich testified that defendant appeared preoccupied with his restraints and had trouble focusing on proceedings.

The court took a recess to review the documents submitted by both parties. When proceedings resumed, Kelley explained that defendant's waist chain was "causing him some pretty

grave discomfort" and "cutting into his waist." The court asked to see the restraints and acknowledged that defendant was in discomfort. Deputy County Counsel James Turner, on behalf of the sheriff's department, stated that a stun belt was an alternative option if the court did not want to keep defendant shackled. The court opined that the belt was a viable option. Kelley objected, arguing that the prosecution did not meet its burden of showing a manifest need for defendant to be restrained in any manner. Kelley noted that defendant had been in court for 12 years without incident. The court responded that defendant had been restrained at every appearance and therefore an incident was "highly unlikely." The court continued, "Now, I'm not saying there is no risk. I just think that the risk is not as high as the People would want me to find, and certainly not as low as you want me to find."

The prosecution argued that defendant "is not one that would do an outburst in the courtroom. The concern is whether or not he poses an escape threat." The prosecution explained that defendant had been found with an item that could be used as a handcuff key on multiple occasions while in custody. The prosecution argued it was also relevant that when defendant was arrested in Canada for shoplifting, he "went to pretty desperate measures" to escape by pulling a gun on the security guards.

The court stated, "There are an awful lot of people very concerned about [defendant] and escapes, and there has to be some reason for that. . . . He has been found with contraband relevant to a possible escape. Now, I can't ignore that. And right now I find there is a manifest need. If you can produce evidence to show that there isn't any, fine. But I don't see why the belt, which is available and effective, and I don't think is

uncomfortable as you are making it sound, I don't see why it is not an effective restraint, and not visible to anybody." The court acknowledged it did not want defendant shackled unless necessary and believed the belt would be effective. The court denied defendant's motion.

On October 14, 1998, after jury selection commenced, defendant filed a motion to have the stun belt removed. At a hearing on the motion on October 23, psychiatrist Stuart Grassian testified that defendant "becomes very preoccupied" with the belt when sitting in court. Dr. Grassian explained that defendant has "a tendency towards obsessional thinking," and once he gets a thought in his mind, it becomes extremely difficult for him to focus on anything else. He further explained that when the stimulus or thought is "noxious, upsetting, unpleasant," defendant's ability to shift his attention away from the stimulus is extremely difficult. Dr. Grassian testified that when defendant wears the stun belt he feels "an enormous sense of shame, of degradation of already being condemned as dangerous and bad." On cross-examination, Dr. Grassian admitted that before the hearing, he had not had the opportunity to observe defendant in court.

In a written ruling, the court denied the motion. The court found that Dr. Grassian's opinion was inconsistent with its observations of defendant, and Dr. Grassian failed to distinguish between restraint by chains and restraint by a hidden stun belt. The court stated that the evidence from the 1997 hearing supported the need for a stun belt: defendant's escape from military custody in Hawaii; his flight to Canada after Lake's arrest; his fight with Canadian security guards who tried to arrest him for shoplifting; the fact that he shot one of the guards during the struggle; and it appeared defendant was

proficient in martial arts. Further, when defendant was imprisoned in Canada, he discussed escaping with Laberge and discussed "busting another inmate out" after defendant was released. Finally, a coworker at the moving company saw defendant climb an elevator shaft. The court noted that these "are some of the reasons" why the court believed defendant should remain restrained.

"In general, the 'court has broad power to maintain courtroom security and orderly proceedings' [citation], and its decisions on these matters are reviewed for abuse of discretion. [Citation.] However, the court's discretion to impose physical restraints is constrained by constitutional principles. Under California law, 'a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints.' [Citation.] Similarly, the federal 'Constitution forbids the use of visible shackles . . . unless that use is "justified by an essential state interest" — such as the interest in courtroom security — specific to the defendant on trial.' [Citation.] We have held that these principles also apply to the use of an electronic 'stun belt,' even if this device is not visible to the jury." (*People v. Lomax* (2010) 49 Cal.4th 530, 558–559 (*Lomax*).)

" 'In deciding whether restraints are justified, the trial court may "take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial." [Citation.] These factors include evidence establishing that a defendant poses a safety risk, a flight risk, or is likely to disrupt the proceedings or otherwise engage in nonconforming behavior.' [Citation.] Although the court need not hold a formal hearing before imposing restraints,

'the record must show the court based its determination on facts, not rumor and innuendo.' [Citation.] The imposition of physical restraints without evidence of violence, a threat of violence, or other nonconforming conduct is an abuse of discretion." (*Lomax*, *supra*, 49 Cal.4th at p. 559.)

The trial court did not abuse its discretion when it ordered defendant to wear the stun belt in 1997 nor when it denied the motion to remove the belt in 1998. We need not parse every reason relied on by the prosecutor and the trial court to justify restraints because there is enough evidence in the record to support the court's finding of a manifest need for restraints. Ample evidence showed that defendant had a history of escape or attempted escape. He had escaped from military custody in Hawaii after he was arrested for breaking into the Marine armory and evaded capture on the mainland for approximately five months. While being transported from the scene following his arrest in Canada, defendant was seen "fooling" with the upper portion of his jeans. Officers located a handcuff key in defendant's pocket, and Canadian authorities concluded he was trying to retrieve the key in order to break out of his handcuffs.

At the extradition hearing in Canada, while in a holding facility before entering the courtroom, security personnel saw defendant manipulating his shackles. They discovered that he had spread the side of the handcuffs, and with more time, he would have been able to free the locking device and break out of his handcuffs. The police were required to replace the damaged handcuffs with a new pair. A police sergeant testified that in 22 years of law enforcement, he had never heard of anyone "fidgeting" with handcuffs to the point of needing to be replaced.

At Folsom Prison, defendant secreted a metal envelope clasp. At a hearing on the matter, the court did not determine what purpose defendant might use the clasp for but found "the fact that it was secreted to be a factor indicating its possible use as for escape. That is, there is no reason to secrete something that you do not feel is useful or something that you desire to hide for some purpose." A former San Quentin warden testified that the clasp could be used as a handcuff key, and a prosecution investigator was able to use the same kind of clasp to unlock a pair of standard-issue handcuffs.

Finally, defendant exhibited behavior toward his handlers that supported a need for restraints. In Canada, he would "always brush up next to his plain clothes handlers to determine whether or not they were armed." In Calaveras County, a detective observed that defendant maintained "a constant vigil as to what's going on around him" and would "always observe and take in where security personnel are, what they are armed with, and distances between himself and them." The detective found defendant to be "very manipulative" and that he would attempt to get acquainted with his immediate handlers. Canadian prison authorities replaced his handlers with new personnel when they became too familiar with defendant, and the Calaveras County authorities continued this practice.

Defendant argues that *People v. Burnett* (1980) 111 Cal.App.3d 661 compels a different conclusion, but he is mistaken. In *Burnett*, the trial court ordered the defendant to be restrained based on one escape conviction seven years prior to the current trial. (*Id.* at pp. 667–669.) The appellate court held that the trial court abused its discretion. Defendant now argues that in his case, "all of the information" relied on by the trial court was older than the seven-year-old information relied

on by the court in *Burnett*. That case, however, is easily distinguished from defendant's case. The trial court in *Burnett* relied on one single escape conviction; here, the trial court relied on a sustained pattern of escape attempts pre- and postcustody. Importantly, in this case, the trial court attributed the lack of recent incidents from defendant to the fact that he was continuously restrained, and therefore any escape attempt was "highly unlikely."

Defendant argues the trial court's ruling nonetheless violates *People v. Mar* (2002) 28 Cal.4th 1201. In *Mar*, we extended previous case law regarding a manifest need determination for visible shackles to the use of a nonvisible stun belt. (*Id*. at pp. 1218–1220.) We further determined that "a trial court must take into consideration the potential adverse psychological consequences that may accompany the compelled use of a stun belt and should give considerable weight to the defendant's perspective in determining whether traditional security measures — such as chains or leg braces — or instead a stun belt constitutes the less intrusive or restrictive alternative . . . ." (*Id*. at p. 1228.) In cases where the trial predated *Mar*, however, we have not faulted the trial court for failing to consider the physical or psychological impacts of the belt when making its determination. (*People v. Jackson* (2014) 58 Cal.4th 724, 739; see *People v. Virgil* (2011) 51 Cal.4th 1210, 1271; *Lomax, supra,* 49 Cal.4th at p. 562.)

Defendant asserts that despite his trial predating *Mar*, the court still erred when it called the belt "a painless thing" and stated that it was "not uncomfortable like the chains." *Mar,* however, states that courts should not *always* presume that the stun belt is less onerous or less restrictive than traditional security measures and instead must weigh all available options.

(*Mar*, *supra*, 28 Cal.4th at p. 1228.) The trial court here made no such presumptions. Defendant complained of pain from the chains, marks they left on his waist, and his inability to write notes while wearing them. Recognizing defendant's discomfort with the chains, the trial court did not abuse its discretion when it chose the stun belt as a viable alternative. Even if our holding in *Mar* applied retroactively, the court did not violate its ruling here.

### E. Extradition Testimony

Defendant contends the trial court erroneously admitted the prior testimony of Maurice Laberge from his extradition hearing.

#### 1. Procedural History

On September 24, 1998, before the prosecution began introducing evidence, the defense filed a motion to exclude the prior testimony of Laberge, a Canadian jailhouse informant. Laberge had testified at defendant's extradition hearing but had since died in an automobile accident. In its motion, the defense argued that Laberge's testimony was inadmissible under Evidence Code section 1291 and that his testimony would violate defendant's right to cross-examine witnesses under the Sixth Amendment.[11]

---

[11] Evidence Code section 1291 states: "(a) Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] (1) The former testimony is offered against a person who offered it in evidence in his own behalf on the former occasion or against the successor in interest of such person; or [¶] (2) The party against whom the former testimony is offered was a party to the action or

In its response, the prosecution argued that it sought to introduce a small portion of Laberge's testimony regarding four cartoon drawings defendant gave him and Laberge's own criminal record. The prosecution offered to stipulate to admission of evidence that he had received benefits in exchange for cooperating in this case and another case. The prosecution argued that Laberge's testimony was admissible under state and federal law.

At a hearing on the motion, the court stated that the extradition hearing appeared very similar to a preliminary hearing. The court further stated that the cross-examination of Laberge was "very extensive." The court ruled the testimony was admissible under the hearsay exception for former testimony and that it satisfied the Sixth Amendment right to confrontation.

At trial, Sergeant Raymond Munro with the Royal Canadian Mounted Police read portions of Laberge's testimony for the jury. As previously noted, defendant and Laberge met in 1986 in a Canadian prison. They exercised together every day for a period of four or five months. Following their meetups on

---

proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing. [¶] (b) The admissibility of former testimony under this section is subject to the same limitations and objections as though the declarant were testifying at the hearing, except that former testimony offered under this section is not subject to: [¶] (1) Objections to the form of the question which were not made at the time the former testimony was given. [¶] (2) Objections based on competency or privilege which did not exist at the time the former testimony was given."

the exercise yard, defendant would give Laberge cartoons related to their discussions. Laberge testified about four cartoons and the discussions he had with defendant regarding each cartoon.

One of the cartoons that defendant gave Laberge depicted a scene from the M Ladies video. Defendant told Laberge that he was "very worried" about a videotape that police found involving Allen and O'Connor. Defendant said that in the videotape, one of the women complained about being warm, so he used a butterfly knife to cut her T-shirt. Defendant told Laberge that at one point while filming Allen, he stopped and made some food and then returned to see Lake "carrying on" with her. Defendant gave Laberge a cartoon of Lake holding a whip in his right hand, standing over a woman who was naked and bound on top of a table in front of Lake. The woman is saying, "Ouch!" Lake is fondling himself with his left hand while saying, "Oh, I love you, Kathi, I really do." Defendant is standing behind a video camera while eating, and saying, "Rice is ready! Dinner time!" A handwriting expert confirmed that defendant had written the words on the cartoon.

Another cartoon that defendant drew bore the words "Calaveras County Remains Claiming Section." The cartoon featured a man labeled Boyd Stephens, who was a coroner involved in the investigation, handing a large bag bearing the name "Dubs" to another man. The coroner says, "[A]nd this bag I <u>think</u> is yours." On a table is another bag labeled "Bond." A lady dressed in mourning is leaving the room carrying a small bag labeled "Allen." A handwriting expert confirmed that defendant wrote the words on the cartoon.

Defendant gave Laberge a cartoon featuring two men, one labeled "Lake" and the other labeled "Slant," Laberge's nickname for defendant. The two men are carrying a person on a stretcher between them; "zzzz" is written above the person. Next to this drawing, the two men are shown holding the stretcher above a fire. Next to that, the body is shown burning in the fire with the words "Ah! You mother fuckers!" above the fire. Lake is shown laughing while defendant leans against the stretcher, watching the fire. Defendant gave Laberge this cartoon after discussing the procedure that he and Lake used to kill and burn their victims. A handwriting expert again confirmed that defendant wrote the words on the cartoon.

The final cartoon that Laberge described was labeled "San Quentin . . . Years Later." In the cartoon, defendant is sitting on a bed in a prison cell. The words "no kill no thrill!" and "no gun no fun" are written on the wall behind him. Pictures of the victims are taped on the wall next to him. One picture, labeled "Bond's," showed a man, woman, and baby. Another picture, labeled "Dubs," also showed a man, woman, and baby. Pictures of individuals were labeled "Carroll," "Cosner," "Pearenteau [sic]," "Gerald," and "Allen." Defendant drew this cartoon to demonstrate what his life would be like once he was extradited to the United States. The words were confirmed to be written by defendant.

Sergeant Munro testified that after the extradition hearing, Laberge was placed in a witness protection program. As part of the program, he received $36,000 in Canadian dollars. His participation in the program was based on his assistance in defendant's case and in an unrelated murder investigation. The prosecutor in the unrelated investigation requested Laberge be placed in witness protection.

Sergeant Munro testified that Laberge had 42 prior convictions. When he testified at the extradition hearing, Laberge was serving a 25-year sentence for two counts of armed robbery, two counts of kidnapping, and the use of a firearm to commit an indictable offense.

Defendant raises three arguments regarding the admission of Laberge's prior testimony. First, he contends Laberge's testimony from the extradition hearing did not qualify as a hearsay exception because Evidence Code section 1291 does not encompass testimony given in a foreign country. Second, he contends that Laberge's testimony was inadmissible as former testimony because the extradition hearing served a manifestly different purpose than the trial. Finally, he contends that Laberge's testimony violated his Sixth Amendment right to confront witnesses.

### 2. *Foreign Testimony Under Evidence Code Section 1291*

Defendant first argues that Laberge's testimony was inadmissible because Evidence Code section 1291 does not encompass testimony given in a foreign country. As discussed below, his claim has no merit.

Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Hearsay is inadmissible unless it falls under an exception. (*Id.*, subd. (b).) Evidence Code section 1291 provides one such exception by allowing the admission of former testimony if the declarant is unavailable, the party against whom the evidence is offered was a party in the prior proceeding, and that party had the opportunity to cross-examine

the declarant with an interest and motive similar to that of the trial. (*Id.*, subd. (a).) When these requirements are met, the admission of former testimony does not violate a defendant's constitutional right of confrontation. (*People v. Herrera* (2010) 49 Cal.4th 613, 621.)

" 'Former testimony' " is defined in section 1290 of the Evidence Code as testimony given under oath in "[a]nother action or in a former hearing or trial of the same action," or a "proceeding to determine a controversy conducted by or under the supervision of an agency that has the power to determine such a controversy and is an agency of the United States or a public entity in the United States," or a "deposition taken in compliance with law in another action," or an "arbitration proceeding if the evidence of such former testimony is a verbatim transcript thereof." (*Id.*, subds. (a)–(d).) Evidence Code section 105 states that the term action "includes a civil action and a criminal action."

Defendant contends the trial court erred by permitting the introduction of Laberge's testimony under Evidence Code section 1291 because the legislature limited the scope of that statute to proceedings occurring only within the United States. He asserts Evidence Code sections 1290–1292 contain no language conveying an intent that the sections should apply to foreign proceedings. He further asserts that extradition hearings in a foreign country are not "actions" within the meaning of Evidence Code section 105. We review a trial court's ruling on the admissibility of evidence for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 725.)

As an initial matter, we reject defendant's argument that an extradition hearing is not an "action" within the meaning of

Evidence Code section 105. An " '[a]ction' includes a civil action and a criminal action." (Evid. Code, § 105.) This definition does not *exclude* any proceeding not strictly criminal or civil. " 'Includes' is 'ordinarily a term of enlargement rather than limitation.' [Citation.] The 'statutory definition of a thing as "including" certain things does not necessarily place thereon a meaning limited to the inclusions.' " (*Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 774.)

There is no California authority on whether a foreign extradition hearing is admissible under Evidence Code section 1291, but a review of federal case law is instructive here. In *U.S. v. Salim* (2d Cir. 1988) 855 F.2d 944 (*Salim*), the Second Circuit held that foreign testimony is admissible as prior testimony under the Federal Rules of Evidence without running afoul of the confrontation clause. Bebe Soraia Rouhani was arrested in Paris, France, on a stopover to New York City to deliver heroin to the defendant. (*Id*. at p. 947.) Federal prosecutors sought the district court's permission to take Rouhani's deposition in France, where she was being held in custody awaiting her own trial. The deposition was taken according to French law and procedures with a French magistrate presiding. (*Id*. at pp. 947–948.) Defendant was in custody in the United States and unable to attend the deposition. French law prohibited defendant's counsel from being in the room while Rouhani testified, and the Assistant United States Attorney voluntarily agreed to be absent from the room to avoid the appearance of an unfair advantage. Attorneys on both sides were permitted to submit written questions to the magistrate. Various portions of Rouhani's deposition testimony were read into the record at defendant's trial. (*Id*. at p. 948.)

On appeal, the defendant challenged the admission of Rouhani's testimony under rule 804(b)(1) of the Federal Rules (28 U.S.C.). Notably, the operative language of rule 804(b)(1) is similar to Evidence Code section 1291.[12] The Second Circuit rejected his argument, holding that the French government's procedures were "consistent with principles of comity in international relations, which instruct us 'to demonstrate due respect . . . for any sovereign interest expressed by a foreign state.' " (*Salim, supra,* 855 F.2d at p. 953.) The court continued, "In short, unless the manner of examination required by the law of the host nation is so incompatible with our fundamental principles of fairness or so prone to inaccuracy or bias as to render the testimony inherently unreliable (or, in the words of the advisory notes to Rule 28 [of the Federal Rules of Evidence (28 U.S.C.)], are 'so devoid of substance or probative value as to warrant its exclusion altogether'), a deposition taken pursuant to letter rogatory in accordance with the law of the host nation

---

[12] Rule 804(b)(1) of the Federal Rules of Evidence (28 U.S.C.) provides that the admission of former testimony does not violate the rule against hearsay if the declarant is unavailable as a witness and the former testimony "was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one" and "is now offered against a party who had — or, in a civil case, whose predecessor in interest had — an opportunity and similar motive to develop it by direct, cross-, or redirect examination." (*Id.,* rule 804(b)(1)(A), (B).) There are minor differences in wording between rule 804(b)(1) and Evidence Code section 1291. These minor differences — e.g., rule 804(b)(1)(B) says "similar motive" while Evidence Code section 1291, subdivision (a)(2) says "motive similar" — are not substantial in way that is relevant here nor have any bearing on the admissibility of foreign testimony.

is taken 'in compliance with law' for purposes of Rule 804(b)(1)." (*Ibid.*)

The Second Circuit acknowledged that "foreign laws do not always permit witnesses to be deposed in the manner to which American courts and lawyers are accustomed. In certain cases, the use of unconventional foreign methods of examination may exceed the limits of accepted American standards of fairness and reliability, such as underlie the confrontation clause and the rule against hearsay. Concerns of this type are addressed best on a case-by-case basis." (*Salim, supra,* 855 F.2d at p. 946.)

The First Circuit agreed with the *Salim* court in *U.S. v. McKeeve* (1st Cir. 1997) 131 F.3d 1. In *McKeeve*, a British magistrate took the deposition of a key witness in accordance with British law and procedures. (*Id.* at p. 7.) Over the defendant's objection, the district court permitted the prosecution to read the deposition into evidence at trial. (*Id.* at pp. 7–8.) The First Circuit acknowledged that the deposition did not comport in all respects with American practice, but nonetheless held that the proceedings substantially conformed to our practice and thus satisfied rule 804(b)(1) of the Federal Rules of Evidence (28 U.S.C.).

The Eleventh Circuit likewise found a British deposition to be admissible under rule 804(b)(1) of the Federal Rules of Evidence (28 U.S.C.). (*U.S. v. Mueller* (11th Cir. 1996) 74 F.3d 1152, 1156–1157.) The court noted that the defendant was able to consult with his lawyer on the telephone during the deposition proceedings, the procedures used followed those in the United States, and there were no language barriers.

Thus, while rule 804(b)(1) of the Federal Rules of Evidence (28 U.S.C.) does not explicitly permit the introduction of foreign testimony, federal courts have held foreign testimony may be admissible regardless. By extension, with respect to California's analogous rule, the fact that the statutory language does not explicitly address foreign testimony does not signify that it must be excluded.

Defendant further contends that the California Legislature intended to exclude foreign testimony from Evidence Code section 1291 because foreign matters are explicitly referenced in other sections in the Evidence Code. Defendant cites three statutes — Evidence Code sections 200 and 452 and Penal Code section 668 — that include reference to foreign matters, none of which supports his assertion that Evidence Code section 1291 precludes introduction of foreign testimony. Evidence Code section 200 defines the term " 'public entity,' " which "includes a nation, state, county, city and county, city, district, public authority, public agency, or any other political subdivision or public corporation, whether foreign or domestic." Evidence Code section 452 details matters which may be judicially noticed and includes the "law of an organization of nations and of foreign nations and public entities in foreign nations." (*Id.*, subd. (f).) Defendant also cites Penal Code section 668, which permits a prior foreign conviction to be used for enhancement if it would constitute a felony in California.

Defendant's contention is not persuasive. He fails to cite any authority to support his argument that two references to foreign matters in the Evidence Code — neither of which have anything to do with prior testimony — indicate the Legislature intended to exclude foreign matters from all other sections in

the Evidence Code. Moreover, his argument cuts against persuasive reasoning about an analogous federal rule by the federal courts of appeal. For example, Federal Rules of Evidence rule 902 (28 U.S.C.) explicitly includes foreign matters. (See *ibid.* [foreign public documents are self-authenticating].) This has not precluded the federal courts from concluding that foreign testimony is admissible under Federal Rules of Evidence, rule 804 (28 U.S.C.).

For these reasons, we are not persuaded that Evidence Code section 1291 categorically excludes foreign testimony. Because defendant has not attempted to show that the Canadian extradition proceedings were so unconventional as to violate American standards of fairness and reliability (see *Salim*, *supra*, 855 F.2d at p. 946), we need not consider whether the testimony was inadmissible for this reason.

### 3. *Purpose of the Extradition Hearing*

Second, defendant contends that even if Evidence Code section 1291 permits the introduction of foreign testimony, Laberge's testimony was nonetheless inadmissible as former testimony. Evidence Code section 1291, subdivision (a)(1), requires that the party against whom the former testimony is offered have the "opportunity to cross-examine the declarant with an interest and motive similar to that" of the trial. Defendant asserts that Laberge's testimony violates this requirement because the extradition hearing served a manifestly different purpose than the trial. Defendant argues that the purpose of the extradition hearing was to show that if he were extradited, he would likely face the death penalty, and therefore the interest and motive was to resist extradition, not to try to rebut guilt. He further asserts that defense counsel had

no reason to impeach Laberge's credibility at the extradition hearing.

Defendant raised a somewhat different argument in the trial court. In his motion to exclude Laberge's testimony, he submitted a declaration by his Canadian extradition attorney. The attorney stated that defendant's guilt was a "secondary" issue at the extradition hearing to the death penalty question but acknowledged that guilt *was* an issue. Importantly, one motive need not be mutually exclusive with the other. Defense counsel could have been motivated to challenge defendant's guilt *and* establish that if the evidence did suggest guilt, defendant would face the death penalty upon extradition.

Testimony from the extradition hearing contradicts defendant's assertion that his attorney had no reason to impeach Laberge's credibility. Cross-examination consumed approximately 165 pages of transcript. Defense counsel asked Laberge about his criminal history, his prior history as an informant, how he came into contact with defendant and his note-taking of defendant's statements, his access to documents that defendant received from his attorneys, his contact with law enforcement to report information about defendant's case, and his access to newspapers and periodicals in prison. The record suggests defense counsel had a significant motive and interest in attacking Laberge's credibility. Additionally, counsel's vigorous and extensive cross-examination of Laberge further supports a finding that counsel's motivation would have been to challenge the evidence implicating defendant in the California murders (and thus was not solely concerned with the fact that defendant would be subject to the death penalty upon extradition).

Evidence Code section 1291 does not require that the motive and interest in cross-examining former testimony be identical to the current interest in examining the unavailable witness, it only requires that they be similar. On this record, it is clear that defendant's motive to defend against the charges at the extradition hearing was similar enough to that at a preliminary hearing. Much as in a preliminary hearing in California, Canada requires the party seeking extradition to present a prima facie case establishing the person committed acts that would be criminal if done in Canada. We have previously held that preliminary hearing testimony is admissible under Evidence Code section 1291 " 'not because the opportunity to cross-examine the witness at the preliminary hearing is considered an exact substitute for the right of confrontation at trial [citation], but because the interests of justice are deemed served by a balancing of the defendant's right to effective cross-examination against the public's interest in effective prosecution.' " (*People v. Samayoa* (1997) 15 Cal.4th 795, 850; see *People v. Carter* (2005) 36 Cal.4th 1114, 1173.) Although "a defendant's motive in cross-examining a witness at a preliminary hearing may differ somewhat from the motive at trial, . . . nevertheless the earlier testimony may be admissible at the trial under section 1291 because the 'motives need not be identical, only "similar." ' " (*Samayoa*, at p. 850, quoting *People v. Zapien* (1993) 4 Cal.4th 929, 975.) Although defendant's motive in cross-examining Laberge at the extradition hearing differed somewhat from that of a trial, the record here supports a finding that the motives were similar enough. Therefore, the admission of Laberge's testimony did not violate Evidence Code section 1291.

Finally, defendant contends that Laberge's testimony violated his Sixth Amendment right to confront witnesses. "[W]hat is significant for the purpose of analyzing whether prior testimony is admissible under the Sixth Amendment to the United States Constitution is whether the party *against whom the prior testimony is offered* had an appropriate opportunity for cross-examination at the prior hearing." (*People v. Williams* (2008) 43 Cal.4th 584, 627.) As discussed, defendant had sufficient opportunity to cross-examine Laberge at the extradition hearing and, indeed, did so at length. Admission of Laberge's testimony did not violate his right to confrontation under the federal Constitution.

### 4. Prejudice

Even if the admission of Laberge's testimony had been error, the error was harmless beyond a reasonable doubt. (*People v. Lopez* (2012) 55 Cal.4th 569, 585 [the standard of review for a confrontation clause violation is whether the admission of evidence was harmless beyond a reasonable doubt].) During a hearing on admissibility of the testimony, the trial court expressed the view that even without Laberge's testimony, the four cartoon drawings would have been admissible under Evidence Code section 1220 as a hearsay exception for admissions of a party. Although Laberge's testimony was helpful in providing context of the drawings to the jury, the cartoon drawings without any explanation were sufficiently inculpatory. The cartoons clearly depicted Lake beating Allen while defendant ate rice and watched, a coroner handing remains of the victims to grieving family members, and defendant and Lake burning the bodies of victims.

Defendant contends the cartoons are not admissible as a party admission because the only evidence he actually drew the cartoons came from Laberge's testimony. Sufficient evidence, however, supports a finding that defendant drew the cartoons himself. As the trial court noted at the hearing, defendant and Laberge were in one-man neighboring cells, suggesting quite plausibly that there was no other way for defendant to possess the drawings if he had not drawn them himself. In addition, the handwriting expert testified that defendant wrote the words on the cartoons. A sufficient foundation was laid for the cartoons to be admitted under Evidence Code section 1220 without Laberge's testimony.

Finally, the overwhelming evidence of guilt, including defendant's own testimony, the M Ladies videotape, and the physical evidence found in Wilseyville, further supports a finding that even if admission of Laberge's testimony was error, any possible error was harmless.

## F. Evidentiary Issues

Defendant contends the trial court deprived him of his right to due process when it admitted prejudicial evidence and excluded proposed defense evidence.

### 1. *Admission of Evidence*

#### a. *Defendant's Call to Michael Carroll*

John Gouveia testified that he was Michael Carroll's foster brother. After Carroll was discharged from the military in the early 1980s, he moved in with Gouveia in Milpitas. On direct examination, the prosecution asked Gouveia if Carroll had ever mentioned knowing someone by the name of Charles Ng. The court sustained defendant's hearsay objection. The prosecution asked Gouveia if he ever received a phone call from someone who

134

identified himself as Charles Ng. Defendant again objected on hearsay grounds; the trial court overruled the objection without explaining the basis for its ruling. Gouveia stated that he had received such a phone call, and the caller asked to speak to Carroll. On cross-examination, Gouveia acknowledged he had never personally met defendant. Gouveia explained that the caller identified himself as "Chuck," but then he clarified with the caller, "Is this Charles Ng?" The caller laughed and said, "Yeah. Just tell Mike I called."

Defendant now argues, as he did in the trial court, that Gouveia's testimony that defendant had called Carroll's house was inadmissible hearsay. The People respond that the testimony was admissible under the hearsay exception set forth by Evidence Code section 1220, which provides that "[e]vidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party . . . ." Defendant counters that this section is inapplicable because the prosecution failed to establish one of the exception's requirements: "*prima facie* proof that [the statement] was made by him or by some person whose statements may legally affect him." (*Lewis v. Western Truck Line* (1941) 44 Cal.App.2d 455, 465.) According to defendant, the prima facie proof "must be independent of the hearsay [statement] itself," and the fact that the caller identified himself as Charles Ng does not suffice. Even assuming arguendo that admission of the statement was error, defendant cannot establish prejudice. Sufficient evidence linked him to Carroll without Gouveia's testimony: defendant assisted Lake in selling Carroll's car after he went missing, Carroll's girlfriend is featured in the M Ladies video, and several items belonging to Carroll were found at the Wilseyville property.

### b. *Evidence of Workplace Conduct*

Outside the presence of the jury, the defense moved to exclude certain testimony from Kenneth Bruce, defendant's coworker at Dennis Moving Company. The defense objected to the prosecution's proffer of Bruce's testimony that defendant had said, "No gun, no fun," "No kill, no thrill," and "Daddy dies, mommy cries, baby fries." The defense also objected to possible testimony that defendant brought a butterfly knife and stun gun to work and bragged to his coworkers about owning guns.

The trial court told the defense that its argument under Evidence Code section 352 was "almost specious. There is nothing prejudicial about it. . . . These things are relevant." The court stated that the challenged statements "were said. They can be used as circumstantial evidence. They can be used as corroborating evidence as to the drawings and as to the statements up in Canada. 'Daddy dies, momma cries, baby fries,' you don't have much of an imagination, Mr. Kelley, to show why that is relevant and it is not prejudicial. These are words. And guns were found in evidence and evidence of guns found in his house. That is more corroborating evidence bragging about having guns. So there will be, you know, it is just stronger evidence that the guns were his."

At trial, Bruce testified that he heard defendant use phrases such as, "No gun, no fun," "No thrill, no kill," and "Daddy die, mommy cry, baby fries." He heard defendant use those phrases more than once around himself and other coworkers. Bruce said that defendant mentioned he owned guns and had brought a butterfly knife to work.

Defendant argues that Bruce's testimony regarding defendant's statements and the weapons "individually and

cumulatively were prejudicial because of the likelihood that the jury would view [defendant's] possession of weapons and his coarse rhymes as a proclivity to violence."

The trial court did not abuse its discretion when it admitted Bruce's testimony. (See *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 480 (*Mora and Rangel*) [ " 'We will not disturb a trial court's exercise of discretion under Evidence Code section 352 " '*except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice' " ' "].) As the court noted, defendant's statements were corroborating evidence that defendant participated in the killings and owned the guns found in his home. His statement, "Daddy dies, mommy cries, baby fries," was relevant and a compelling admission that defendant participated in the Dubs and Bond/O'Connor murders, both of which involved killing a father, mother, and infant.

Further, Bruce's testimony was not unduly prejudicial. Defendant used a knife in the M Ladies video to cut off O'Connor's shirt and bra; in comparison, his bringing a knife to work and bragging to a coworker about possessing guns was not likely to inflame the emotions of the jury. (See *Doolin*, *supra*, 45 Cal.4th at p. 439 ["evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury"].) Similarly, his statements to Bruce, "No gun, no fun" and "No thrill, no kill," were unlikely to inflame the emotions of jury given that the jury had seen those same words written out in one of the cartoons that defendant shared with Laberge.

### c. *Evidence of Seized VCR*

After the Dubs family disappeared, the police determined that a VCR was missing from their apartment. At trial, the prosecution proffered evidence that police had found two VCRs in defendant's apartment of the same model and type as the VCR missing from the Dubses' apartment, one of which had the serial number removed. Defendant argued the evidence was irrelevant and prejudicial under Evidence Code section 352. He argued that authorities never linked the VCRs found in defendant's apartment to the Dubs family, and the evidence "doesn't prove anything."

The trial court stated, "If the D.A. in good faith can look at the jury and say, 'We believe that is the VCR taken from Dubs,' how can you prevent them from doing that?" Kelley responded, "Because 'We believe' is not proof, your honor, 'we believe' is just opinion." The court said, "But it is the same type and model." Kelley replied, "But it is not an unusual thing. What if the Dubs — " The trial court interrupted and stated that it was unusual to have a serial number removed unless an item is stolen. Kelley said, "Stolen from where is the question." The court responded, "Well, that is what they want to argue to the jury, that it was taken from the Dubs. So there is relevance. I don't see that it is prejudicial." The court overruled defendant's objection.

Defendant argues the trial court erred in admitting evidence of the VCRs. He asserts there was no "foundation to establish [the evidence's] relevance to the charged crimes" — i.e. "some independent confirmation that" one of them "was the VCR player missing from the Dubs" — and that admission of the evidence therefore "permitted a spurious inference that [he] had

somehow come into possession of at least one item taken from the Dubs[] at the time of their disappearance."

We reject defendant's claim. Where "the relevance of evidence depends on the existence of a preliminary fact," a trial court "should exclude the proffered evidence only if the 'showing of [the] preliminary fact[] is too weak to support a favorable determination by the jury.' [Citations.] The decision whether the foundational evidence is sufficiently substantial is a matter within the court's discretion." (*People v. Lucas* (1995) 12 Cal.4th 415, 466.) Here, the court did not abuse its discretion in finding that the evidence — i.e., the VCR found in defendant's apartment was the same make and model of the Dubses' missing VCR and its serial number had been removed — was not too weak to support a conclusion that the VCR belonged to the Dubses. Nor was the admission of this evidence unduly prejudicial. (*Doolin, supra*, 45 Cal.4th at p. 439.)

### d. *Evidence of Marijuana*

The prosecution proffered evidence that police had seized four bags of marijuana from defendant's apartment that were packaged similarly to marijuana found at the Wilseyville property. The defense argued the evidence was irrelevant to the murder charges. The prosecution stated that the evidence was "relevant because of the conspiracy, the overall method of operation, the fact that the two defendants, the two men were engaged in this common criminal plan. And it's the People's position that the plan involved not just the murder of the 12 victims but also profiting from various activities." The court agreed with the defense: "I understand why [the prosecution] think[s] it's relevant but it's so watered down. How much of a connection do you want to make? So under [Evidence Code

section] 352 grounds, as the evidence is right now, the objection is sustained."

Shortly after, the defense objected to defendant's former coworker Hector Salcedo's testimony that defendant had invited Peranteau to come "up to the hills to help him harvest a weed field." The defense argued the evidence was irrelevant because they did not know the time frame of when the conversation occurred and how the timing related to when Peranteau disappeared. The court found Salcedo's testimony to be relevant and continued, "I don't find it prejudicial at all in the sense that we use the word 'prejudice.' And it is highly relevant. You have somebody who disappears. They have an accusation who helped cause that, and now you have a direct statement made before the disappearance. It is relevant."

Salcedo testified that one afternoon in December 1984 or January 1985, while he was with Peranteau at his apartment, defendant showed up unannounced. Salcedo did not recall what defendant and Peranteau initially discussed but remembered defendant "eventually taking a bag of marijuana, showing it to us and telling us that he had[,] or a friend had[,] a plantation and if we would go help him, we could get some. We would be able to take some home or keep some." Salcedo testified that Peranteau sometimes smoked marijuana.

On cross-examination, the defense elicited that Salcedo had initially told officers that Peranteau had told him about the marijuana conversation with defendant, and he was not actually present for that discussion. On redirect, Salcedo clarified that there were two separate incidents with defendant regarding marijuana. At one point Peranteau told him that defendant offered to take him up to the hills to harvest marijuana.

Sometime later, he was at Peranteau's apartment when defendant appeared and again discussed harvesting marijuana.

After the defense rested its case, but before defendant took the stand, the prosecution again sought to introduce evidence of the marijuana found in defendant's apartment as rebuttal evidence. The prosecution explained that the defense introduced evidence that Lake may have murdered the victims for financial gain and grew marijuana as a way to lure people to Calaveras County. The court ruled the evidence admissible to rebut the defense theory that "whatever Lake did, he did it on his own." The court noted that the jury heard testimony that defendant never smoked marijuana, and the jury could infer why he would have marijuana at his home if he did not use it.

The parties stipulated that authorities found four bags of marijuana in defendant's San Francisco apartment. The bags were admitted into evidence.

Defendant argues the court abused its discretion when it admitted testimony from Salcedo that defendant showed him and Peranteau marijuana and when it admitted evidence of the marijuana bags found in defendant's apartment. He contends the marijuana evidence "had negligible, if any, probative value, but served to portray [defendant] as a criminally-oriented character." Although the prosecution did not establish at exactly what point in time defendant invited Peranteau to harvest marijuana as it relates to Peranteau's disappearance, Salcedo testified it happened sometime in December 1984 or January 1985, and Peranteau disappeared on January 19, 1985, supporting an inference that defendant may have tried to lure Peranteau to Wilseyville and may have been connected to his disappearance. As the trial court noted when it admitted the

evidence, defendant's statement inviting Peranteau to Wilseyville connected defendant to the victim at around the time of the victim's disappearance. Further, Salcedo's testimony was not unduly prejudicial because defendant's invitation to Peranteau to help harvest marijuana was not especially inflammatory. The trial court did not abuse its discretion when it found defendant's invitation to Peranteau was relevant to his disappearance.

The trial court likewise did not abuse its discretion when it admitted evidence of the marijuana bags found in defendant's home. The evidence corroborated Salcedo's testimony that defendant showed him and Peranteau a bag of marijuana. The jury heard considerable evidence that Lake sold marijuana: one witness saw marijuana drying on the floor of the Wilseyville property; another witness saw Lake at the Bond/O'Connor house dividing up three pounds of marijuana with someone; a third witness testified that Lake invited her to his ranch to pick marijuana; and a fourth witness testified that Lake dropped off a bag of marijuana through her window and said, "There is more where that came from." Evidence that defendant possessed marijuana was relevant to further connect him to Lake and show that they were participating in a common enterprise, particularly in light of testimony that defendant did not smoke marijuana himself, making it more likely that he possessed marijuana for another purpose. For the same reasons, as the court ruled, the marijuana rebutted the defense theory that Lake acted on his own and defendant did not participate. The court ruled that the jury could reasonably infer that defendant possessed the marijuana because he was actively working with Lake.

Furthermore, the evidence was not unduly prejudicial. Officers found items in defendant's home that linked him to several victims. Combined with the evidence admitted regarding the 12 murders and the M Ladies video, defendant cannot establish how evidence that he possessed marijuana inflamed the jurors' emotions and caused them to punish defendant based on that emotional reaction. (See *People v. Dalton* (2019) 7 Cal.5th 166, 220.)

### 2. *Exclusion of Defense Evidence*

Defendant contends the trial court deprived him of his federal due process rights and Sixth Amendment right to present a defense when it curtailed cross-examination and excluded defense evidence regarding Lake.

Defendant first claims the court erred by excluding testimony from Lake's sister that their mother preferred his brother over Lake. At trial, the prosecutor objected on hearsay grounds, and the court sustained the objection. Defendant never offered a nonhearsay basis for admitting Lake's sister's testimony about what her mother said. Nor can he assert on appeal new reasons why the evidence should have been admitted. (See *People v. Marks* (2003) 31 Cal.4th 197, 228 ["A general objection to the admission or exclusion of evidence, or one based on a different ground from that advanced at trial, does not preserve the claim for appeal"].) Defendant's claim thus fails.

Defendant next claims the court erred by excluding testimony from Lake's ex-wife. During direct examination, counsel asked her if she thought that Lake had a "God complex." The prosecutor objected based on relevance, and the court sustained the objection and also ruled that the question was

vague. On appeal, defendant argues the testimony would have "highlighted that Lake . . . viewed himself in a grandiose manner as controlling and manipulative of others," which "would have emphasized" that defendant "was not necessarily any kind of partner to Lake" or "a knowing aider and abettor to Lake's crimes, but was merely an acolyte who followed directions without knowing of Lake's homicidal mania."

We need not decide whether the trial court erred because its ruling could not have prejudiced the defense. Although defendant's ex-wife was not allowed to say whether she thought Lake had a "God complex," she did testify that he "was controlling" of her in ways she "didn't like" and "was able to control," "convince . . . or influence" her without her "realiz[ing]" what "was happening." Several other defense witnesses testified that Lake was "very controlling" and "manipulative." Ernie Pardini, who was Lake's neighbor for a period of time, testified as follows: Lake "spoke to" defendant "in a very degrading and domineering manner, like rode him hard" and "ordered [him] around like a slave." Defendant "seemed very timid around" Lake and had "kind of a hurt look in his eyes," "[l]ike he was trying to win [Lake's] approval and wasn't quite successful." Defendant "seemed to sort of follow [Lake] around," "always . . . seemed very subservient and willing to do whatever Lake said," and "never" ignored or talked back to Lake. In light of this testimony, and the claimed relevance of the excluded testimony in question, the court's ruling could not have prejudiced defendant.

This discussion likewise disposes of defendant's next claim: the trial court erred by striking Pardini's testimony that defendant "seemed like a lost child trying to win his father's approval." The prosecution objected that Pardini's testimony

lacked foundation and was "improper opinion." Commenting that the testimony was "also vague," the court sustained the objection, ordered the testimony stricken, and directed the jury to disregard it. On appeal, defendant argues this testimony was "important to demonstrate that [he] was manipulated into a role in which he felt obligated to assist Lake in Lake's ventures." However, as explained above, Pardini provided ample evidence on this point, testifying that defendant "seemed very timid around" Lake and had "kind of a hurt look in his eyes," "[l]ike he was trying to win [Lake's] approval," that defendant "always . . . seemed very subservient and willing to do whatever Lake said," and that he "never" ignored or talked back to Lake. In light of this testimony, even were defendant correct that the court erred by excluding Pardini's statement that defendant "seemed like a lost child trying to win his father's approval," the error could not have prejudiced the defense.

Defendant next contends the court erroneously excluded testimony that Stapley distributed methamphetamine in San Diego and that he and Bond had an antagonistic relationship with Lake unrelated to defendant. The prosecutor argued that Stapley's drug activities in San Diego were irrelevant, and noted that the court had admitted an abundance of evidence that Bond and Stapley manufactured methamphetamine in Wilseyville. The court agreed that the evidence was irrelevant and told the defense it would sustain an objection if the defense tried to present testimony about Stapley's activities in San Diego. On appeal, defendant argues this evidence was relevant to establish that Lake had an antagonistic relationship with Stapley and Bond, and a motive to kill them unrelated to defendant. Defendant is mistaken. As the trial court noted, ample evidence was admitted demonstrating Stapley and Bond's drug activities

in Wilseyville, and a juror could reasonably infer that Stapley had experience selling drugs prior to arriving in Wilseyville. Evidence of Stapley's drug sales in San Diego was thus cumulative and the trial court did not abuse its discretion when it excluded this evidence.

Relatedly, defendant argues that the trial court "excluded virtually all testimony" from a witness regarding Bond stating that he was taking a pistol to Wilseyville to confront Lake. He further argues the trial court erred when it excluded testimony from another witness that Bond stated he was going to Wilseyville to confront Lake and to "finish it." Defendant contends this evidence was relevant to establish that Lake killed Bond and Stapley because of a personal feud over drug activity. The jury, however, did hear evidence that Bond had plans to go to Lake's house to "confront him and settle a score" and that he was armed at the time he left for Wilseyville. Even if the trial court had abused its discretion, defendant cannot establish prejudice because the evidence defendant now challenges was admitted through another witness.

Next, defendant contends the trial court erred when it excluded testimony that Lake fit the profile of a serial killer. The trial court sustained the prosecution's relevance objection, stating that "we don't need an expert to come in . . . and tell these jurors that" Lake was a serial killer. Defendant argues on appeal that this testimony was necessary to establish that Lake fit the profile of a serial killer while defendant did not. At no point during counsel's offer of proof, however, did counsel argue that this evidence was relevant to distinguish between Lake and defendant. Moreover, as the trial court noted, whether or not Lake was a serial killer was not a disputed fact at issue. The

trial court did not abuse its discretion when it excluded this testimony.

Defendant next challenges the trial court's exclusion of selected excerpts from Lake's journal. The defense sought to introduce a limited number of entries from the journal to show Lake's state of mind and that he murdered many individuals without any knowledge or participation from defendant, suggesting he likewise could have murdered the current victims without defendant's assistance. The prosecution argued that if the court admitted the defense's proffered excerpts, additional journal entries should be admitted into evidence, including entries that implicated defendant, in order to have a complete picture of what was going through Lake's mind. The court agreed that admitting only edited portions of the journal would be misleading. The court explained that the defense wanted to admit portions of the diary that suggested Lake killed the 12 victims without any assistance from defendant. The court pointed out that these selected portions were therefore misleading because many of the victims in this case were strangers to Lake; their connection to him was through defendant. Additionally, "we know based upon the evidence that Mr. Ng was available to assist in those homicides." The court ruled that the proffered sections of the journal were inadmissible under Evidence Code section 356.

Defense counsel asked if the court would admit the entire diary. The trial court excluded admission of the entire diary under Evidence Code section 352, ruling that the diary as a whole was "hard to read," largely "pure junk," "too time consuming, too confusing, and literally not very relevant." The court offered to reconsider the matter if defense counsel

presented a reedited version of the diary or proffered different excerpts.

Two weeks later, the defense proffered one new, edited excerpt of Lake's journal. The prosecution again objected, arguing the proffered excerpts were misleading because they removed all references to defendant. The trial court agreed, stating, "I'm not going to let you put in a partial statement when the next statement clearly implicates Mr. Ng." The court stated, "If you can't get over [relevance grounds], how do you get over anything else?" Counsel argued that the entries were relevant because the defense theory was that Lake had a plan and a motive that did not involve defendant; the court noted it was not relevant because Lake's motive and plan were uncontested. The court further explained that the evidence the defense wanted to raise by way of the journal entries — that Lake engaged in criminality without defendant's involvement and that he had fantasies of keeping women hostage in a bunker — were already before the jury via other evidence.

The trial court again noted that excerpts proposed by the defense focused exclusively on Lake acting alone while omitting many references to contact between Lake and defendant.

In addition to excluding the entire diary under relevance grounds and Evidence Code section 352, the court also sustained the prosecution's objection to the proffered entries under Evidence Code section 356. The court ultimately allowed the defense to reference one journal entry regarding Lake's long-held bunker fantasies "to show that he did really write a diary and he did have this fantasy for some 20-odd years before all this started." On appeal, defendant argues that the journal

reflected Lake's 20-year criminal scheme and was crucial to the defense.

Evidence Code section 352 states that a trial court has the discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Evidence Code section 356 states: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence." "The purpose of Evidence Code section 356 is 'to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed.' " (*Clark, supra,* 63 Cal.4th at p. 600.)

The trial court did not abuse its discretion when it excluded the journal entries offered by defendant under Evidence Code section 356. The defense sought to introduce excerpts from the journal suggesting that Lake committed the murders alone while excluding excerpts concerning defendant. The trial court did not abuse its discretion in determining that defendant's proposal to include only selected aspects of the diary would create a misleading impression in violation of Evidence Code section 356. Defendant's offer to admit the entire diary may have appeased the court's concern under Evidence Code 356, but the trial court did not abuse its discretion in concluding that the entire diary was nonetheless inadmissible under

Evidence Code section 352. (See *Mora and Rangel, supra*, 5 Cal.5th at p. 480.) The trial court acted within its discretion when it determined that the diary would create an undue consumption of time and confuse the jury. As the court noted, the diary as a whole was hard to read and largely irrelevant. The court properly determined that the proffered entries were cumulative because many of the issues, such as Lake's plan to murder and to keep women hostage in his bunker, were already before the jury.

In sum, the trial court did not abuse its discretion when it excluded the proffered journal entries on relevance and Evidence Code sections 356 and 352 grounds.

Next, defendant argues the trial court erroneously excluded a video of Lake and Claralyn having sex while talking about capturing other women and children. The prosecution objected based on relevance, hearsay, and Evidence Code section 352. After reading the transcript of the video, the trial court agreed. The court stated that there was no "relevance to any of the things" in the video, there were no plans made to do anything, it was hard to tell why Lake said what he said or why Claralyn said what she said, and that the discussion "appears to . . . have been an S and M exercise." Additionally, the tape was recorded prior to defendant's involvement with Lake. Defendant now argues on appeal that the evidence would have established that Lake engaged in criminal conduct with the assistance of other people. Contrary to his own argument, however, defendant acknowledges elsewhere in his briefing that the video suggests Claralyn did not take Lake seriously because she believed that she was "merely a character in his fantasy." The court agreed when it found the comments between Lake and Claralyn to be fantasies discussed during a sexual encounter.

The conversation does not prove anything regarding Lake and defendant's relationship, nor does it prove anything regarding defendant's involvement in the charged offenses. The trial court did not abuse its discretion.

Finally, defendant challenges the court's refusal to permit the defense to recall Claralyn. During her initial testimony, the defense introduced, by stipulation, the terms of her immunity agreement with the prosecution. Neither party asked her any questions. After defendant testified, the defense requested to recall Claralyn. Counsel argued that after defendant's testimony, they needed to "put a different light on the defense" and while Claralyn's testimony was not newly discovered, it was necessary for their new strategy. The trial court denied the request to recall her because she had previously been on the stand and the defense "just asked no questions." The court further noted that Claralyn was not available to testify that day. On appeal, defendant argues that the need to corroborate important parts of his testimony outweighed potential damage Claralyn could have caused.

We review a trial court's decision on whether to reopen a criminal case to present additional evidence for an abuse of discretion. (*People v. Marshall* (1996) 13 Cal.4th 799, 836.) "[W]e have directed reviewing courts to consider 'the following factors: "(1) the stage the proceedings had reached when the motion was made; (2) the defendant's diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence." ' " (*In re Freeman* (2006) 38 Cal.4th 630, 650.) These factors support the trial court's ruling here. The prosecution had already given its closing argument when defendant requested to testify; the court

allowed the defense to reopen its case at that time for defendant's testimony. As the prosecution argued in trial, allowing the defense to recall Claralyn would unduly emphasize her testimony because it would directly follow defendant's testimony, and their testimony would stand out from the rest of the evidence. Lastly, the defense did not have any new evidence to present; indeed, the defense declined to make an offer of proof regarding the content of Claralyn's testimony. As such, the defense cannot establish the significance of her testimony. The trial court did not abuse its discretion when it declined to allow Claralyn to testify.

Defendant asserts the cumulative effect of the court's exclusionary rulings prevented the defense from adequately demonstrating to the jury that Lake was "a highly secretive and diabolical psychopath who manipulated people without their realizing it." Defendant, however, cannot establish any prejudice from the exclusion of the challenged testimony. Significant evidence was presented to the jury that Lake was manipulative and displayed psychopathic tendencies: evidence of uncharged murders, his controlling and abusive relationships with women, his fantasies of keeping women hostage in the bunker, his alleged control over defendant, and his belief that it was okay to kill people.

## G. Instructional Error

Defendant contends the trial court deprived him of his right to due process and a fair trial when it denied several of the defense's proposed jury instructions.

Defendant first challenges the court's failure to instruct on unanimity. While discussing jury instructions, defense counsel noted that the court would be instructing on three

theories of liability: direct perpetrator, coconspirator, and aiding and abetting. Counsel requested the court instruct the jury that it must unanimously agree on the theory of liability. The court denied the request, stating that the law does not require a jury to unanimously agree on the theory of liability. Defendant contends the trial court erred because a unanimity instruction was required. We have repeatedly held jury unanimity regarding the theory of first degree murder is not required. (*Mora and Rangel, supra*, 5 Cal.5th at pp. 496–497.) Defendant provides no persuasive reason to revisit our precedent now.

Defendant next challenges the trial court's refusal to instruct on what he described as lesser-related offenses. Specifically, defendant asked the court to instruct the jury that, if it rejected the murder charges, it could still find defendant guilty of accessory after the fact as to all 12 counts; kidnapping, false imprisonment by menace, and sexual battery as to Allen and O'Connor; robbery as to O'Connor; and burglary as to each member of the Dubs family. The prosecutor objected to the instructions. Relying on *People v. Birks* (1998) 19 Cal.4th 108 (*Birks*), the trial court denied defendant's request.

In *Birks*, we held that a trial court cannot instruct the jury on lesser related offenses requested by the defendant over the prosecution's objection. (*Birks, supra*, 19 Cal.4th at p. 136.) Defendant acknowledges this holding but argues a contrary conclusion is compelled by the Ninth Circuit's decision in *Conde v. Henry* (9th Cir. 1999) 198 F.3d 734. That case is inapposite. As we have previously pointed out, *Conde* "involved a trial court's failure to instruct on a lesser *included,* not a lesser *related,* offense." (*People v. Taylor, supra,* 48 Cal.4th at

p. 622.) The trial court thus correctly denied defendant's request.

Finally, defendant challenges the trial court's denial of his request to instruct the jury on proper vicinage. Defendant's proposed instruction stated that the Dubs, Peranteau, Gerald, and Cosner charges could not be tried in Orange County — and the jury must find defendant not guilty — unless the prosecution proved by a preponderance of the evidence that vicinage requirements were satisfied. The trial court denied defendant's request, explaining that proper vicinage was "a legal issue decided several times already." Defendant contends that the court erred by rejecting his instruction because the court lacked subject matter jurisdiction over his case unless vicinage was satisfied. However, "it is beyond dispute that a change of venue may be ordered in a criminal case under appropriate circumstances, and also beyond dispute that any superior court to which a felony proceeding has been transferred has subject matter jurisdiction over the proceeding . . . ." (*Simon*, *supra*, 25 Cal.4th at p. 1097.)

Moreover, as determined by the trial court, vicinage is a legal question for the court, not the jury. Defendant argues that *People v. Posey* (2004) 32 Cal.4th 193 holds otherwise. *Posey* held that venue is a question of law, to be determined by the court and not a question of fact for the jury. (*Id.* at p. 210.) The reasoning appears to rest in part on the fact that venue (unlike vicinage) is statutory rather than constitutional. (*Id.* at p. 209 [noting that venue is a statutory right and vicinage a constitutional one].) Defendant argues that under *Posey*, vicinage is an issue of fact, rather than a legal issue, about which the jury should have been instructed. Defendant is mistaken. The core of *Posey*'s reasoning about venue — that it is not related to guilt, and

is better determined prior to trial — applies equally to vicinage and suggests it is likewise a question of law to be decided by the court. (*Id.* at pp. 209–212.) The trial court did not err.

## III. PENALTY PHASE ISSUES

### A. Motion for a Mistrial

Defendant contends the trial court erred in denying his motion for a mistrial after an investigator for the prosecution spoke with a juror.

On April 14, 1999, Kelley informed the trial court that earlier that morning he and members of his staff observed Calaveras County Investigator Mitch Hrdlicka "having a nice, friendly chat" with Juror No. 174. Kelley continued, "He was standing there. They were laughing and talked. He had his cup of coffee. It was all very friendly. And I looked at him quite startled. I said, 'Mitch, that is one of our jurors you are talking to.' And his response was, and I quote, 'I am very well aware of that.'" Kelley requested the court inquire with Hrdlicka regarding the subject matter of his conversation with the juror, and the prosecutor agreed.

The court called Hrdlicka to the stand and asked him the nature of his conversation. Hrdlicka immediately apologized for his behavior. He noted that "as probably everyone is aware," he wears a unique tie to court every day. That morning, Juror No. 174 commented on his tie, mentioned that her fiancé would like it, and asked where she can buy similar ties. He knew that the juror had an operation scheduled for the following week and asked her what her surgery was for. She told him it was a shoulder surgery and because he had just had a shoulder replacement, they started talking about shoulder surgery. At that point, Kelley appeared, and the conversation ceased.

Kelley asked Hrdlicka why he spoke to the juror. Hrdlicka again apologized and stated that he had no excuse. He knew that he should never have a conversation with a juror, and it was "poor judgment" on his behalf. The prosecutor asked Hrdlicka how long the conversation lasted; he replied three minutes. Hrdlicka confirmed that they only discussed ties and shoulder surgery and did not discuss the case.

The court excused Hrdlicka and called Juror No. 174. She explained that Hrdlicka wore unusual ties, and several jurors like to see what tie he would wear every day. She noted that the day before he wore a light bulb tie with a pull string on it, and she told him the tie was "neat." The juror also confirmed that she discussed her upcoming surgery with Hrdlicka. She said that Hrdlicka also told her that Stapley's dad had two hips and a knee replaced and that it can take time to recover. She told the court that the conversation lasted a few minutes and they did not discuss the case.

Kelley asked the juror to expand on her comment about other jurors discussing Hrdlicka's ties. The juror explained, "We talked about different people. We have been here so long we talk about how different people dress. And he has very unusual, distinctive ties. And so we usually look to see what type of tie he has on." Kelley asked if she was aware of any conversations between other jurors and Hrdlicka. She replied, "A couple said, you know, 'Let me see your tie.'" The juror said that Hrdlicka will usually show them his tie, and the previous day he mentioned that his light bulb tie "has an actual chain." When asked how many times Hrdlicka had shown the jurors his tie, she guessed around 10 to 12 times.

Juror No. 174 explained that early on in the case, during the guilt phase, some of the ladies would look at his tie. They would catch Hrdlicka as he was walking off the elevator while they were waiting to enter the courtroom. The jurors did not initially know that he was an investigator, but after he testified, they realized he worked for the prosecution.

Kelley requested an inquiry of all 12 jurors to determine if their interactions with Hrdlicka may have influenced them, to which the court agreed. Three additional jurors, and one alternate juror who later got seated, stated that they had told Hrdlicka that they liked his tie on one or more occasion.

A few of the jurors noticed Hrdlicka's ties but did not have any conversations with Hrdlicka regarding his ties. Some jurors acknowledged hearing other jurors comment about the ties to Hrdlicka or to each other. A few of the jurors did not notice Hrdlicka's ties or hear any comments or conversations about the ties. When asked, none of the jurors said that Hrdlicka's ties were discussed during deliberations or affected their ability to remain impartial about the case.

After the court questioned each juror, Kelley moved for a mistrial of the penalty phase. Kelley noted that Hrdlicka told the court that he discussed ties and shoulder surgery with Juror No. 174 and nothing else, but the juror told the court that Hrdlicka also mentioned the Stapley family and a hip replacement. Kelley expressed concern that Hrdlicka did not tell the court the truth and argued that discussing a victim's family with a juror "could be incredibly influential on the issue of whether or not [defendant] should receive the death penalty." The prosecution agreed that Hrdlicka's conversation about the Stapley family was "troubling" and requested the court recall

Juror No. 174 to ask whether the conversation about the Stapley family had any effect on her deliberation.

The court agreed that Hrdlicka committed misconduct, as well as Juror No. 174 for not obeying the court's order to not converse with anyone involved in the case. The court acknowledged that Hrdlicka wore unusual ties during the trial that were "obvious" and "apparent to see." The court did not find it improper for the jurors to discuss Hrdlicka's ties amongst themselves but found it improper for a juror to comment to him about his ties.

The court found that the misconduct fell "far short of what is necessary for a mistrial" because there was "absolutely no prejudice." The court said, "The only prejudice, and it is potential prejudice, is the conversations concerning the health of the parents of Mr. Stapley." Kelley continued to argue for a mistrial and insisted that removing Juror No. 174, who he believed to be defense prone, would cause defendant to suffer the consequence of the prosecution's mistake. Kelley requested that if the court removed the juror, it also instruct the jury that the juror was removed as a result of prosecutorial misconduct.

When proceedings resumed that afternoon, the prosecution informed the court that a witness heard a voice from a telephone kiosk in the hallway say the words "San Andreas Investigator" and "mistrial." The witness then saw Juror No. 174 walk out of the telephone kiosk area and believed it was the juror who had been on the phone. The court questioned the witness, who confirmed what the prosecution had said. The court questioned the juror, who admitted to talking on the phone but denied discussing the case. She admitted, however, to discussing Stapley's father's hip surgery with other jurors

during a lunch break.  The court questioned the three jurors and two alternate jurors who had eaten lunch with Juror No. 174 that day.  None of them recalled discussing hip surgery or the Stapley family.

With the parties' consent, the court dismissed Juror No. 174.  Although the court found it troubling, it ultimately did not believe the other jurors committed misconduct by commenting on Hrdlicka's ties to him but did express concern with Hrdlicka responding.  Accordingly, the court banned Hrdlicka from the courthouse for the remainder of trial.

When the jurors rejoined proceedings, the court read the following statement:  "After a thorough hearing into the matter, the court has concluded that Mitch Hrdlicka, Calaveras County District Attorney Investigator and witness in this case, has from time to time committed prosecutorial misconduct by speaking to jurors.  I urge you to do your best to avoid any future contact with all parties, witnesses and spectators in this case."  The court asked the jurors if they understood and could assure him they would avoid future contact.  One juror asked, "Does that include even saying 'good morning'?"  The court clarified that polite greetings were not misconduct but also "not a great idea" and that no juror engaged in misconduct by telling Hrdlicka that he had an unusual tie.

Defendant contends the trial court erred when it denied his motion for a mistrial.  The denial of a mistrial motion is reviewed for abuse of discretion.  (*People v. Harris* (2013) 57 Cal.4th 804, 848.)

Unauthorized contact between a juror and a witness is improper (*People v. Cowan* (2010) 50 Cal.4th 401, 507) and raises a presumption of prejudice (*People v. Gamache* (2010) 48

Cal.4th 347, 397).  Such a presumption will be rebutted if the entire record indicates there is no substantial likelihood that one or more jurors were actually biased against the defendant. (*In re Hamilton* (1999) 20 Cal.4th 273, 296.)  Contact between a juror and witness, however, can be nonprejudicial if there is no showing that the contact related to the trial.  (*Cowan*, at p. 507.)

Defendant contends the court erred because it failed to apply a presumption of prejudice.  Defendant, however, points to no place in the record that suggests the trial court failed to apply the law correctly.  Quite the opposite:  the trial court clearly stated that it found both the investigator and the juror committed misconduct and thoroughly questioned each juror and Hrdlicka to determine the extent of the conversations and interactions, and if there was the possibility of prejudice or bias amongst each juror.

Defendant further contends the court abused its discretion when it found there was no prejudice arising from the interactions with Hrdlicka and denied defendant's motion for a mistrial.  Defendant's claim fails because there is no substantial likelihood that the jurors' encounters with Hrdlicka resulted in any bias.  Of the 12 seated jurors and three alternates, seven had never spoken to or interacted with Hrdlicka.  Three of those seven jurors never spoke with Hrdlicka but heard other jurors comment in passing that they liked his ties.  Four jurors noticed and liked Hrdlicka's ties but never spoke to him.

Of those jurors who had some interaction with Hrdlicka, five acknowledged commenting to Hrdlicka directly regarding his ties, including Juror No. 174.  Juror No. 287 said "unusual tie" as Hrdlicka walked past him, but he did not recall if Hrdlicka replied and did not even know Hrdlicka's name.  Juror

No. 213 once asked Hrdlicka what was on his tie that day but did not remember if or how Hrdlicka responded. Juror No. 263 commented once that Hrdlicka had on a "curious tie." He responded with "nothing more than 'thank you' or an acknowledgment." Alternate Juror No. 157, who was seated after Juror No. 174's dismissal, also told Hrdlicka that she liked his light bulb tie. Hrdlicka did not respond. Every juror confirmed that their interactions with Hrdlicka did not affect their deliberations or ability to remain impartial about the case.

In *People v. Loker* (2008) 44 Cal.4th 691, a juror engaged in conversation with the deceased victim's father about both of them serving in the United States Marine Corps and the father's upcoming surgery. (*Id*. at pp. 754–755.) We held that the interaction, while misconduct, was harmless. In *People v. Jones* (1998) 17 Cal.4th 279, a juror asked the victim's mother if she was related to the victim, and a second juror told the victim's husband that a former neighbor said hello. (*Id*. at p. 309.) We held the communications were misconduct but not egregious, and counsel was not ineffective for failing to challenge the jurors' continued service. (*Id*. at p. 310.) In *People v. Stewart* (2004) 33 Cal.4th 425, a juror told the defendant's ex-girlfriend that she was beautiful. (*Id*. at p. 509.) We held the trial court did not err in denying the defendant's motion for a new trial on the basis of the misconduct.

Although Hrdlicka's engagement with Juror No. 174 was misconduct, the conduct in the present case is no more egregious than the conduct in these cases. The interactions between the jurors and Hrdlicka were minimal and unrelated to the case, with most of them focused on small talk around Hrdlicka's neckties, and the fairness of the trial was in no way affected by the misconduct. (See *People v. Miranda* (1987) 44 Cal.3d 57,

117–118 [verdict will not be disturbed when misconduct is of such a trifling nature that it does not appear to affect the fairness of the trial].) The trial court did not abuse its discretion when it denied defendant's motion for a mistrial based on lack of prejudice.

## B. Absence from Hearing

Defendant contends the trial court deprived him of his right to due process, right of presence, and a fair penalty trial by holding a hearing in his absence.

The jury began its penalty phase deliberations on Monday, April 26, 1999. The following Monday, on May 3, the trial court held a closed hearing. The court informed the parties that the previous Friday, Juror No. 12 contacted the bailiff and told him that she was contacted by an individual who identified himself as defendant. Defendant was not present at the hearing. The court expressed a concern for how the juror would feel if defendant were in the courtroom, and the court wanted to hear from her what exactly happened the previous Friday. Defense counsel agreed that defendant should not be in the courtroom.

The court questioned Juror No. 12 regarding the phone call. She explained that on Friday afternoon, she received a phone call and the person asked, "Is this (Juror 12)?" She said, "Who is this?" The caller said, "Well, I need to know if this is (Juror 12). Then I know." The juror said, "Well, this is." The called replied, "This is Charles." At first the juror thought the caller was her ex-husband, who was also named Charles, and that maybe something was wrong. She said, "Well who is this?" The caller again asked if she was Juror 12. She again said, "Well, who is this?" And he again said, "This is Charles." She said, "Charles who? Who is this?" The caller replied, "Are you

the (Juror 12) that is on the jury?" She asked the caller, "Is this Charles Ng?" He said, "Oh, I am sorry. I just wanted to tell you, you are very nice." The juror asked how he got her phone number, and he replied, "I had a friend help me." The juror told him that he could not call her and hung up. She called the bailiff to report the incident.

Juror No. 12 did not recognize the voice of the caller. She explained that she did not pay attention at first because she thought the caller was someone else. She said the voice sounded very quiet and like he had an accent, but she could not identify what kind of accent. The court asked her opinion on her ability to remain objective as a juror. She did not think it would be a problem and explained that the call had nothing to do with deliberations. She agreed not to tell the other jurors about the phone call.

The prosecution asked the trial court what time the phone call occurred. The bailiff said 3:30 p.m., and that he had contacted the jail to determine if defendant had been on the phone at that time. The sergeant he spoke with confirmed that defendant used the phone for two hours until approximately 3:30 p.m. The court told the parties that after the bailiff received the report from the juror, it ordered defendant not to have access to the telephone through the remainder of deliberations.

The court asked defense counsel if he wanted time to think about his position and get back to the court later. Counsel said he did not believe prejudice had been shown, and the jurors should continue to deliberate. The prosecution agreed. The court asked if they should bring defendant into the courtroom to apprise him of what happened. Defense counsel stated that he

would prefer to inform defendant himself, unless the court felt like it needed to do so. The court said that if it needed to inform defendant directly, it would have had defendant at the hearing and reiterated that "it was appropriate to have this hearing outside of his presence."

The court called Juror No. 12 back into the courtroom. The court told the juror that they did not know who exactly placed the phone call to her and asked if she could "totally disregard" the incident. The court reminded the juror that if at any point she believed she could no longer abide by the court's instructions to please let them know. The juror said that she would be fine, but if she did have a problem, she would let the court know.

The jury reached a verdict shortly after the hearing. Before the jury entered the courtroom, the court confirmed that defendant had been told about the closed hearing. Defense counsel confirmed that he told defendant. The court said, "You were not invited for several reasons. One is I was concerned that you would react one way or another; that would create problems which we avoided by not having you here. I didn't want to lose a juror without good cause. And all counsel agreed to the proceeding." Defendant replied, "Over my objection."

That evening, investigators from the Orange County Sheriff's Department searched defendant's cell and found Juror No. 12's home phone number. The investigation revealed that defendant knew the jurors' names, and Juror No. 12's phone number was listed in the phone book. Phone records showed that on the day the juror received the call, at 3:23 p.m., someone placed a three-minute call to her phone number from the "Module J vestibule" phone at the Orange County jail. The jail's

logs confirmed that at the same time, defendant was using that phone.

In defendant's subsequent motion for a new trial, he argued that the trial court violated his state and federal constitutional rights by excluding him from the hearing. In its opposition, the prosecution argued that defendant was barred from benefitting from his own wrongdoing. The court denied defendant's claim, noting that defense counsel waived defendant's right to be present at the hearing and, as the prosecution argued, he had no right to benefit from his own misconduct.

"Under the Sixth Amendment's confrontation clause, a defendant has the right to be personally present at any proceeding in which his appearance is necessary to prevent 'interference with [his] opportunity for effective cross-examination.' [Citations.] The Fourteenth Amendment guarantees the right to be present as a matter of due process at any 'stage . . . that is critical to [the] outcome' and where the defendant's 'presence would contribute to the fairness of the procedure.' " (*People v. Harris* (2008) 43 Cal.4th 1269, 1306.) We have previously held, however, that neither the state nor federal Constitution, nor any statutory requirement, provides a defendant with the right to be present at hearings or discussions outside the jury's presence "on questions of law or other matters as to which his presence bears no reasonable, substantial relation to his opportunity to defend the charges against him." (*Ibid.*; see *People v. Rogers* (2006) 39 Cal.4th 826, 855.)

Defendant had no right to be present at the hearing on his phone call to Juror No. 12. It is well settled that the removal of a juror is not a matter for which a defendant is entitled to be

present. (*People v. Harris*, *supra*, 43 Cal.4th at p. 1310; see *United States v. Gagnon* (1985) 470 U.S. 522, 527; *People v. Ochoa* (2001) 26 Cal.4th 398, 435–436.) Defendant now argues that if he had been present, he could have explained that he felt alienated by his counsel and the trial court, and that he responded to a smile from Juror No. 12 by reaching out to the one sympathetic person he saw in the courtroom. He contends he would have explained that he did not call to intimidate, frighten, or influence the juror. Defendant's reasons for calling the juror are irrelevant, however, as any contact between defendant and the juror was improper. (See *People v. Harris*, at p. 1310.) Defendant's absence from the hearing did not constitute error.

## C. Exclusion of Mitigating Evidence

### 1. *Skipper Error*

Defendant contends the trial court deprived him of his rights to due process and a fair penalty trial when it excluded mitigating evidence. Specifically, defendant attempted to elicit testimony from correctional officers regarding the behavior of other inmates as compared to defendant's behavior in prison.

The defense called several witnesses to testify regarding defendant's good behavior in prison, including Correctional Officers James Tinseth, Maurice Geddis, and Gerald Coleman. Tinseth was one of defendant's "handlers" at Folsom State Prison, which meant he assisted with restraining defendant during transports from the prison to the courthouse. Tinseth described the type of restraints used on defendant, including a "Martin chain," which ran vertically down defendant's back and then hooked into the leg chain. The officers also used a leather strap that pulled his arms toward his back and was secured by

a padlock. Tinseth testified that defendant was always compliant and courteous, and he never had any trouble with defendant.

Geddis testified that he was also assigned to defendant's team of security escorts. Like Tinseth, Geddis testified that defendant never refused a directive and was always compliant and courteous. Defense counsel asked Geddis, "There had been other inmates during your time that you did have trouble with; is that correct?" Geddis confirmed it was correct. Counsel asked if when another inmate wore the Martin chains, he would still "act out." The prosecution objected on relevance grounds, and the trial court sustained the objection.

Coleman testified that he worked in the Folsom State Prison library from 1991 through 1995, during which time he came into contact with defendant. When defendant wanted to use the library, two officers would escort him there. Sometimes Coleman would be one of the officers to escort defendant. Coleman testified that defendant never acted out or caused a problem while walking to and from the library. He was always polite and courteous. Defense counsel asked Coleman if he had ever feared for his safety while escorting other inmates. The prosecution objected on relevance grounds, and the trial court sustained the objection.

Defendant contends the trial court deprived him of his constitutional right to present mitigating evidence. He asserts the excluded testimony was necessary to show that he behaved well in prison because of his character, not because of the restraints.

In *Skipper v. South Carolina* (1986) 476 U.S. 1, the United States Supreme Court held that "evidence that the defendant

would not pose a danger if spared (but incarcerated) must be considered potentially mitigating. Under *Eddings* [*v. Oklahoma* (1982) 455 U.S. 104], such evidence may not be excluded from the sentencer's consideration." (*Id.* at p. 5, fn. omitted.) The erroneous exclusion of evidence pursuant to *Skipper* does not automatically require reversal, but instead is reversible unless it is harmless beyond a reasonable doubt. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1117; see *Chapman v. California* (1967) 386 U.S. 18.)

Defendant's argument fails on the merits. As described above, the defense presented extensive testimony from several witnesses, including Tinseth, Geddis, and Coleman, that defendant was a well-behaved inmate, listened to direction, and never acted out. The trial court sustained the prosecution's objections to defense questions concerning the conduct of other inmates in the officers' custody. Other correctional officers testified that defendant was a "class A inmate," quiet and respectful, and a model inmate. Without any obvious comparison to defendant, evidence regarding other inmates in prison was irrelevant to whether defendant would pose a threat when incarcerated, and defendant cites no law suggesting otherwise. The trial court did not exclude mitigating evidence under *Skipper* and did not abuse its discretion when it excluded the evidence that defendant now challenges.

## 2. *Racial Discrimination*

Defendant contends the trial court erred when it excluded evidence that he encountered racial discrimination while serving in the Marine Corps.

After defendant was arrested for breaking into the military armory in Hawaii in 1981, he escaped custody and fled

to California. Sergeant Bradley Chapline was in charge of defendant's guard detail once he was returned to custody in Hawaii. Chapline testified that defendant was hospitalized with a broken leg for several months at the army hospital before he could be transferred to federal prison. Chapline explained that he had several conversations with defendant while guarding him in the hospital.

Defense counsel asked Chapline if he ever learned that other guards had mistreated defendant while in the hospital. The prosecutor objected on hearsay grounds, and the trial court sustained the objection. He clarified that some nurses on duty reported incidents to him, and he in turn admonished other Marines that the incidents "better never happen again." When counsel asked if it was difficult for minorities to move up in rank in the Marines, Chapline opined that it would be difficult. Defendant had told Chapline that he believed his race prevented him from becoming a Marine officer.

On redirect, counsel attempted to elicit testimony that defendant may have experienced racism while serving in the Marine Corps. Counsel asked Chapline about injuries defendant sustained at the hands of other Marines when he was in the hospital. The prosecution objected, arguing that the question assumed facts in evidence, called for hearsay, and lacked personal knowledge. The court sustained the objection. Counsel asked Chapline if he had ever seen other Marines stabbing defendant in the feet with needles while he lay in the hospital. The prosecution objected because the question assumed facts not in evidence, and the court sustained the objection. Counsel asked Chapline if the Marines he admonished regarding defendant were Caucasian; Chapline confirmed that they were.

Defense counsel then asked, "With regard to the actual Marines that you had to admonish who had been guarding [defendant], did you see those Marines stabbing [defendant's] feet with these pins?" The prosecution again objected due to the question assuming facts not in evidence, and the court again sustained the objection.

After Chapline finished testifying and the court excused the jury for an afternoon recess, defense counsel sought further clarification. The court explained that his question "assumes that the latter part happened. You have to lay the foundation. Were you there during the second shift? No. If yes, what did you observe? Or, oh, I observed Marines sticking needles in his foot. That is how you get it in. You know he wasn't there or you would have got it in. There is a way to do it properly." Counsel replied, "Perhaps you are right, Judge."

Defendant argues that the trial court deprived him of due process and a fair penalty trial by excluding Chapline's testimony regarding "racial harassment and tormenting" by other Marines. He asserts this evidence was relevant to help explain why defendant broke into the armory and, after facing road blocks in the Marine Corps, why he may have attached himself to Lake. Defendant's argument is unavailing as the trial court did not exclude the evidence on relevance grounds but did so because counsel's questions lacked a proper foundation and assumed facts not in evidence.

Furthermore, the trial court did not err. As the court noted, Chapline did not personally observe any mistreatment by other Marines and only knew what had been reported to him by nurses. (See Evid. Code, § 702, subd. (a) ["the testimony of a witness concerning a particular matter is inadmissible unless

170

he has personal knowledge of the matter"].)  Chapline properly testified regarding his admonitions to the other Marines but could not testify regarding an incident he did not perceive himself.  Additionally, defendant was successful in admitting some evidence of racial discrimination.  Although the defense was unable to introduce evidence of specific mistreatment, Chapline did opine while testifying that it would be difficult for minorities to move up in rank.  Chapline also testified that defendant believed his race prevented him from becoming an officer and that the Marines he admonished for misbehaving were all Caucasian.  The trial court did not exclude competent evidence of racial discrimination or possible discrimination.[13]

---

[13]    Defendant makes a series of arguments concerning the exclusion of Chapline's testimony for the first time in his reply brief, asserting that:  (1) the evidence was admissible under Evidence Code section 1250, which provides that evidence is not made inadmissible by the hearsay rule when it is offered to prove the declarant's state of mind; and (2) the Eighth Amendment required the admission of the evidence (see *Green v. Georgia* (1979) 442 U.S. 95 [holding that a defendant's due process rights at a penalty trial are violated when a trial court excludes "highly relevant" hearsay testimony]; see also *People v. Eubanks* (2011) 53 Cal.4th 110, 150 [under *Green*, the proffered evidence must bear " 'special indicia of reliability' "]).  "It is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party." (*People v. Tully* (2012) 54 Cal.4th 952, 1075.)  These claims are thus forfeited. (See *People v. Rangel* (2016) 62 Cal.4th 1192, 1218–1219.)  In any event, we note that Evidence Code section 1250 and *Green* address the admissibility of evidence that would otherwise be excluded by the hearsay rule.  However, the trial court here excluded Chapline's testimony not solely on hearsay grounds, but also because the witness lacked personal knowledge and the questions assumed facts not in evidence.

### D. Instructional Error

#### 1. Lingering Doubt

During the penalty phase, the defense requested instructions on lingering doubt as a mitigating factor. The prosecution objected, arguing that such an instruction is not required under the federal or state Constitutions and the concept was adequately covered in other instructions. The trial court agreed and denied the defense's request but told counsel that he could argue lingering doubt to the jury. During closing argument, counsel argued that if the jurors had any lingering doubt about whether defendant was actually the killer, that should be given a substantial amount of weight when trying to decide the appropriate penalty.

Defendant now contends the trial court erred when it refused to instruct the jury on lingering doubt. We have repeatedly held that neither state nor federal law requires the trial court to instruct on lingering doubt and see no reason to revisit this holding now. (See *People v. Ramirez* (2021) 10 Cal.5th 983, 1030; *People v. Rivera* (2019) 7 Cal.5th 306, 346; *People v. Anderson* (2018) 5 Cal.5th 372, 425; *People v. Boyce* (2014) 59 Cal.4th 672, 708.)

#### 2. Aggravating Factors

The defense asked the court to instruct the jury that it could impose a life sentence even if the aggravating factors outweighed the mitigating factors. The prosecution objected, arguing this was a misstatement of law. The trial court agreed that the defense's request was inconsistent with controlling authority. Defense counsel asked if the prosecutor would object, and if the court in turn would sustain the objection, if he argued to the jury that they could still return a verdict of life without

the possibility of parole if they found the aggravating factors substantially outweighed the mitigating factors. The court confirmed that if counsel argued something inconsistent with the law, it would sustain an objection. The court told counsel, however, that he could correctly tell the jury that they are never *required* to return a verdict of death.

Defendant acknowledges that he is not entitled to an instruction that the jury can choose a life sentence when the aggravating factors outweigh the mitigating factors, and thus, his claim fails. (*People v. Morgan* (2007) 42 Cal.4th 593, 625–626; *People v. Kipp* (1998) 18 Cal.4th 349, 381; *People v. Medina* (1995) 11 Cal.4th 694, 781–782.) The trial court did not err when it refused to allow counsel to make such an argument.

### E. Judicial Bias

Defendant contends he was deprived of due process and fair guilt and penalty trials because of pervasive judicial bias and misconduct. Defendant asserts bias from three of the judges who oversaw proceedings: Judge McMartin in Calaveras County, Judge Fitzgerald in Orange County, and Judge Ryan in Orange County.

Defendant's claims lack merit. He fails to demonstrate the presence of misconduct or bias, let alone that "any judicial misconduct or bias was so prejudicial that it deprived defendant of ' "a fair, as opposed to a perfect, trial." ' " (*People v. Guerra* (2006) 37 Cal.4th 1067, 1112 (*Guerra*); see *People v. Maciel* (2013) 57 Cal.4th 482, 533.)

Defendant first asserts that Judge McMartin committed misconduct by manipulating the selection process to send the case to Orange County for trial and deliberately thwarted defendant's efforts for San Francisco to be considered as the

venue. As previously discussed, the court in Calaveras County did not err when it transferred the case to Orange County, nor did the court deliberately prevent the case from being transferred to San Francisco. Defendant, therefore, cannot establish that Judge McMartin committed misconduct or exhibited bias.

Defendant next asserts that Judge Fitzgerald was biased. Judge Fitzgerald was assigned to the case in October 1994, after it was transferred to Orange County. The Court of Appeal ordered Judge Fitzgerald disqualified from the case in February 1997. (*Ng, supra,* 52 Cal.App.4th 1010.) The Court of Appeal explicitly did not determine whether Judge Fitzgerald was biased, but rather, found that the interests of justice required a different judge to preside over defendant's proceedings. (*Id.* at p. 1024.)

The Court of Appeal's opinion stemmed from Judge Fitzgerald relieving Kelley and OCPD, following a *Marsden* motion in August 1996. One week later, defendant moved to reinstate OCPD as his counsel. The prosecution also filed a motion to vacate the earlier order. The court denied the request. Defendant sought a writ of mandate directing the trial court to vacate its order denying his motion and reinstate the public defender, which the Court of Appeal denied. We subsequently granted his petition for review and transferred the matter back to the Court of Appeal with directions to vacate the order denying mandate and to issue an alternative writ. (*Ng, supra,* 52 Cal.App.4th at p. 1015.)

After the appellate court issued an alternative writ, Judge Fitzgerald filed a return and a declaration explaining the reasons for his decision. (*Ng, supra*, 52 Cal.App.4th at p. 1015.)

The Court of Appeal held that with the exception of unusual circumstances, "the requirement of neutrality prohibits judges from having a stake in the outcome of the appellate decision in 'their' cases." (*Id.* at p. 1020.) The court found it would be inappropriate to consider the judge's return and its accompanying declaration. (*Id.* at pp. 1020–1021.)

The Court of Appeal held that the trial court abused its discretion by relieving appointed counsel and compounded its error by refusing to reinstate the public defender. (*Ng, supra,* 52 Cal.App.4th at p. 1023.)

In addressing previously filed petitions seeking review of orders denying motions to disqualify the judge, the appellate court noted that Judge Fitzgerald "had an unusual personal interest in handling the case." (*Ng, supra,* 52 Cal.App.4th at p. 1023.) As an example, the appellate court noted that in connection with a motion to change venue, Judge Fitzgerald said, " 'Candidly, this court wants to try this case. My ego tells me that I'm in a better posture than anybody around to do it with the experience I have had.' " (*Ibid.*) This comment and comments made by the judge in connection with *Marsden* proceedings, combined with facts disclosed in previous petitions, led the appellate court to conclude that Judge Fitzgerald should be disqualified. (*Ibid.*) As noted above, however, the court did not make a finding of actual bias but instead concluded, because of a potential for a perceived appearance of impartiality, Judge Fitzgerald should be disqualified. (*Id.* at p. 1024.)

The decision in *Ng* does not support a conclusion that Judge Fitzgerald exhibited misconduct or bias. A judge should be disqualified when "[a] person aware of the facts might reasonably entertain a doubt that the judge would be able to be

175

impartial." (Code Civ. Proc., § 170.1, subd. (a)(6)(A)(iii).) Disqualification, however, does not necessarily entail a finding of bias. (See *People v. Freeman* (2010) 47 Cal.4th 993, 996 ["a showing of actual bias is not required for judicial disqualification under the due process clause"].) As detailed above, the venue motions that Judge Fitzgerald presided over were correctly decided. Defendant, therefore, can point to nothing in the record to demonstrate that Judge Fitzgerald was biased or that his trial was unfair.

Finally, defendant contends Judge Ryan's evidentiary rulings consistently favored the prosecution, supporting an inference of judicial bias. His claim against Judge Ryan also fails. "[A] trial court's numerous rulings against a party — even when erroneous — do not establish a charge of judicial bias, especially when they are subject to review." (*Guerra, supra,* 37 Cal.4th at p. 1112.) And, as previously discussed, Judge Ryan's evidentiary rulings were not erroneous nor did they indicate bias against the defense.

## IV. OTHER ISSUES

### A. Challenges to Death Penalty Law

Defendant raises several challenges to California's death penalty law that we have considered and rejected. He provides no persuasive reason for us to reexamine the following conclusions:

The death penalty statute "is not invalid for failing to require (1) written findings or unanimity as to aggravating factors, (2) proof of all aggravating factors beyond a reasonable doubt, (3) findings that aggravation outweighs mitigation beyond a reasonable doubt, or (4) findings that death is the appropriate penalty beyond a reasonable doubt." (*People v.*

*Snow* (2003) 30 Cal.4th 43, 126 (*Snow*).) These conclusions are not altered by the United States Supreme Court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 or *Ring v. Arizona* (2002) 536 U.S. 584. (*People v. Simon* (2016) 1 Cal.5th 98, 149.) The high court's decision in *Hurst v. Florida* (2016) 577 U.S. 92, which invalidated Florida's capital sentencing scheme, does not invalidate California's law because our sentencing scheme is " 'materially different from that in Florida.' " (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1038; *People v. Rangel* (2016) 62 Cal.4th 1192, 1235, fn. 16.)

"Allowing the jury to consider the circumstances of the crime (§ 190.3, factor (a)) does not lead to the imposition of the death penalty in an arbitrary or capricious manner." (*People v. Kennedy* (2005) 36 Cal.4th 595, 641.)

"Comparative intercase proportionality review by the trial or appellate courts is not constitutionally required." (*Snow*, *supra*, 30 Cal.4th at p. 126.)

"California's death penalty law 'adequately narrows the class of murderers subject to the death penalty' and does not violate the Eighth Amendment. [Citation.] Section 190.2, which sets forth the circumstances in which the penalty of death may be imposed, is not impermissibly broad in violation of the Eighth Amendment." (*People v. Williams* (2013) 58 Cal.4th 197, 294.)

California's death penalty does not violate international law or international norms of decency. (*People v. Thomas* (2012) 53 Cal.4th 771, 837.)

## B. Cumulative Error

Defendant contends reversal is warranted because of the cumulatively prejudicial effect of the guilt and penalty phase

errors. We have assumed two errors — the court's failure to hold a hearing pursuant to section 987.05 and the admission of Gouveia's testimony — and found no prejudice from either; we further conducted a harmless error analysis as an alternate conclusion to two additional claims — the admission of Laberge's testimony and excluded defense testimony regarding Lake — and concluded that defendant suffered no prejudice. Thus, no cumulative effect warrants reversal.

## V.  CONCLUSION

The judgment is affirmed.

**GROBAN, J.**

**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**JENKINS, J.**
**GUERRERO, J.**
**POLLAK, J.** *

---

*       Presiding Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Ng

_____

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S080276
**Date Filed:** July 28, 2022

_____

**Court:**  Superior
**County:**  Orange
**Judge:**  John J. Ryan

_____

**Counsel:**

Eric S. Multhaup, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Rob Bonta, Attorneys General, Michael P. Farrell, Assistant Attorney General, Ward A. Campbell and Kenneth N. Sokoler, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Eric S. Multhaup
35 Miller Avenue, #229
Mill Valley, CA 94941
(415) 381-9311

Kenneth N. Sokoler
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA 95814
(916) 210-7751